UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID LEE, JR., | No. 1:15-cv-01774-LJO-JLT (HC) |
| Petitioner, | **FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| SCOTT FRAUENHEIM, | **[TWENTY-ONE DAY OBJECTION DEADLINE]** |
| Respondent. | |

Petitioner, along with co-defendants Corey Johnson and Joseph Dixon, were convicted for multiple murders and attempted murders committed in 2007 while participating in a criminal street gang in Bakersfield, California. Petitioner brings this habeas petition raising numerous claimed violations of his constitutional rights. As discussed below, the Court finds the claims to be without merit and recommends the petition be **DENIED.**

## I.    PROCEDURAL HISTORY

Petitioner was convicted in the Kern County Superior Court on March 20, 2009, of:

- *Count 1*: March 21, 2007, attempted murder of Edwin McGowan, involving the personal discharge of a firearm proximately causing great bodily injury, and committed for the benefit of a criminal street gang (Cal. Penal Code §§ 186.22(b)(1)(C), 187(a), 664, 12022.53(d), (e)(1)).

- *Count 2*: April 19, 2007, premeditated murder of James Wallace, involving the

personal discharge of a firearm proximately causing death, committed by an active participant in and for the benefit of a criminal street gang, and constituting one of multiple murders (Cal. Penal Code §§ 186.22(b)(1)(C), 187(a), 190.2(a)(3), (22), 12022.53(d), (e)(1)).

- *Count three*: April 19, 2007, premeditated murder of Vanessa Alcala, involving the personal discharge of a firearm proximately causing death, committed by an active participant in and for the benefit of a criminal street gang, and constituting one of multiple murders (Cal. Penal Code §§ 186.22(b)(1)(C), 187(a), 190.2(a)(3), (22), 12022.53(d), (e)(1)).

- *Count four*: April 19, 2007, premeditated murder of Baby Boy Alcala, involving the personal discharge of a firearm proximately causing death, committed by an active participant in and for the benefit of a criminal street gang, and constituting one of multiple murders (Cal. Penal Code §§ 186.22(b)(1)(C), 187(a), 190.2(a)(3), (22), 12022.53(d), (e)(1)).

- *Count five*: April 19, 2007, attempted murder of Anthony Lyons, involving the personal discharge of a firearm proximately causing great bodily injury, and committed for the benefit of a criminal street gang (Cal. Penal Code §§ 186.22(b)(1)(C), 187(a), 664, 12022.53(d), (e)(1)).

- *Count Seven*: August 11, 2007, attempted murder of Adrian Bonner, involving the personal discharge of a firearm proximately causing great bodily injury, and committed for the benefit of a criminal street gang (Cal. Penal Code §§ 186.22(b)(1)(C), 187(a), 664, 12022.53(d), (e)(1)).

- *Count eight*: August 11, 2007, discharge of a firearm at an occupied vehicle, involving the personal discharge of a firearm proximately causing great bodily injury or death, and committed for the benefit of a criminal street gang (Cal. Penal Code §§ 186.22(b)(1)(C), 246, 12022.53(d), (e)(1)).

- *Count nine*: March 2, 2007 – August 22, 2007, conspiracy to violate any or all of sections 186.22(a), 187, 211, and 245(a)(2), committed for the benefit of a

2

criminal street gang (Cal. Penal Code §§ 182(a)(1), 186.22(b)(1)(C).

- *Count Eleven*: March 2, 2007 – August 22, 2007, active participation in a criminal street gang (Cal. Penal Code § 186.22(a)).

See Pet. at 1; People v. Johnson, No. F057736, 2013 WL 5366390, at *1-2 (Cal. Ct. App. 2013). In addition, special circumstance and enhancement allegations were found to be true. Id. On May 1, 2009, Petitioner was sentenced to 3 consecutive life terms without possibility of parole, plus 196 years. Pet. at 1.

Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate District. On April 26, 2012, the appellate court reversed the conviction for conspiracy and noted several sentencing errors, but otherwise affirmed the conviction. Pet. at 2. Both Petitioner and Respondent sought review by the California Supreme Court. Petitioner's petition for review was summarily denied, however, the California Supreme Court granted Respondent's petition for review. Id. On July 18, 2013, the California reversed the Court of Appeal's decision regarding elements of the criminal gang participation enhancements. People v. Johnson, 57 Cal.4th 250 (2013). On September 25, 2013, the Court of Appeal issued a revised and amended opinion in light of the reversal from the California Supreme Court. Johnson, 2013 WL 5366390.

Petitioner also filed several petitions for writ of habeas corpus in the state courts. On August 5, 2014, he filed a habeas petition in the Kern County Superior Court. See Resp't's Answer, Ex. C. The Kern County Superior Court denied the petition in a reasoned decision. Id. He filed a second habeas petition in the Kern County Superior Court on December 12, 2014. See Resp't's Answer, Ex. D. The petition was rejected on March 16, 2015, for raising issues previously denied. Id. Petitioner then filed a habeas petition in the Fifth DCA on March 12, 2015, and the petition was summarily denied on July 10, 2015. See Resp't's Answer, Ex. E. Finally, he filed a habeas petition in the California Supreme Court which was summarily denied on November 10, 2015. See Resp't's Answer, Ex. F.

On November 24, 2015, Petitioner filed the instant petition for writ of habeas corpus in this Court. (Doc. No. 1.) Respondent filed an answer on May 16, 2016. (Doc. No. 27.) Petitioner filed a traverse to Respondent's answer on July 28, 2016. (Doc. No. 45.)

## II.    FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

I.    Prosecution Evidence

Events Surrounding March 21, 2007

Early on the morning of March 20, 2007, someone shot Venesta Grinnage's vehicle, which was parked in front of her home in the 4300 block of Deborah Street in Bakersfield. [FN4] Grinnage's son, Daniel Davis, frequented the house, although he did not live there. Multiple shell casings from three different semiautomatic firearms were found at the time of the street. Although no suspects could be developed, a neighbor reported seeing a burgundy Honda drive slowly by shortly after 3:30 a.m. and again about 15 minutes later. The car had tinted windows and she could not see inside it. About 4:00 a.m., she heard what sounded like numerous gunshots.

> [FN4]: All dates are in the year 2007 unless otherwise stated.

> Some of the law enforcement officers who testified had received promotions or retired by the time of trial. To the extent possible, we refer to them by the titles they had at the time of events.

> A number of peripheral actors in the case were regularly referred to at trial by their nicknames or monikers. For the most part, we use the same appellations for the sake of clarity.

> Last, exact addresses were given at trial.

Just after midnight on March 21, Bakersfield Police Officers Shaff and Williamson, both members of the police department's Special Enforcement Unit (also known as SEU or the gang unit) were dispatched to an address on Myrtle Street in response to a call in which the reporting party said he had been shot at and his vehicle had been hit with bullets. Upon arrival, Shaff contacted Lee, who reported he had been standing by his vehicle in front of a residence in the 800 block of Deanna Way, talking with some friends, when an older silver or green Jeep drove by and shots were fired at him and his friends. Lee said the incident occurred about half an hour before he called the police, and that he had left the area and gone home. Shaff noted that Lee seemed unusually vague in terms of information he was giving. For instance, he would not identify the friends who had been present, and he seemed very hesitant when Shaff asked for specifics about the other vehicle and its occupants.

There were what appeared to be bullet holes in Lee's vehicle, a 2000 Chevrolet Tahoe that belonged to his father. Shell casings and bullet fragments from at least one gun were found in the 800 block of Deanna Way, where Lee said the shooting had occurred.

As of March 21, the area of Monterey and Inyo in Bakersfield was known to SEU

---

[1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

4

officers as an area that was controlled by the Bloods criminal street gang, a group that was associated with the color red. The Country Boy Crips, who were associated with the color powder blue, were active rivals of the Bloods at the time. The Bloods had somewhat of an alliance with the Westside Crips, and were not actively quarrelling with the Eastside Crips. The corner was a known narcotics location, with sales being made out of the apartment complex there. The territory of a local Hispanic gang, which also sold narcotics, began nearby.

Around 6:45 that evening, Edwin McGowan was talking to friends outside the apartments when he heard some shots. He tried to run, but fell, having been struck. He saw a male wearing a burgundy hoodie shooting a little gun over the top of a car. When McGowan fell, the person ran behind him and shot him two more times, then took off running. McGowan could see the eyes and upper nose of this person, who was not wearing a mask. McGowan denied ever having seen defendants.

Officer Meek interviewed McGowan in the emergency room. McGowan described the shooter as a tall, light-skinned African-American male, 17 to 21 years old, wearing a red hooded sweatshirt, dark pants, a dark ball cap, and clear glasses. Meek confirmed that McGowan was certain the race was African-American and not Hispanic. When asked, McGowan said he would be able to identify the person if he saw him. [FN5]

> [FN5] McGowan denied telling Meek that a light-skinned African-American male shot him. Rather, he told Meek the shooter could have been Hispanic or "a bright-skinned" male. McGowan told the grand jury that the shooter was a very light-skinned person, but he could not tell his race. McGowan did not consider any of the defendants to be light-skinned. They all appeared to be African-American to him.

On October 4, Bakersfield Police Detective Darbee showed McGowan a photographic lineup that included a picture of Johnson, whom Darbee considered to be light to medium-skinned. McGowan said he did not recognize anyone, and did not know who shot him because the person had a hoodie over his face. When confronted with the fact that he had told Meek he would be able to identify the shooter, McGowan was hesitant to answer and asked if Darbee knew what would happen to his family if he were to identify anyone or testify against anyone in court.

At the scene, adult-sized footprints, with a stride length suggesting the person had been running, led from the area in which McGowan had lain in front of one of the apartments, toward where a hole had been cut in the chain-link fence at the far corner of the parking lot. [FN6] Three spent .25-caliber shell casings were found near the door of the apartment where McGowan had lain, and another was recovered from the parking lot. All four had been fired from the same gun.

> [FN6] A canal ran parallel to Monterey Street about a block away. A traversable alleyway ran along both sides of the canal.

All told, McGowan was struck three times in the back. He suffered major abdominal injuries that necessitated multiple surgeries. Taken together, his injuries were life-threatening.

Sometime between 8:00 p.m. and 10:45 p.m. on March 22, Michael Wilcox was inside his home in the 4200 block of Deborah Street, when he heard six to 10 gunshots. Looking out, he saw a person, who appeared to be in the area of the

5

Grinnage house, shooting at a van that was driving away. The van was white with blue trim, and Wilcox had seen it before in the neighborhood. The driver was an African-American male; Wilcox could not tell if anyone else was in the vehicle.

Around 10:45 p.m., Jorge Garcia, who lived in the vicinity, was cleaning his garage when he heard around three gunshots. Before that, there had been some males behind his house, drinking and playing loud music. When he heard the shots, he went to the back to see if they were having a fight, but nobody was around. Garcia returned to cleaning the garage with the door open, then Lee walked in, said he had been shot, and asked Garcia to give him a ride around the corner. Lee had been shot in the left arm and the right hand and fingers. Garcia took him to the location in the 800 block of Deanna Way at which Lee's vehicle had previously been shot. The people there called the police and an ambulance.

Bakersfield Police Officer Hernandez responded to the scene. At the same time, the Kern County Sheriff's Deputies Chandler and Moreno were responding to a report of "an illegal shooting" in the 4300 block of Kenny Street, one street east of Deborah Street. [FN7] Chandler attempted to talk to Lee, but Lee did not respond to any of Chandler's questions. Lee was not in possession of a handgun.

> [FN7] The 4300 blocks of Deborah, Kenny, and Eve Streets are in a county pocket; hence, the different law enforcement jurisdictions.

Investigation revealed broken automobile glass and what appeared to be part of an automobile window frame near the Grinnage house. On the east side of Deborah Street were a number of spent shell casings. Some were grouped in one place, while two were apart from the others. Eight had been fired from the same gun, while one was from a different firearm — the same firearm as some of the shell casings recovered from the March 20 shooting of Grinnage's vehicle.

Chandler and Moreno contacted Lee in the hospital emergency room. Told shell casings had been found in the 4300 block of Deborah Street, Lee said he had been walking southbound in the 4300 block of Deborah Street, when he saw subjects in a green 1995 or 1996 Jeep pull up alongside him. He saw a flash and heard five to six shots. He described the route he ran before reaching Garcia's garage. A blood trail was found in that area, but no weapon.

Events Surrounding April 19, 2007

As of April 19, James Wallace resided with his mother, Kathie Oats, not far from McNew Court in Bakersfield. Dixon's mother and Wallace's father, who lived on Watts Drive in a part of town called the Country, were cousins, although Oats believed Dixon and Wallace had only been introduced once. Wallace had never been arrested and was not in a gang.

On April 19, Wilma Shaw, the aunt of Wallace's best friend, held a barbecue in the front yard of her residence in the 1300 block of McNew Court. Her guests, who included Wallace and her nephews, Anthony and Othelon Lyons, were outside off and on most of the day, talking and playing music in the front yard. [FN8] When it began to get dark, Shaw went inside to attend to her grandchildren. Not long after, she heard multiple gunshots.

> [FN8] For the sake of clarity, we refer to Anthony and Othelon Lyons, and Mikeshiea and Myeshia Herring, by their first names. No disrespect is intended.

Anthony had been at his aunt's house all day, as he usually was during this time period. Just before 8:00 p.m., he was in the front yard, hooking up music with his cousin, Curtis Miller, in Miller's Tahoe. The vehicle was parked in the driveway of Shaw's apartment complex. Helping him were his younger brother, Othelon, and Wallace. At some point, another cousin, Albert Darrett, arrived with his girlfriend in a black Tahoe and parked on the wrong side of the street.

Anthony went up to the driver's side of the vehicle to talk to Darrett, and leaned in as they conversed. Anthony was moving away from the vehicle when he saw a tall person, weighing about 200 pounds, in the middle of the street. The person, who was dressed all in black, started shooting toward the house. Anthony only saw one person, and could not tell if it was a man or a woman or the person's race, because the person had on a hoodie with the hood up. [FN9]

> [FN9] Anthony had no vision in his right eye, having been shot in 2004. He was also grazed in the head in 2005. His older half-brother, Deshawn Peterson, was shot and killed on Feliz Drive about four years earlier. Anthony had met Johnson, who was Peterson's cousin, one time about six years earlier. Anthony was a child when he last saw Johnson, and would not recognize him if he saw him again. He did not see Johnson on the night of April 19, although he had heard that Johnson used to cut people's hair in the area.

At some point, Anthony was shown photographic lineups containing Johnson's and Lee's pictures. Anthony did not identify either defendant as one of the shooters. He said it was dark and he did not get a good look at the people who shot him.

Anthony ran toward the back door of Shaw's residence. He believed Wallace was by Miller's truck, and Miller was inside the truck. Wallace was running ahead of Anthony toward the house, then Anthony saw Wallace fall down. Anthony ran through the back entrance and out the front. Wallace was on the front porch, lying on his stomach on the step in a pool of blood.

Anthony believed he heard about five shots. He was struck above the right hip. The bullet remained in his body at the time of trial, as he refused to have it removed for fear of possible complications. [FN10]

> [FN10] Sheriff's Sergeant Marshall interviewed Anthony at the hospital on the evening of the shooting. Anthony related that he saw a Black male, about five feet eight or nine inches tall, wearing a black hoodie, walking from west to east across the street near a white van. The shooter was by the white van, and when the shooting started, he ran. He was in the parking lot of the apartment complex when he felt himself get hit with a bullet. When Marshall explained that he really needed the bullet as physical evidence, Anthony agreed to have an elective procedure so it could be retrieved. He did not express any hesitation about having the surgery.

As of April 19, Albert Darrett resided in Bakersfield with his girlfriend, Vanessa Alcala, and her mother and child. Alcala was pregnant with Darrett's son.

Darrett worked in oilfield construction. [FN11] On April 19, he needed to cash his paycheck, so he picked up Alcala and they drove in his black Chevrolet Tahoe to the store on the corner of Feliz Drive and Cottonwood Road. After he cashed his

check, they went south on Cottonwood Road to the first street, McNew Court, and went to Shaw's house. Shaw was Darrett's aunt, and it was his habit to stop by her house for a few minutes every day after work. On April 19, family and friends were in her driveway. Curtis Miller was one of the cousins who was there. Like Darrett, Miller drove a black Chevrolet Tahoe, which was parked at Shaw's residence.

> [FN11] Darrett admitted being booked into the Kern County jail four days before the shooting, and stating at that time that he associated with the Crips. He denied saying, however, that he wanted to be kept away from Country Boy Crips. He initially denied, but then admitted, once having a tattoo on his arm that read "805 ESC," meaning the area code for Bakersfield and Eastside Crip. He was about 15 years old when he got the tattoo. He was older by the time of trial and not in a gang, although he knew people who were in the Eastside Crips.

Darrett pulled over on the wrong side of the street (facing west) next to the driveway, left his vehicle running, and started talking to his cousin, Anthony, who was at the driver's side door. Alcala remained in the passenger seat. Darrett and Anthony conversed for a couple of minutes. It was light out, but getting dark. Darrett saw two people walking up the opposite side of the street, headed in the direction of Cottonwood Road. They were about halfway down the block when he first saw them, and he did not pay much attention to them. He did not see either of them get out of an automobile or come out of a house, and he saw nothing in either one's hands.

Darrett continued to talk to Anthony, then glanced at the two and saw them crossing the street in a diagonal direction toward him. They crossed the street together, then came up to the car and spread out so they were a couple of feet apart. One was toward the passenger's side of the vehicle, while the other was right in front of it. Both were no more than five feet from the vehicle, and both then started shooting. One shot toward the apartment complex, while the other shot toward the vehicle. Darrett tried to duck. He did not hear anything from Alcala or see what she or anyone else did.

After the shooting stopped, Darrett saw the two men running back in the direction from which they had come. Although he did not see their faces, he believed they were African-American. They appeared to be around 5 feet 10 or 11 inches tall, and were thin. Although Darrett could not tell their approximate ages, he believed they were younger than him. [FN12] Both were dressed all in black. At least one, and possibly both, wore a black hooded sweatshirt with the hood pulled over his head. Darrett tried to run them over, but was unsuccessful because they ran back the other direction, toward Cottonwood Road. They separated, with one running north toward Feliz Drive, and one running south toward Cannon, via the dirt alleyway next to Shaw's apartment. Darrett did not see either of them taking off their clothes or trying to jump a fence to get away.

> [FN12] Darrett was 31 years old as of December 19, 2008. Dixon was between five feet six and five feet seven inches tall.

Halfway up the block, Darrett turned to look at Alcala. She was bleeding and unresponsive, and he realized she had been shot. He drove her to Kern Medical Center. He did not see either of the shooters exit onto Feliz Drive or any cars leaving or trying to flee, but he was not really paying attention.

8

At 7:58 p.m., the Kern County Sheriff's Department received a 911 call from the McNew Court address, reporting a shooting. Senior Deputy Lostaunau arrived four minutes later, and the helicopter and other deputies shortly after that. Lostaunau, who was in the gang unit at the time, had driven down several of the streets in the area before the shooting was reported, looking for people to contact or anything that appeared to be out of the ordinary. He did not come across any parked car containing three African-American males or make contact with a group of three African-American males on foot. He did not see anybody jumping fences or running, or any vehicle fleeing at a high rate of speed.

Lostaunau parked a few feet west of the driveway into the apartments and found empty cartridge casings on the ground at his feet when he got out of his car. [FN13] He also smelled gunpowder and saw a person down on the ground in front of the apartment. He could hear screaming coming from the apartment.

> [FN13] Five spent .38-caliber Super Plus P shell casings were found. That kind of ammunition normally is used in semiautomatic firearms. No fingerprints were found on the casings. The core of a round of jacketed ammunition was found in the front passenger side door of Darrett's vehicle. The spent shell casings found on McNew Court were fired from the same firearm. A partial fingerprint, which could not be identified when compared to the prints of defendants, Darrett, and Alcala, was found on the rear passenger window exterior.

Detective Armendariz investigated a number of vehicles at or near the scene of the shooting. None were registered to or associated with any defendant. The white van parked across the street and to the west of Shaw's residence belonged to the Fuentes family.

Lostaunau approached the apartment and asked what happened and who did it. Someone inside yelled that it was a Black male, and Lostaunau broadcast that over his radio. He then started attending to Wallace. When he put his hand on Wallace's back, he felt it rise at least once with a breath. Within seconds, however, Lostaunau could feel no more breathing and was unable to find a pulse. Deputy Adams, a former paramedic, determined Wallace was deceased.

Around 8:00 p.m., Leon Reyes was asleep in the back room of his house on the south side of McNew Court, in the same block as Shaw's residence, when he heard a racket at the fence separating his front yard from his back yard on the west side of the house. He stepped out onto his back porch and saw someone jump the fence separating his back yard from his neighbor to the south. He could not see who it was, but the person could have been wearing dark clothing.

Reyes immediately went to the front yard to check on his car. As he did, he saw Deputy Ollague going down McNew Court. Reyes informed Ollague that a subject wearing white tennis shoes and dark clothing had just gone over his fence. Ollague and a K-9 deputy searched the front and back yards, but found nothing.

One of the units responding to the scene was the helicopter, Air One. It did not report anyone who appeared to be fleeing the scene, although it did report a subject walking on Feliz Drive near Cottonwood Road, a location one block north of the shooting and east of where the dirt alley from McNew Court came out onto Feliz Drive. The subject appeared to be wearing dark clothing and white shoes. Contact was made with this person, a teenager, who was searched, questioned, and released.

Just before 8:00 p.m. on April 19, Rebecca Martinez, who lived in the 1200 block of McNew Court, heard five to six gunshots, a scream that sounded female, and tires "peeling out." Martinez called 911. When Sheriff's Sergeant Rennie contacted her, she pointed him to the house directly across the street, where a large dog was barking near the east fence line. Martinez suggested Rennie check that yard, because the residents were not home and the dog rarely barked.

Rennie checked the house and saw that it appeared to be secure. When he looked under one of the vehicles parked in the driveway of the house immediately to the east, which was across the street and four houses down from the location of the shooting, however, he saw a small pile of dark clothing that consisted of a dark-colored baseball cap bearing the Boston Red Sox logo (a red B), a Nike brand U.S.A. Basketball Michael Jordan jersey, a dark blue or black Navy-style Volcom-brand pea coat, and a beige or tan American Dawn-brand smock-type shirt. A Samsung cellular telephone was found in one of the coat pockets. The clothes did not belong to anyone in that household, and had not been there earlier that evening. [FN14]

> [FN14] From March 16 through April 12, Johnson attended Bakersfield Barber College. Students were required to wear a tan, short-sleeved smock. The school generally issued students a Brick McMann-brand smock with an American Dawn logo.

Following their arrests, DNA samples were obtained from defendants and compared to DNA extracted from various places on the items of clothing. All three defendants were among the five or more contributors to the DNA found on the coat. Because of the number of contributors, the astronomically rare frequencies (probability of finding that genetic profile in the general population) typically found with a single-source genetic profile were not obtained. Thus, for example, although Johnson was included as a contributor to the mixture found on the coat collar, approximately one in 25 people could also have had the same profile and been contributors. The frequencies were similarly common with respect to Lee and Dixon. Where such common frequencies were obtained, Gary Harmor, the senior forensic serologist at the Serological Research Institute who conducted the DNA analysis in this case, could not say with certainty that a particular defendant touched the particular item.

DNA extracted from various places on the smock was also a mixture of contributors, with all three defendants included. Frequencies again were common, except with respect to the three-contributor mixture found on the inside front collar. Johnson's genetic types showed up strongly enough that it could be determined only approximately one out of every 1.1 million people would have genetic types consistent with what was found in the evidence compared to Johnson.

DNA extracted from the jersey was also a mixture of contributors. Lee was excluded as a possible contributor. Dixon could not be excluded. Johnson was included as a possible contributor; with respect to the mixture found on the inside front collar, only one in 8.8 million people could have the same types. A frequency calculation of that magnitude was quite significant where a mixture was concerned.

DNA extracted from the sweatband of the cap was a mixture of at least four contributors. Johnson could not be excluded as a contributor, but the statistical analysis showed that approximately one in 1144 persons would have a type similar

10

to that contributor. Lee and Dixon were excluded as contributors to the DNA on the baseball cap.

Senior Deputy Little contacted Othelon at the scene. After learning that Othelon had witnessed some of what happened, Little took Othelon to his patrol car, activated his tape recorder, and took his statement. Othelon was cooperative.

Othelon told Little that he was sitting in the backseat of his cousin's truck, eating and hooking up music, when his cousin Darrett and Alcala pulled up. They were facing west, and Anthony, Miller, and Wallace were standing by the driver's side, talking to Darrett. Othelon heard shots. He opened the door and looked back, and saw one of the assailants jump the fence into a field. This person was wearing a black hoodie with the hood up, and a white Pro Club shirt over the black hoodie. He was African-American, 18 to 20 years old, around six feet tall and 180 to 185 pounds, and with a dark complexion. Othelon did not see this one with a gun. The other one ran down the alley. He was dressed all in black. He had a handgun pointed toward Shaw's house and was running southbound. He was African-American, 18 to 19 years old, about 5 feet 10 inches tall, weighed 160 or 165 pounds, and was dark-complected. One of the two had a "punk" hairstyle, a "short bush [A]fro." [FN15] The gun was all black and sounded like a nine-millimeter. Nothing was said before the shooting started. After, everyone ran into the house. Wallace only made it to the porch.

> [FN15] Little was in contact with Johnson sometime after the shooting. Johnson did not have an Afro, nor was a small Afro wig found. Little also saw Dixon two days after the McNew Court shootings. There was no indication Dixon shaved or cut his hair in the preceding couple of days, nor were any wigs found on him.

Othelon related that he did not see any cars come up and stop anywhere in the area before the shooting started, and that he did not notice the shooters until after they had stopped shooting. Othelon estimated he heard at least eight shots, and that it sounded like they all came from the same gun. He did not recognize either of the assailants, although he believed he would probably recognize them if he saw them again. [FN16]

> [FN16] At trial, Othelon testified that just before the shooting, he was sitting in Miller's truck, installing stereo speakers. He further testified that the only time he ever saw Dixon was when they both were in prison sometime after the shooting, but the two were in different locations and never met. Beyond that, Othelon claimed that he was unable to remember anything, did not want to testify, and was not going to identify anyone. He did not remember talking to Little or what he told the grand jury.

Kern County Sheriff's Senior Deputy Pratt spoke to Othelon on February 1, 2008, while Othelon was in prison. Othelon admitted being a gang member. He said he was Eastside or Stroller Boys, and that at the time of the shooting, things had been "pretty tense" between Eastside and the Country. Pratt again talked to Othelon on December 10, 2008, after Othelon paroled, with respect to a rumor Pratt had heard about Othelon being threatened by Dixon while in prison. Othelon denied being threatened and said that if Dixon had threatened him, Othelon would have "taken him out." Othelon told Pratt that he used to live in the Country and knew Dixon from his childhood, when they would ride dirt bikes together. Othelon said Dixon told him, as kind of an apology, "I didn't know it was your auntie's house."

11

When brought into the hospital, Alcala was in a deep coma. She had a penetrating injury to the posterior portion of the occipital area of the brain, with the entry site on the right lower back portion of the skull and the bullet's direction of travel upward to the left, and back to front. There were bone and metallic fragments in her brain. She died during surgery performed in an attempt to control her continued rapid bleeding. The cause of death was gunshot wound of the head. Alcala was pregnant with a boy whose gestational age was approximately 12 to 14 weeks. The fetus was medically healthy and died as a result of the mother's gunshot wound to the head.

Wallace suffered an entrance gunshot wound to the right side of his chest, underneath the armpit, with an exit wound in the left shoulder area. The bullet traveled right to left and slightly upward. The absence of soot or stippling indicated the weapon was more than three to four feet from him when the shot was fired. The cause of death was gunshot wound of the chest. As the bullet injured internal organs and major vasculature of the heart, he lived a matter of a minute to minutes after he was shot.

The day after the shooting, Marshall and Little began investigating the Samsung cell phone found in the coat pocket. Marshall ultimately was able to determine the phone's number. At about 2:00 p.m., the phone rang, and the caller asked for "Dodo." Little checked some law enforcement databases and discovered that Dixon used the moniker Dodo. Little obtained photographs of Dixon maintained by law enforcement. They revealed that Dixon bore tattoos related to the Country Boy Crips and its Watts and Lotus clique. There were photographs of Dixon stored in the phone's memory. The screensaver for the phone read, "Watts wit it."

Further investigation into Dixon led Little to an apartment in the 2600 block of Chandler Court, Bakersfield, which was the residence of Myeshia Herring. Myeshia related that Dixon had called her and said he needed a place to stay because of some parole issues. She texted him the address. He moved in Wednesday, April 18; she did not see him at all on Thursday, April 19; they left together on Friday, April 20; when she got back early Saturday morning, he was not there, but he was there when she got up later that day; later on Saturday, he left with Myeshia's friend, Gina Stewart, in a white 1990's Chevrolet Caprice. Little examined Myeshia's cell phone, which contained the number of the Samsung cell phone found in the coat pocket in the address book under the name "friend."

Little told Myeshia to tell Dixon to call Little when she saw Dixon. About three hours later, Dixon contacted Little and then voluntarily came to the sheriff's office. Little took identifying photographs and more detailed photographs of Dixon's tattoos. Dixon, who was wearing dark blue pants and light blue boxers, was allowed to leave after he was photographed.

On April 25, Little interviewed Myeshia again. [FN17] Myeshia reiterated that Dixon needed a place to stay, and she simply replied by text message to whatever number he used to contact her. Dixon moved into the apartment Wednesday and spent the night. Thursday, the night of the McNew Court shootings, he was at the apartment in the daytime, but not at night. When Myeshia woke Friday morning, Dixon was not there, but he did spend the night Friday. Myeshia related that she had Dixon's number stored in her phone as "friend," and that he had grown suspicious of her after Little interviewed her the first time.

> [FN17] At trial, Myeshia either denied, or testified she did not recall, telling Little anything about Dixon during the interview. A video recording

of the Interview was shown to the jury.

Myeshia related that her nickname was "Messy 1," and that she had known Dixon since they were in junior high school. She said she saw Dixon on the day he got out of prison. With respect to the Samsung cell phone found in the coat pocket, Myeshia related that her sister Mikeshiea gave the cell phone to Dixon shortly after his release from prison. Myeshia said that every time she called that phone, Dixon answered.

Myeshia related that about a week before this interview, Dixon called Myeshia from a number she did not recognize. When she asked him about why he was calling from that number, he said he did not have his other phone because he had lost it. When she asked how he lost it, he told her not to worry about it.

Myeshia said she had known Johnson for several years. He had a girlfriend who was Hispanic and several years older than him. Myeshia said she had never known Johnson and Dixon to be close. Dixon was always by himself or with "the girls."

Meanwhile, Marshall obtained a search warrant for the subscriber information and tolls for the Samsung cell phone found in the coat pocket. Records listed the phone's subscriber as Dominique S. Clayton, with an address in the 4400 block of Balboa Drive, Bakersfield. The phone was activated on March 10. On the evening of April 27, Rennie and Little went to an apartment in the 4400 block of Balboa Drive — the same street address as the subscriber of the phone found in the coat — to interview Mikeshiea. Mikeshiea's middle name was Dominique, and she had a child by Gary Clayton.

Mikeshiea gave Little and Rennie permission to enter to look for Dixon. They did not find him. Mikeshiea denied knowing anyone named Dominique Clayton or ever giving Dixon a cell phone, although she admitted knowing someone named Dodo and identified Dixon's photograph.

Little examined Mikeshiea's cell phone. The screen read "Messina #2." When he inquired of Mikeshiea, she said that she and her sister Myeshia used the names "Messy 1" and "Messy 2." Mikeshiea said she was Messy 2, while Myeshia was Messy 1. Little found no reference in Mikeshiea's phone's contents to the number of the Samsung cell phone found in the coat pocket or to the name Dodo. There was, however, a number for "Pook," whom Mikeshiea identified as Columbus Holford and with whom Little was familiar. [FN18]

> [FN18] Mikeshiea testified at trial that she and Myeshia never went by the nicknames Messy 1 and Messy 2. On Mikeshiea's MySpace page, however, she referred to herself as Messy, while people who posted messages to her referred to her as Messy or Messy 2. At trial, Mikeshiea testified that she had never heard of or called the number of the cell phone found on McNew Court and did not know Dixon personally, although she knew him to be a friend of her sister. She denied ever giving him a cell phone.

Myeshia also denied telling Little the things to which he testified. She testified that she had only known Dixon, whom she knew as Dodo, for a couple of years. Although she was aware he went to prison, she did not meet with him the first day he got out. She did not know if Dixon had a cell phone. She and Mikeshiea did not help him get that phone. Myeshia had seen Johnson and knew who he was, but had not spoken to him. Myeshia knew Lee, as he had lived on the same street as her grandmother, and he and Myeshia went to the same church. However, she denied

ever talking to him. Myeshia admitted allowing Dixon to use her address as a mailing address, but denied that he ever moved in with her. She denied ever texting Dixon her address.

The phone found at the scene listed Messy 1 and Messy 2 as the first two contacts in its address book. A text message stored in the phone from Messy 2, dated April 21, read, "Friend, are you okay? Call me. It's important. Please call me." Another text message in the phone, dated April 16 and from Messy 1, gave an address in the 2600 block of Chandler Court. The address, which was the same as that determined to belong to Dixon, was Myeshia's apartment. One of the text messages from Messy 1 was directed to Dodo. One of the texts, dated March 27, read, "F-u-c-c U." Kern County Sheriff's Senior Deputy Pratt had seen that spelling in the course of gang investigations. According to some people, "CK" is not used because it stands for "Crip Killer." According to others, "CC" stands for "Country Boy Crips."

Cell phone records showed calls between Dixon's phone that was found in the coat pocket at the McNew Court crime scene and Mikeshiea's and Holford's phones. Records further showed a series of eight calls, beginning at 7:19 p.m., made from Dixon's phone to a number determined to belong to Lee's cell phone. A search warrant was obtained, and records seized, for Lee's phone number.

Cell phone and cell tower records for Dixon's phone showed a grouping of calls occurring in the vicinity of the cell phone antenna with coverage of the McNew Court area, from 7:14 p.m. through 7:45 p.m. The first six were made on the antenna consistent with the shooting scene in the 1300 block of McNew Court. The seventh call, which was made beginning at 7:45 p.m., was almost four minutes long. It began on the antenna consistent with the 1300 block of McNew Court, but ended on the antenna consistent with the 1200 block of McNew Court. The eighth call did not register on an antenna, which was consistent with the phone being powered off, either intentionally or because the battery died. This last call was an incoming call from Lee's phone that occurred at 7:54 p.m. Records further showed activity that was consistent with Dixon's phone being in the area of Inyo and Monterey at 6:45 p.m. on March 21.

Records for Lee's phone showed that when the 7:19 p.m. call was received from Dixon's phone, Lee's phone was north of Highway 58, which in turn was north of McNew Court. By the time the 7:25 p.m. call was received, Lee's phone had moved south of Highway 58, in an area covered by the antenna that had coverage of the McNew Court vicinity. The third call from Dixon's phone to Lee's phone occurred at 7:40 p.m. Dixon's phone was on the antenna that encompassed the 1300 block of McNew Court. The next incoming call was the nearly four-minute one; Lee's phone was still on the same antenna. The outgoing call at 7:54 p.m. was moving away from that antenna. The next call, made at 8:02 p.m., which was after the shootings were reported, was from the antenna that covered Cottonwood Road and Highway 58. The phone was probably north of the highway at the time; the call was outgoing to a number associated with Joseph Gage, whose moniker was "Gage." Dixon's phone had contact with that number before the shootings.

Events Surrounding August 11, 2007

Sometime after 9:00 p.m. on March 25, Adrian Bonner was getting a tattoo at a tattoo parlor in the vicinity of H and 20th Streets, in downtown Bakersfield, when Lee and a light-skinned, green-eyed Black male came in. Bonner knew of Lee, although he did not know him personally, because each had once dated Saleta

14

Roseburr. Bonner last saw Lee about a month before Lee walked into the tattoo parlor.

When Lee walked in, he and Bonner made eye contact, and Lee acknowledged the people he knew there. He asked Bonner's female friend if this was her "dude." When she said yes, Lee talked a little more and then walked back outside.

Lee was outside a minute or two. Bonner did not know what he was doing. Lee then walked back inside, went up to Bonner, and asked if Bonner was a Blood. He also said something like, "[T]his Little Gunner Loc from South Side Crip. I just want you to know where you're at." Bonner was aware the Bloods were a criminal street gang and that their color was red. He did not believe he was wearing any red that night.

The tattoo artist said it was a place of business and that they did not have to worry about any of that there. The situation caused Bonner to start feeling nervous, and so he asked for a cell phone so he could call a family member and let that person know his whereabouts. His girlfriend handed him her phone, and he dialed all the relatives he thought would be home, but got no answer.

During this time, Lee produced a cell phone and started showing everyone the pictures on it and telling them to look at what was done to his hand, which was bandaged, and his truck. Curious, Bonner asked to see. He saw a picture of injuries to Lee's finger, and of a truck with bullet holes in the windshield.

The artist was still doing Bonner's tattoo, and Lee went outside and came back in a couple more times. At some point, one of the other males said, "your homeboy Rifle's here." Lee walked outside, then returned a few seconds later with Johnson, whom Bonner had never seen before. Lee sat down, but Johnson kept walking in and out of the parlor and looking at Bonner in an awkward kind of way. By this point, Bonner was feeling very intimidated.

When the tattoo was finished, Bonner got up, shook the artist's hand, and paid him. Lee was sitting on the couch a few feet from Bonner, talking about how his pain medicine had him tired. Bonner also shook another male's hand. He then extended his hand to the third male, but that person just looked at him and said, "nah, Watts." [FN19] Bonner knew what this meant and that Watts was located in the Country.

[FN19] Neither of these males was Dixon, who was not in the tattoo parlor.

Bonner turned to leave. As he was on his way out, however, Johnson, who was standing in the doorway, struck him in the face with his fist. The person to whom Bonner had extended his hand also started hitting him. Both Johnson and the other man struck Bonner multiple times. Dazed and almost unconscious, Bonner tried to cover up as he lay on the floor of the tattoo parlor, being hit and kicked. He did not know where Lee was.

At some point, the blows stopped. Bonner got up and ran. He could hear voices coming from the alley, threatening to get him and kill him. He ran until he felt he was a safe distance away, ending up a couple of blocks away at a men's shelter. He went inside and stayed there for 45 minutes to an hour, then one of the residents was able to contact Bonner's girlfriend. She took him to his cousin's house, and Bonner contacted his father. Although Bonner did not give a statement to police that night, his father did.

Bonner was not a Blood, but he had friends and family members who were. He associated with Bloods "all the time." The Eastside, Westside, and Country were the Bloods' rivals. As of March, Bonner was acquainted with Daniel Davis (Grinnage's son), who lived on Deborah Street. Bonner would regularly visit Davis at that house, as would Bloods. In Bonner's estimation, that house was a Blood hangout. A couple blocks away, on Deanna Street, was a house where Country Boys tended to congregate. Bonner had seen Lee there on a couple of occasions. Lee was driving a Tahoe at the time, the same one in the pictures in Lee's cell phone. At the time, the Bloods did not really have a territory, just certain places they would be at. One of these places was on the east side, near Monterey Street.

Between March 25 and August 11, Bonner saw Lee a couple of times in traffic. Both times, Lee was in a black Volkswagen Jetta or Passat.

On August 11, Bonner was living with his sister in the southwest part of Bakersfield. About 10:30 that morning, he borrowed a car and drove to the Denny's on White Lane. He was alone. While he waited for his order, which he had already called in, he talked to Saleta Roseburr, who worked there. Bonner felt someone staring at him, and turned to see a person he knew as "Cutty Pete." Bonner knew him from a prior incident in which he and Bonner's cousin had had an altercation. At that time, Cutty Pete said he was from the Country, meaning he was a Country Boy Crip.

Bonner and Cutty Pete exchanged words. Cutty Pete threatened to hurt Bonner, who laughed at him. Bonner got his order and got back in his vehicle, at which time Cutty Pete came to the door of the restaurant and started "[t]hrowing up signs" through the window and saying things Bonner could not hear. This occurred shortly after 11:00 a.m. Bonner did not see Cutty Pete any other time that day.

Later that morning, Bonner picked up his friends, Paul and Dwayne, who lived directly south of the Foods Co. at White Lane and South H Street, and headed toward a barbershop in the vicinity of Real and Wilson Roads. They were at the barbershop for approximately three hours. Another friend was there, and he asked for a ride. Bonner took him home, then took Paul and Dwayne back to their house.

Bonner next went to the Taco Bell by Foods Co. to eat. It was around 4:00 or 5:00 p.m. Although he was wearing all red that day, he was not trying to dress like a Blood; it simply happened to be what he had on. As he was leaving the parking lot, he saw Lee two, to two and a half, car lengths away from him in a 2001 or later small, four-door, reddish-burgundy car that Bonner believed was a Suzuki Forenza. Lee, who appeared to be alone, did a double- or triple-take, and Bonner made eye contact with him. Bonner then pursued him in the vehicle, and ended up directly behind him, headed east on White Lane. Bonner wanted to fight Lee because of what had happened at the tattoo parlor.

The light at South H Street and White Lane turned red, and both cars stopped. It looked like Lee was going to go straight, but then he ran the red light and turned left, heading north on South H Street. Bonner did not follow, but instead made a U-turn and headed back to Paul's house. He wanted to let Paul know that Lee was in the area. Bonner was concerned that if Lee had seen Bonner in the car earlier in front of Paul's house, something could happen at the house.

Bonner remained at Paul's house for five or 10 minutes, then headed out to return the car. His route took him north on South H Street, then west on Planz. As he

came to where Real Road dead-ends into Planz, the light turned red for traffic on Planz. Bonner stopped. His was the fourth car back from the intersection. He was listening to music when he heard a loud popping sound and felt his body jolt. Out of the corner of his eye, he saw a burgundy vehicle passing by the passenger side of his car. He did not know if it was the same car Lee had been driving earlier, although it was the same color, or even if the shots came from that car. He did not see who or how many were in the vehicle.

Bonner knew immediately it was a gunshot, but did not know if it was more than one, as it all sounded like one drawn-out noise. He felt something hit him, and checked himself over. His vision blurred, and when he began to move, he started to feel a burning sensation in his abdomen. He tried to get out of the car, but could not move his legs. He felt only tingling in his lower body. He was able to get the car to roll, and so made a right turn onto Real Road, and the first left turn possible, which was into the driveway of someone's house. Someone there called 911 and an ambulance. About 20 minutes had elapsed from when he saw Lee on South H Street to when he was shot.

When talking to the officer at the scene, Bonner never mentioned Lee or the other defendants. He said he did not know who shot him and could not describe the suspects, although he thought the shooter was the person with whom he had had the altercation at Denny's. In light of Cutty Pete's belligerence and aggressiveness, Bonner had considered the incident with him more significant than the incident with Lee in the parking lot.

Christopher Calloway lived at the house on the corner of Real Road and Planz. Around 7:22 p.m., he was outside when he heard at least two gunshots. He saw a car waiting at the red light. A second car pulled up on the right side and someone in the second car shot toward the other car. Calloway believed there were three individuals in the car from which the shots were fired. The shooter was a darker-skinned African-American male wearing a black hat or do-rag, sitting toward the left side of the vehicle in the back seat. The driver and front passenger also were African-American and, Calloway believed, male. The shooter's arms, shoulders, and head were outside the window until after the second shot. The gun was a black handgun. The car was a burgundy color, possibly a newer-model (late-1990's or early 2000's) Ford Taurus or something of that nature. Calloway believed it was a four-door model. The car rounded the corner and then sped north on South Real Road. Calloway could not say whether any defendant was in the car from which the shots were fired.

Ruben Gonzaga and some friends were outside a house on the south side of Planz, talking, when Gonzaga heard a loud pop. He saw gun smoke outside one of the windows of a cherry red, four-door car — possibly a Chevrolet sedan or Ford Taurus — that sped off. He believed he heard two shots. He could see at least two people in the car, but believed there may have been three or four. Gonzaga was unable to tell who in the car was shooting or the race of anyone in the vehicle.

Talia Zarate and Bryan Kunzmann were traveling westbound on Planz and had to stop for a red light at Real Road. There was one car stopped in front of them. They had been at a full stop for a couple of seconds when a small, four-door, maroon or cranberry-colored car pulled up beside the vehicle stopped in front of Zarate. A young, dark-complected African-American rolled down the driver's side rear window. He was wearing a black beanie cap and had a goatee. Half of his body came out of the vehicle, and he started shooting a black gun at the vehicle in front of Zarate. He was using a two-handed grip. Zarate did not know if anyone other

17

than the shooter and the driver was in the car. She did not know if any defendants were in the car.

Kunzmann described the car as being either dark red or burgundy. It was a late, four-door model, and either a Ford Taurus or something with that type of rounded body style. [FN20] The shooter, whose arms were outside of the car window, was an African-American male in his early 20's, wearing a black sweatshirt or long-sleeved T-shirt, and a black hat or beanie. He had a neatly trimmed goatee. There were three people in the car, all African-American males: the driver, the front passenger, and the driver's side rear passenger.

> [FN20] In his 911 call, Kunzmann said the car was red and looked like a Toyota Corolla.

Bonner was shot in the right side of the chest, close to the armpit. [FN21] The bullet caused major, life-threatening abdominal injuries, including the loss of a kidney and damage to the spinal cord. He underwent almost immediate surgery to control internal exsanguinating hemorrhage. As a result of the gunshot wound, Bonner was left a permanent paraplegic. The bullet was not recovered, because it was lodged in the spine, and the neurosurgeons felt it would be too dangerous to attempt to remove it.

> [FN21] He suffered a second injury in the same area, but it could not be identified with certainty as a bullet wound. When Kunzmann spoke to him immediately after the shooting, however, Bonner said he had been hit twice. In addition, Officer Vasquez saw two bullet holes in the car, one on the right rear passenger quarter panel, and the other on the passenger-side front by the door handle. Two expended nine-millimeter shell casings were found on the east side of the intersection. They had been fired from the same gun.

Later that month, Kunzmann was shown three photographic lineups, one containing each defendant. He did not identify, select, or eliminate anyone. However, records for Lee's cell phone showed that calls made or received between 10:17 a.m. and 3:52 p.m. were routed through the cell antenna site near Lee's residence on Myrtle Street. Calls between 4:22 p.m. and 4:34 p.m. were routed on the antenna at South Real and Wilson Roads. Calls between 4:58 p.m. and 6:48 p.m. were routed on the antenna that covered an apartment complex at Eye Street, although the calls moved from the side of the antenna facing due north to the side facing southeast during that time. Between 6:48 p.m. and 7:01 p.m., there were several calls between Johnson's residence on Thoreson Court and Lee's phone. At 7:18 p.m., a call was made from Lee's phone that, given the cell phone tower on which it originated, was consistent with the phone being to the east, or at the corner, of South Real Road and Planz. At 7:28 p.m., the antenna registered a call that was consistent with the phone being in the Thoreson Court area. The phone then moved north.

On August 16, Kern County Sheriff's Senior Deputy Little, and Bakersfield Police Detectives Heredia and Darbee, flew to Las Vegas, Nevada, to interview Sara Agustin, a woman who had been in a prior relationship with Johnson. The detectives returned her to Bakersfield, where she pointed out various locations to them. Agustin also provided telephone numbers of people she knew during the time she lived with Johnson, together with photographs and credit card statements.

Shortly after 8:00 p.m. on August 23, Bakersfield Police Officer Finney and his

partner, Officer Ursery — both assigned to SEU — were on patrol on Dobrusky Drive in Bakersfield, an area within the traditional boundaries of the Westside Crips. They observed a gray Nissan, motor running, parked in front of a house from which Finney previously had seized firearms. Columbus Holford, who lived there and whom they knew to be a Country Boy Crip with the moniker "Pookie," was speaking to three subjects inside the car.

As the officers approached, Finney recognized Dixon as the Nissan's driver. Aware Dixon was on parole, Finney yelled at him a couple of times to turn off the car and step out so he could perform a parole search. At first there was no reaction, but then Dixon accelerated away. A vehicle pursuit ensued.

In front of an apartment complex in the 100 block of L Street, Dixon stopped, and the occupant in the front passenger seat jumped out of the vehicle. Ursery pursued him on foot. The individual was a dark-skinned African-American male, six feet or six feet one inch tall, about 175 pounds, with short hair. Ursery was unable to catch him.

Meanwhile, Dixon again sped off. At one point, he drove through the 200 block of Eye Street, then subsequently returned to the apartment complex on L Street. There, the car again stopped. The driver's door opened, then, after about 15 seconds, closed again and the pursuit resumed. On northbound Chester, the vehicle pulled into the center turn lane in the 200 block and slowed significantly. Dixon jumped out and ran, eventually climbing the back wall of the parking lot for an apartment complex in the 200 block of Eye Street. The vehicle continued on until it hit a curb and came to a stop. Finney followed it and found Lee sitting in the rear passenger-side seat. In a partially unzipped lunch pouch on the left rear seat, directly behind the driver, were a loaded Tec-9 pistol and additional rounds of ammunition.

The Nissan had been reported stolen from an apartment in the complex in the 200 block of Eye Street, although investigation revealed it had not actually been stolen. Officers determined that Dixon had jumped a wall to the east of the complex. On the west side of the wall, in the apartment complex's rear parking lot, were three live rounds of ammunition. One of the cars parked in the lot at the back of the complex at that time was red.

Dixon was arrested shortly after midnight on August 24. He was taken into custody at his residence in the 2900 block of Half Moon.

On October 1, Kern County Sheriff's Senior Deputy Lopez and other officers executed a search warrant at the residence on Myrtle Street in which Lee lived with his father. Lee was in custody at the time. Lopez found letters referencing gang activity that were addressed to Lee and appeared to be from his brother in prison, photographs depicting persons throwing gang signs, and rap lyrics containing references to gang activity. Also found were a gas mask, some articles of powder blue clothing, multiple rounds of various calibers of ammunition, and a baggie containing a usable amount of marijuana.

That same day, Lopez and his team executed a search warrant at the apartment in the 2900 block of North Half Moon at which Dixon had been residing. Dixon was in custody at the time of the search. In addition to some bills addressed to Dixon at that address, officers found a California identification card for Johnson.

Sara Agustin's Testimony

Sara Agustin, who testified under a grant of immunity, first met Johnson in late September 2006, when he was 20 years old and she was 36. She was driving to a market on Cottonwood Road and Casino to purchase marijuana, when she saw Johnson and his friend, "Fat-Fat," walking to the market. Agustin pulled over and asked Johnson if he knew where she could purchase marijuana. Johnson eventually directed her to the house of a drug dealer, about three blocks away. The dealer's nickname was "Reese," and he lived on Reese Street. With money provided by Agustin, Johnson purchased marijuana, then he, Agustin, and Fat-Fat went to the latter's apartment and smoked some. Agustin and Johnson exchanged telephone numbers.

During the next month to month and a half, Agustin and Johnson shared the common bond of smoking marijuana, and they had fun together. At the same time, Agustin's relationship with her husband deteriorated, and they separated just before Thanksgiving 2006. Johnson and Agustin then moved into an apartment in the 2500 block of Encina Street in Bakersfield. Agustin was employed at the time, but Johnson was not. He told Agustin he was selling crack cocaine, and showed her white rocks. He said he "post[ed]" himself at the market where they first met, meaning he sold the drugs there. Johnson said he got his cocaine from his uncle and "Two C's."

When Agustin first met Johnson, she did not know whether he was in a criminal street gang. She became suspicious, however, when he would take her to the Country and she would see his behavior. [FN22] They would be at an intersection, and he would see one of what he called his homies, and he would make what sounded like bird noises and make signs with his hand. Early in 2007, Johnson told Agustin that he was a member of the Country Boy Crips, and that they "pushed the hood," meaning they protected the neighborhood from rival gangs. Although Johnson did not grow up in the Country, he said he became a Country Boy Crip around the age of 14 or 15. Johnson explained that he was jumped by rival gang members then. They broke his jaw, and he began to "have hate towards certain types of individuals." That was what got him interested in being part of a gang. Johnson said the rivals of the Country Boy Crips were the Bloods and the Eastside, whom he derogatorily called "slobs" and "eggs." Johnson told Agustin that the Country Boy Crips did drive-by shootings and sold drugs.

> [FN22] The Country is considered the southeast part of Bakersfield. The main street is Cottonwood Road.

Johnson had several monikers, but was most commonly called "Rife" and "Rifle." [FN23] Johnson explained to Agustin that his "big hom[ie]," "Big Rifle," had given him that name because Johnson was someone "who was bold enough to really push the hood." Johnson said he admired Big Rifle, who was now deceased.

> [FN23] Agustin's daughter heard one person call him "Rifleman."

When Agustin first met Johnson, Johnson had several tattoos. On the first three fingers of one hand were an "E," an "S," and a "K," which Johnson said meant Eastside Killers. A tattoo on his chest read, "fuc[c] them other niggas." Johnson explained it was derogatory to his rival gangs. While they were living on Encina Street, he got a tattoo on his lower back that said "2007" and "NC." Johnson explained that 2007 was "the year of the Country," and that NC stood for Neighborhood Crips. He also pointed out Watts and Lotus to her and said he claimed or "pushed" Watts.

Agustin encouraged Johnson to quit selling drugs and learn a trade. He began going to barber school in early 2007. She also discouraged him from participating in the gang. Over the course of their relationship, however, Johnson began to tell Agustin about his gang activities. With respect to the gang, Johnson said he was the boss, so he pretty much did what he wanted to do. In order to have that position of leadership, he said he did anything necessary. During the middle of the relationship, while they were living on Encina Street, Johnson told Agustin that he was a hit man. He said that if other people in the gang needed something done, they called him, because he was the one who could get the job done. He was not afraid of anybody.

Agustin met Lee in around October 2006, when she had known Johnson a couple of weeks to a month. She met him through Johnson. Johnson referred to his friends as homies, loc, and cuz. He explained that Crips called each other Cuz. He also explained that powder blue was the color of the Country Boy Crips. Johnson sometimes wore that color, but he would wear any color. Sometimes his friends wore powder blue, but not on a regular basis.

After Agustin met Lee, she saw him often, as he was Johnson's best friend. Johnson said they had known each other since childhood. Lee lived on Myrtle Street with his father. Myrtle Street was in Central Bakersfield, not in the Country. However, Lee's mother lived in the Country. At some point, he told Agustin that he worked in Los Angeles as a respiratory therapist. She saw him in various automobiles during the time she lived on Encina Street, most often a powder blue Magnum that he liked to rent. He also had his own car, a small black vehicle. In the first part of 2007, Agustin and Johnson were at Lee's house on Myrtle Street. Somehow, the topic came up, and Lee said he hid guns in the backyard. He did not give a specific location.

Sometime after February, while living on Encina Street, Agustin heard Johnson and Lee talk about being Country Boy Crips. They carried on conversations about their neighborhood and activities. They discussed drive-by shootings. On August 13, Agustin heard Johnson call Lee "Gunman." This was the only time she heard Lee called anything but "Dave." Agustin never saw Lee flash hand signs. Johnson was more blatant about being in a gang than Lee. Lee did not dress like a gang member.

Agustin knew Dixon only as Dodo. Although she did not meet him until the spring of 2007, he and Johnson were together almost daily during the time Agustin and Johnson lived on Encina Street. They were together even more frequently in July and August, after Agustin moved away and then returned to Bakersfield with Johnson. Agustin also often saw Lee with them while she lived on Encina Street, and more often during July and August. Occasionally, Dixon talked to Johnson, in Agustin's presence, about being a Country Boy Crip. In addition, Johnson told Agustin that Dixon was a Country Boy Crip, as was Lee. Johnson also identified "Big Gage," "Little Gage," "Nip," a woman named "Cece," her husband Jim Herron (also known as "Big Boy" or "Big Jim"), Bradley Walker (also known as "Bus Loc" or "Buzz Loc"), "Goo," "D-Keys," "Two C's," and someone Johnson referred to as "the light hom[ie]" as Country Boy Crips. Johnson obtained marijuana from Herron whenever he wanted. Agustin never saw him pay Herron. Herron also provided Johnson with Ecstasy. Agustin saw Dixon at Herron's house one time, and Lee there more than once but not often.

In January, around Martin Luther King, Jr.'s birthday, Johnson and Agustin

attended a barbecue in Casa Loma Park, which was located in the Country. Johnson said it was the year of the Country, and they were going to celebrate it. [FN24] Johnson wore a black shirt that he designed. Lee had an identical shirt. According to Johnson, he and Lee drove to Los Angeles and had the shirts made specifically for them. Johnson's shirt read, from top to bottom, "2007," "S," "Wingstone," "Watts Blocc," "monstas." Johnson explained that S stood for Southerner, the side of town on which their gang neighborhood was located. Watts was the name of a street in Johnson's neighborhood in the Country, and the block he represented was Watts block. Monstas meant monsters, and Johnson said he was a monsta. The back of the shirt read, again from top to bottom, "Naybors," "Southsiders," "Shell Killa," "Country." Shell was one of the monikers used for rival gangs. It meant eggs. The phrase meant Johnson was a shell killer, i.e., someone who would kill an egg. Country was Johnson's neighborhood. Each sleeve bore the letters "SSC," for Southsider Country.

[FN24] Dixon was in prison at the time. Agustin did not believe Lee was present, as she did not see him that day.

Two or three times in early 2007, Agustin went with Johnson to purchase marijuana at a house a couple of blocks off Pacheco Road. Agustin never met anyone who lived at the house, and never saw Dixon or Lee there. However, in the first part of 2007, Agustin was present when Lee and Johnson discussed Lee's car being hit by gunfire in the area of Pacheco Road. [FN25] Lee said he and Johnson had gone to the location on Pacheco Road to purchase some marijuana, and in the process, they were shot at by some individuals. Both told Agustin they themselves were not armed. Lee said his vehicle was shot numerous times. He and Johnson both were angry, and Johnson said they needed to go back and retaliate. Lee wanted to submit the damage to his insurance company, but he said he regretted submitting the claim because the insurance company required a police report, and that was how the police department found out the shooting had taken place. Lee and Johnson did not talk about the specifics of what they were going to do or when.

[FN25] The neighborhood containing Deborah Street and Deanna Way is north of Pacheco Road and just east of Monitor Street.

Within a day or two, Lee came to the house on Encina Street with his arm bandaged. Agustin and Johnson were present. Lee unwrapped his arm and talked about how he had gotten shot in the arm when they went back to retaliate for the initial shooting on Pacheco Road. [FN26] Lee said they parked away from where the initial shooting occurred so that their vehicle would not be spotted by those who lived in that location. Johnson said that after they parked, they began walking toward the location where the initial shooting had taken place. Lee said they were walking toward where the individuals lived, or were thought to live, when they spotted a vehicle driving toward them. The individuals in the vehicle were the same ones who had shot at Lee's vehicle, and they now began to shoot toward Lee and Johnson. Johnson told Agustin that he pulled out his gun, but as he went to fire, the gun jammed. He and Lee then began to run from the individuals in the vehicle, who continued shooting at them. Johnson related that he and Lee ran in different directions. Lee said he jumped over a fence, but it broke and he injured himself. Lee was very angry and said he wanted to get them back. Johnson said those who had shot Lee were their rival gang on the east side.

[FN26] Agustin was already aware Lee had been shot, because Johnson had told her.

During this time, Johnson was attending barber college on the east side of Bakersfield, on Niles Street. One day within a couple of days after Lee was shot, Agustin picked Johnson up from school. Johnson then drove on a dirt road beside a canal in a neighborhood in the area of Monterey and Niles. He said he was scouting rival gang members who were hanging out in that location, and he pointed out a residential area. He drove through and pointed out some African-American males who were standing outside, right off of Monterey Street. One was wearing red, which Johnson also pointed out. Johnson said they were coming into the barbershop, and he was scared for his safety. He said he could not take his gun into the barbershop because the owner, who was his teacher, had security cameras, and he was feeling really helpless without his gun. He said that now he would have to start taking his gun to the barbershop, but that he would leave it in the vehicle.

One morning after this time, Johnson gave Agustin a pair of white Nike tennis shoes with red on the emblem and a red hoodie sweatshirt Agustin had bought him, and told her to destroy the items because they had been involved in a drive-by shooting he had committed in the canal area. He said that a couple of days earlier, he and Lee went to the area. Lee was driving his black vehicle. Lee parked in an alley and Johnson got out. He put on a mask and walked to the front of a residence, where a couple of individuals were sitting. [FN27] Johnson walked up to one and started shooting. Johnson said he shot this person several times and thought he had killed him. Johnson told Agustin that Lee wanted to go and retaliate for the shooting that took place on Pacheco Road, but Lee could not shoot the gun himself because his arm had been injured and so Johnson had to shoot on Lee's behalf.

> [FN27] When Agustin and Johnson lived on Encina Street, Johnson possessed a black mask that looked almost like a gas mask. Agustin's credit card receipt showed she bought the mask for him on March 30. Johnson said he wanted it for smoking marijuana. Johnson did not tell Agustin what he was wearing or the kind of mask he used during the shooting. During the time the couple lived on Encina, Agustin's daughter observed a black ski mask in a duffel bag Johnson kept in Agustin's closet. On one occasion, Agustin's daughter saw Johnson leaving the house with the duffel bag. He appeared to be in a hurry.

Agustin burned the sweatshirt in the fireplace of the Encina Street residence, and discarded the shoes in her trash can, because Johnson told her to get rid of the items. She did not feel she had a choice. By that time in the relationship, he often hit her. Although she knew she was helping Johnson cover up a crime, she felt helpless, because he had told her he would kill her if she ever left him or told on anything he did. Johnson subsequently told her that the person he shot had survived.

On March 25, Johnson and Agustin went to Disneyland and Santa Monica. They came straight home, because Johnson was in a hurry to get home and be with his friends. Agustin believed they reached Bakersfield around nightfall, and she was almost certain he then went out with his friends. Johnson said nothing to her around this date about beating up a Blood gang member or someone at a tattoo parlor.

For Christmas of 2006, Agustin bought Johnson a black Volcom-brand pea coat. For Johnson's birthday on April 12, Agustin bought him a blue hat with "B" or "S" on it and a white jersey. While attending barber college, Johnson had to wear a tan, zippered smock. [FN28]

23

Johnson normally came home around 11:00 p.m. or midnight. Agustin did not know what he was doing at those times, although he went out a lot with Lee. About a week after his birthday, however, he came home several hours earlier than usual. He was very startled. He told Agustin that he had done something and that they needed to go back to the location, but that they had to wait until 3:00 a.m., when it would be safe and there would be no police around.

A few hours later, Johnson told Agustin that he, Lee, and Dixon had driven to a certain location on McNew Court. Lee was driving. He parked the car, and they watched a particular vehicle. Lee and Dixon then stayed in the car while Johnson got out, approached the other vehicle, and started shooting. Johnson said he could not see inside the vehicle, but he thought there was someone inside. Johnson told Agustin that after he shot, he ran to another location, then took off the clothes he was wearing and hid them underneath a vehicle. He did not specify what he was wearing. Johnson wanted Agustin and her daughter, who was living with Agustin at the time, to say that he was at home with them, watching movies, if anything ever came up about that night. He said he needed to go pick up a gun, but he wanted to wait until 3:00 a.m. because he thought all the police would be gone from the area.

At exactly 3:00 a.m., Johnson told Agustin that it was time to go. Agustin drove, with Johnson directing her, through the McNew Court area. Because she did not have her glasses and could not see well, her driving was somewhat erratic. Upset, Johnson told her that she needed to be more careful, because they could get pulled over by the police and that would jeopardize him.

They drove past McNew Court. As far as Agustin could see, there were no law enforcement officers in the area. Johnson directed Agustin to turn one block past McNew Court, and then to make a U-turn. He then had her park as close to the curb as possible by the mailbox of a house with a brick wall and wrought-iron fencing, and that had a van or similar large vehicle parked in front. Johnson then reached out of Agustin's vehicle, took a dark-colored gun out of the mailbox, and placed it on his lap. [FN29] Johnson had guns at the house on Encina Street, and this appeared to be one of them. [FN30]

[FN29] When Agustin subsequently pointed out locations to law enforcement officers, she identified a house in the 1000 block of Feliz Drive, near Jastro, as the place where Johnson retrieved the gun. Senior Deputy Little determined that the mailbox in front of that house was too far from the curb for a person sitting in the passenger seat of a car to reach inside. Two houses to the west, however, was a similar-looking house with a mailbox much closer to the curb.

[FN30] Agustin observed Johnson to have a small revolver that he referred to as a .22, another revolver that jammed frequently and which he called a .38, and a large gun, about three feet long, that Agustin believed was a Tec-9 because she had heard Johnson use the term. He also had a grayish-black gun that was about the same length as the .38, but it was not a revolver and had a slide on it. He also had a black one like police officers carry. It was

24

an older model. The .22, .38, and large gun began appearing at the residence in the early part of 2007. At some point, she did not see the large gun or the .38 anymore, but she still saw the .22. Agustin was unable to tell which gun Johnson retrieved from the mailbox because it was too dark. She knew from its size that it was not the .22. It appeared to be the same size as the .38, but did not appear to be a revolver.

Agustin and Johnson went straight home. Johnson told her how scared he was, then went to the back yard and hid the gun. He told Agustin that he needed to get rid of it right away. Johnson subsequently told Agustin he had sold the gun, but did not say to whom.

A day or two after Agustin took Johnson to the McNew Court area, Johnson received a telephone call from Dixon. Dixon was extremely upset at Johnson because Johnson had left the clothing he was wearing at the shooting, and inside the coat pocket was Dixon's cell phone. The police had found the phone and were harassing Dixon. Dixon was upset that Johnson had gotten very careless. Johnson wanted to know what the police were asking and what kind of information Dixon was giving them. Johnson did not tell Agustin why he had Dixon's cell phone, but just that Dixon was angry at him because he had taken off his clothes and put the cell phone in the pocket. Johnson said he put the clothes underneath a vehicle not far from the crime scene. Johnson expressed concern that since the police had found the clothes, he and the others were going to get caught.

On Saturday, April 21, Agustin and Johnson went to Pismo Beach alone for a night. The trip was unplanned. Johnson said he wanted them to get out of town to have some quality time together.

After the McNew Court shooting, Johnson's demeanor changed and he began drinking heavily. About a week after the shooting, Agustin asked him why. He said he had found out that he had killed a pregnant woman. Johnson seemed remorseful.

After the shooting, Dixon stopped coming to Agustin and Johnson's house for a few weeks. After that time, however, he started coming over to the house again. He said the police had stopped coming to his house as often as they had in the beginning. Dixon told Johnson that Johnson had gotten careless. Dixon was concerned he would end up being blamed, since the police had no evidence that Johnson was involved. Johnson and Dixon discussed the car used in the shooting on McNew Court; both said it was Lee's black car.

At some point in early May, Johnson told Agustin that things were "getting pretty hot" and he was afraid he was going to get caught, so he left the Encina Street house and moved to San Jose to live with his sister, Lynell Johnson. Johnson asked Agustin to move with him, because he wanted to start over. He said he was going to change his life. She did not believe him, but, hoping he really was going to change, moved in with Johnson and his sister in late May. After Johnson moved, but before Agustin joined him, Johnson telephoned and asked if she could park Lee's vehicle, a Volkswagen, in her garage. She said no, because she wanted no involvement in what they had done. He then asked if she could at least drive the vehicle to the light homie's house and park it there. Agustin agreed and took the car to 19th Street, just off of Cedar. She locked the keys inside it and left it there. A day or so later, Johnson telephoned and said that Lee had tried to retrieve the vehicle, but the police had towed it. [FN31]

[FN31] On the morning of May 2, police received a complaint of an

25

illegally parked vehicle in the 2500 block of 19th Street, between Pine and Cedar Streets. There, a 1999 four-door Volkswagen Passat, without current registration tags, was blocking a construction dumpster. Because the registration tags had been expired more than six months, the vehicle was impounded.

After Agustin and Johnson moved back to Bakersfield from San Jose, they moved in with P.G. and Dreenie, who were close friends of Johnson. Dreenie had a wig that she occasionally wore. The hair was black and short, but not curly. One evening in late June or early July, Johnson asked if he could borrow it. Dreenie gave him the wig. After it grew dark, Johnson said he had something to do and would be back. He left the house with Lee in Agustin's Expedition. They were gone for 45 minutes to an hour or so.

When Johnson, Dixon, and Goo returned, Agustin did not see her Expedition. Johnson told her that she needed to go get Lee "in the hood," by Reese's house. Agustin did not have a car, so she asked Dreenie to drive her. She and Dreenie drove around by Reese's house but could not find Lee, so they returned to Dreenie's house. When they arrived, Agustin's Expedition was there, and Johnson, Dixon, Lee, and Goo were on the floor of the front room. There was a bunch of money all over the floor, along with three large sandwich bags of marijuana. The men were kneeling on the floor, counting the money and sorting it out among themselves. Agustin overheard them say that they had robbed Reese. Two of them went inside to make it look like they were going to buy marijuana like usual, then Johnson and the fourth one went in, disguised and with guns. When they came in, they pointed the guns toward the others and demanded the money. Johnson said that one of the people got so scared, he "pretty much went to the bathroom on himself." Johnson said that to make it look good, he had to sock Lee in the face. Johnson, Goo, Dixon, and Lee were all discussing the robbery and laughing about how easy it had been.

Since they now had money, Johnson told Agustin to get her things, as they were going to get a room somewhere else. They then moved out of P.G. and Dreenie's house to a motel in Oildale. Johnson made Agustin use the $400 he had given her from the robbery proceeds to pay for their room and food. When the money ran out after less than a week, Agustin contacted her best friend, Alethia Larios, who lived on Thoreson Court, just down the street from Big Jim Herron. Larios allowed Agustin and Johnson to move in with her. This was during July.

In early 2007, before Lee was shot, Johnson began getting physically violent with Agustin, often because she refused to give him the keys to her Expedition. There were multiple incidents; they included him striking her with his fist and "busting" her nose, holding her head underwater in the bathtub, attempting to shoot her but having his gun jam, biting her hard enough to leave scars, dragging her by a belt around her neck, and threatening her with bodily harm and death. [FN32]

> [FN32] Lee was not present on any of these occasions. Lee never threatened Agustin, and she was not afraid of him. Although she saw Johnson and Dixon with a gun, she never saw Lee with one.

Agustin and Johnson lived with Larios for slightly more than a month. During that time, their relationship was worse than it had been when they were living on Encina Street. They fought all the time, and on August 7, Agustin contacted a battered women's shelter. She was tired of the abuse and feared for her life, as Johnson had gone so far as to get his semiautomatic out of the closet and stick it in

her mouth. [FN33] Agustin went to the shelter on August 7, and was in telephone contact with them for several days after, but they had no beds available.

> [FN33] As far as Agustin saw, the black semiautomatic was the only gun Johnson had at this time. He kept it in a pillowcase in the closet, along with the mask that looked like a gas mask, a wig, and black clothing.

Early on August 9, Johnson received a telephone call. He subsequently told Agustin that he needed to take the car, and that something bad happened. He did not go into any details, but was in a hurry. He left in Agustin's Expedition. Concerned, Agustin telephoned Lee and then Dixon. Each told her not to worry, and that he would get a hold of Johnson.

Several hours later, Johnson returned to the house in the Expedition. He told Agustin that Cuckoo's wife's cousin had gotten shot. Johnson related that the person had been shot in the face and several times in the chest on Cheatham Street, which was in the Country next to Reese Street. Johnson said that one of his "hom[ie]s" had seen the shooting take place, and that the shooter had been a Mexican male. Johnson related that he (Johnson) had contacted the shooter on his cell phone and asked him to meet somewhere so they could talk. When the individual refused, Johnson told him that Johnson was going to "get him where it hurt him the most." Johnson said that he and Dixon had found out where the individual's father lived, which was out in the bluffs, and they had gone in Agustin's car to that location. [FN34] When they were walking toward the house, a vehicle approached. The individuals in that car saw them and made eye contact, and Johnson and Dixon got scared and acted as if they were tying their shoes. When Agustin said she could not believe Johnson would do such a thing in her car, Johnson said he did not want to "do" her like that and have a shootout in her car, so he and Dixon left the area.

> [FN34] Johnson did not say Lee was with them. Agustin assumed that by "the bluffs," Johnson meant the area in northeast Bakersfield, by Bakersfield College and Panorama Drive.

On August 11, Johnson and Agustin were still living on Thoreson Court, and Agustin was still trying unsuccessfully to get into the battered women's shelter. That afternoon, the couple got into a physical altercation over Johnson taking Agustin's vehicle. Johnson eventually said Agustin could go with him, but, once she got into the driver's seat and he got in on the passenger side, he retrieved the black semiautomatic from between the passenger seat and the center console, and he pointed it at her. She got out of the vehicle and ran back into the house. He followed her in and told her to come on, and she went with him. He had the gun stuffed in his pants at the time.

The two ran an errand, then, near the intersection of Ming Avenue and Real Road, Johnson got into an argument with a lady driving a green Tahoe over who had cut off whom. Johnson got mad, pulled out the semiautomatic, and pointed it toward the lady. She immediately got on her cell phone, and Agustin feared that if she got the license plate number for Agustin's Expedition, it would lead the police to Agustin.

The lady and Johnson and Agustin went in different directions at the intersection. Johnson and Agustin ran several more errands, which included Johnson buying some Ecstasy pills and forcing Agustin to ingest one. They returned to Larios's house around 4:30 p.m., but Agustin was feeling the effects of the drug and drove

alone to a market to purchase some beer. When she returned, she felt like someone was following her. She told Johnson and warned him to hide his gun. Agustin then returned to the market, contacted her ex-husband, and ended up spending the night at his house. She did not have any contact with Johnson the night of August 11.

On Sunday, August 12, Agustin checked her messages and learned Johnson had been looking for her and wondering why she never came home. She lied and told him that she had gone to a battered women's shelter. Johnson asked to see her, and she told him she could only get away from the shelter for a certain period of time.

At 8:00 p.m., Agustin arrived at Lee's house on Myrtle Street, and Johnson greeted her at her car. As they talked, Agustin heard a couple of noises. Johnson saw a vehicle approaching, and he grabbed Agustin's hand and said something had happened the night before. They then ran to the back of Lee's house. Lee and Dixon, who were by a tree in the front yard, also ran to the back. The vehicle that drove by was large, possibly a van or an SUV, and Johnson said he suspected the occupants were rival gang members.

After a few minutes, Agustin told Johnson she needed to get back to the shelter. She then left and returned to her ex-husband's house. She did not have further contact with Johnson that night, although while at Lee's house, she had made arrangements to pick Johnson up from Dixon's house on Monday morning to take him to an appointment with his public defender. Instead, at 8:00 a.m. on Monday, August 13, Agustin went to the shelter in person. She was in fear and desperate to get away. Again unable to get a bed and with nowhere else to go because her ex-husband did not want her coming back, she went to meet Johnson at his attorney's office.

After they left the office, Johnson said he wanted Agustin to see something. They went to the intersection at Planz and Real Road, where Johnson told Agustin to look up at the signal light and asked what she saw. When she said she saw a camera, he asked her what she thought it did. She said she did not know. She told him that the big square cameras in certain intersections took pictures if someone ran a red light, but that she did not know what this little camera did. She said it possibly recorded things, but she was not sure. He then got scared.

Johnson told Agustin that he had done a drive-by shooting at that intersection on Saturday night. He said Lee was driving, Dixon was in the front passenger seat, and Johnson was in the back seat. [FN35] Johnson said he saw someone walking on the sidewalk, and so he stuck his head out and fired twice, and he was concerned that if the camera was recording, the incident would have been caught on camera. Johnson said he and Agustin needed to get out of town, and that his plan was for them to go to Las Vegas. He said he had a friend and extended family there.

> [FN35] Agustin never saw Lee driving a vehicle that was red, burgundy, cranberry, or maroon.

Johnson said he had some guns that he needed to sell so they could get some money. They then drove to a house in the 400 block of Eye Street. Agustin remained in the car; when Johnson came back a few minutes later, he said the individuals at the house had made him an acceptable offer of $400 and he needed to get the guns.

Johnson and Agustin then drove south on Eye Street to a set of apartments. Dixon,

28

Lee, and Lee's young son were outside, and there were several women in the front yard. Johnson told Dixon and Lee to get in the car, because he had something to show them. Lee's son stayed behind; when Agustin asked, Lee said some friends lived there, and that his son was in good hands. Johnson then drove back to the intersection, pointed toward the pole, asked them if they had seen the camera and what they thought that camera did. They said they did not know. Johnson said that if the camera was actually recording, it would be bad because it would show that Lee was driving, the vehicle and the license plate, and that Dixon was in the front seat. Dixon responded that if it was going to show that, it was also going to show when Johnson put his head out of the window and started firing. Johnson then told them that he wanted to get out of town, and Dixon and Lee tried to discourage him from leaving.

Johnson said he had found someone to purchase the guns, and so they drove back to the house on Eye Street. There, the three men went inside. When they came back out a few minutes later, Johnson was excited because the people had actually raised the offer to $500. Johnson told Agustin that she needed to drive the three of them to the Country so that they could dig up the big gun. Johnson actually drove, and they went to the home of Lee's mother. There, Dixon retrieved a shovel, and they directed Agustin to drop them off at Watts and Lotus. She was then instructed to go to Larios's house and get packed and ready to move. Johnson told her to wait for a phone call to come back and pick them up. Agustin left all three of them standing in the middle of the intersection with one shovel.

About 15 minutes later, Agustin received a call from Johnson, telling her to come and get them. Only Johnson and Dixon were there. They went to a market on Casino Street, off Cottonwood Road, and Lee drove up in what looked like a white Explorer. Lee said it was his mother's car. They then all went to his mother's house. Johnson made some phone calls, trying unsuccessfully to sell the guns. Dixon called D-Keys to see if he was interested. Although D-Keys was out of town, Dixon told Johnson that D-Keys had asked Dixon to pay Johnson, and that D-Keys would reimburse Dixon when he returned. Dixon then handed Johnson $150 for the black semiautomatic. The last time Agustin saw that gun, Dixon had it. Johnson, Dixon, and Lee discussed how they had been unable to unbury the big gun, and Johnson instructed Lee to make sure he got rid of it.

Johnson and Agustin then went to the home of one of Johnson's friends to get directions to Las Vegas. By now, it was dark. They headed for Las Vegas that night, sleeping in a rest area outside of that city and arriving the next morning. They then went directly to a homeless shelter and then to the welfare department to apply for emergency food stamps. While there, Agustin was just staring off, but a woman in line apparently thought Agustin was staring at her, and said something. Johnson said something to the woman, then got angry at Agustin for making him "look bad" when Agustin refused to respond rudely to the woman. Johnson then decided he did not want to stay in Las Vegas, and demanded that Agustin take him home. She refused, and he eventually calmed down.

Johnson and Agustin did not return to the homeless shelter in time to get beds, but Johnson said he had enough money for them to be able to get a room. They spent the night of August 14 in a hotel. That evening, they walked to a couple of casinos. After they had both had some drinks, Johnson brought up the incident at the welfare office and chastised Agustin for her response. Eventually, he got up and started walking out of the hotel. He cursed at Agustin, threatened her, threatened to have his mother beat her up, and threatened to mess up her vehicle. Perhaps feeling the effect of the alcohol, Agustin got "a little bold" and told him that the

last time he hit her was going to be the last time he hit her. She told him that if he hit her again, she would go to the police and tell them everything she knew about him. Johnson became extremely angry, and Agustin ran inside a McDonald's when he came toward her. She asked the assistant manager to call the police.

Agustin went to her car, but Johnson reached it just before she did. He threw a rock through one of the Expedition's windows. Agustin saw someone walking and asked to borrow his cell phone to call the police. Johnson started walking away, and Agustin called the police. She then waited with her vehicle, but, when no one came after what seemed like a long time, she drove it back to the hotel. By the time she reached her room and fell asleep inside, it possibly was after midnight of Wednesday, August 15.

Agustin was awakened by a knock at the door. Looking through the peephole, she saw someone who appeared to be the light homie. She stepped away from the door, frightened, then looked through the peephole again. This time, she saw Johnson. He asked her to let him in. She refused. She saw him walking toward the office, then he entered the motel room with the light homie. Johnson ran toward Agustin and struck her in the forehead with his fist right above the left eye. She started gushing blood, and he started to punch and kick her. He told his friend to get everything out of the room. Agustin begged the friend to get Johnson to stop.

Johnson got Agustin down onto the ground, then grabbed a pillow and began smothering her with it. At last, he let up. He told her that if he had his gun on him, he would kill her because she called the police. He then told her to get inside the bathtub. She obeyed. The last thing he said to her was that he was going to go back and kill her son. She believed he would do it.

When Agustin heard the door close, she called 911 and begged the Las Vegas police to call the Bakersfield Police Department and alert them to the threat Johnson had just made against her son's life. At first, the Las Vegas police did not take her seriously and accused her of being drunk. As she told the officer about the incidents in which Johnson had been involved, however, the officer's attitude toward her changed. A short time later, she was able to talk to Bakersfield Police Detective Burdick and tell him what had happened and what Johnson had told her.

Upon her return from Las Vegas to Bakersfield, Agustin lived in battered women's shelters. At some point, she agreed to testify if this case went to court. In September, she was placed in the Witness Relocation Program and remained there as of January 2009, when she testified at trial. Through the program, her rent was paid, and she was given $450 a month for her other expenses, by an investigator for the district attorney's office. In addition, in late August, the district attorney's office or law enforcement gave her money so she could return to Las Vegas and get her vehicle out of impound, as well as food and travel expenses. They also bought her a cell phone.

Prior to the Las Vegas incident, Agustin did not report any of the domestic violence to law enforcement, nor did she report any of the crimes Johnson had told her about committing. She continued to live with and support Johnson despite the various incidents, even after learning a pregnant woman had been killed. She left Bakersfield for Las Vegas because Johnson asked her to, and she wanted to be with him. She estimated that, between January and August, she spent thousands of dollars on Johnson. [FN36]

[FN36] Psychologist Michael Musacco testified concerning Battered

30

Women's Syndrome (BWS), its cycle of violence, and its effects. He also discussed common symptoms of victims suffering from BWS, and why a battered woman would stay in an abusive relationship and not report the abuse to law enforcement. As defendants raise no issues concerning this testimony and the jury was instructed the testimony was not evidence Johnson committed any acts of violence, we do not summarize it further.

## Dupree Jackson's Testimony

At the time of trial, Dupree Jackson, who testified under a grant of immunity, was imprisoned on a parole violation. For most of his life, he lived in the south part of Bakersfield known as the Country. When he was little, he often saw sales of rock cocaine going on in front of his home. He also saw guns and drive-by shootings. When he was around 13 years old, he began thinking about becoming a member of the Country Boy Crips. All his family was "from there," and he did not see anything else to do. He hoped to make money selling drugs. Someone was not allowed to do that "in the hood" unless the person was in the gang.

Jackson was "jumped in" to the gang, meaning two people physically beat him, when he was not quite 14. The point of being "jumped in" is to show the person is not scared of anything, and to give that person more reputation. Reputation for being tough is important "in the hood." [FN37] Once in the gang, Jackson got to know other members. He had daily contact with them, and they would discuss their various activities. At the time, the Country Boy Crips were engaged in selling drugs, gangbanging, and "riding on the enemies," meaning they would shoot at rival gang members. Older people in the gang were called big homies, which was the same thing as an OG, meaning someone who had been there for a long time and had "a lot of say-so over the hood." Younger gang members had a personal big homie, who looked out for the younger member and taught him things.

> [FN37] Jackson explained that if a person grew up in the Country or spent a lot of time there, he was then Country automatically and did not really need to get jumped in. Jackson was familiar with Wingstone. It was off of Watts, in the Country.

> (Jackson made a brief reference to the Country Girl Crips. Because we have no information concerning whether the practices of female gang members are the same as the practices of male gang members, we use only masculine pronouns to refer to gang members in general.)

During the time Jackson was a Country Boy Crip, the gang's enemies were the Eastside Crips and Westside Piru Bloods. Eastside was considered worse than the Bloods. [FN38] The Country Boy Crips were different than the Eastside, in that the Country Boy Crips did not jump in outsiders. They were more like a family, with generation after generation growing up in the gang. By contrast, the Eastside jumped anybody in.

> [FN38] Prior to Jackson's involvement in the gang, the Westside Crips and Country Boy Crips were enemies. By the time he had joined the gang, however, the "beef" between the two had died down and there was some sort of truce.

There were roles within the Country Boy Crips that certain gang members would have. Some — like Jackson — would sell drugs, particularly rock cocaine and marijuana, the proceeds from which would go toward buying guns, providing

money for gang members in custody, and the like. [FN39] Some were "pretty boys," who would affiliate with the gang and bring in females, but who otherwise did not do much for the gang or get involved in anything serious. Some would patrol the boundaries of "the hood," keeping out outsiders and enemies. [FN40] Some would "hang out." Others would "ride with the guns, go put it down," killing the gang's enemies by walk-up and drive-by shootings. The OG's basically would "call shots." Those who "r[o]de on the enemies" had the highest status in the gang. They were respected and feared. Firearms played an important role in the gang. They were used to protect the hood, to protect the gang member himself, and to go "riding on" the enemies. Gang members might trade or sell guns to other members, or might keep a gun on one's person sometimes and hide it other times. Jackson had never heard of hiding a gun underground.

[FN39] Jackson's role in the gang was a drug dealer. He sold rock cocaine.

[FN40] Seeing a rival gang member in one's hood would be a sign of disrespect to the Country, unless the rival had a relative in the Country. In that case, the rival would be given a pass, and it would not be disrespectful for him to be there. A rival might also be given a pass if he was incarcerated with one of the gang members and became friends with him. Crip factions are not kept separate in prison, and Crips in prison from Kern County have a kind of bond and call themselves "805," for the old Bakersfield area code.

At a Country Boy meeting, one of the OG homies instructed that walk-up shootings were preferable, because in drive-bys the enemy was often missed and innocent bystanders were hit instead. Jackson explained that a walk-up shooting involved taking a car to the enemy's territory, getting out, and shooting at the enemy. A drive-by shooting involved shooting out of a car toward the enemy. If a participant in a walk-up shooting did not have a gun, he would not get out of the car. The driver would remain with the car; his role would be to get the shooter to and from the location in rival gang territory at which the shooting took place. The driver would use a cell phone to communicate with the shooter about when the shooter would return, that the driver was to have the car started, and similar subjects.

During the time Jackson was a teenager, he estimated the Country Boy Crips had about 100 to 200 members. He personally knew the majority of them, or was aware of their reputation in the gang. The gang had subsets, called cliques. Jackson was in the Cottonwood clique, also called the Deep because it was in the area of the Country that was farthest to the south, away from the Eastside. Other Country Boy Crip cliques were Reese and Cheatham, Mad Blocc, and Watts and Lotus. There were no territorial boundaries among the cliques, which all got along together.

The territorial boundaries of the Country Boy Crips were Belle Terrace on the north, Panama on the south, Union on the west, and Cottonwood Road on the east. There was a rival gang to the north of Belle Terrace, namely the Stroller Boys, who were part of the Eastside Crips. On the other side of the western border were the Westside Crips. There was nothing beyond Cottonwood Road, as it was mostly fields. The Bloods did not have a big territory. Their territory consisted of a large apartment complex near Bakersfield Memorial Hospital, in the area of 31st Street, Jewett Avenue, Columbus, and Union. Bloods would also congregate in the area of Pacheco Road and Calcutta. The boundaries remained pretty much the same the entire time Jackson was in the gang.

During the time Jackson was a Country Boy Crip, he observed that some Country Boy Crip members had tattoos, while others did not. Some people had tattoos that were not gang related, while others had gang tattoos. Typical ones were "CBC," which stood for Country Boy Crip; "SS," which stood for South Side; and Watts and Lotus. There were also tattoos about rival gangs. For instance, "ESK" stood for Eggshell killer, with eggshell being a derogatory term for the Eastside Crips. [FN41] Some tattoos would be pictures rather than letters or words. For instance, someone might have a portrait of a dead homie, which would show that person respect; or a picture of an egg, which would be disrespecting the Eastside. Someone might have a tattoo of hands throwing gang signs.

[FN41] Bloods were derogatorily called "dead rags" or "slobs."

Powder blue was the color associated with the Country Boy Crips. [FN42] Although someone did not have to wear that color to be in the gang, doing so let people know where the individual was from. Wearing the color meant both that the person was from the Country and that he was a gang member. Although gang members did not wear powder blue every day, every gang member wore the color at some time or another. Country Boy Crip members also used graffiti to label their territory and let people know where their hood was at. Jackson had seen words in which CK was replaced with CC. This was because CK stood for Crip killer, which would be disrespecting one's own hood.

[FN42] The colors of the Eastside Crips were royal blue and dark blue. The Eastside Crips were enemies of the Country Boy Crips because they killed some Country Boy Crips "back in the days."

In 2005, when he was 17 years old, Jackson pled guilty to possession of cocaine for sale and served 22 months in prison. He was initially released on parole in October or November of 2006, returned to Bakersfield, and again lived in the Country. Following a parole violation for assault with a deadly weapon against his sister, he was imprisoned from January 7 to June 7, then out of custody and living in the Country until his arrest on August 23 for absconding from parole. He was released again in December 2007 or January 2008, and was in the Witness Relocation Program from then until June 2008, in connection with this case. In June 2008, he again violated parole, this time by being around gang members, and was returned to custody. He expected to be released later in the month that he testified at trial (February 2009).

Jackson and Johnson were cousins, although they first met in junior high school. After that, they got to know each other fairly well. Johnson did not grow up in the Country Boy Crip neighborhood, but would visit about every other day and claimed Country Boy Crip. Jackson and Johnson both were active gang members. Jackson saw Johnson sell rock cocaine, "ride," pack a gun, steal cars, and similar activity. Jackson was aware of Johnson's reputation; from that reputation, Jackson knew that Johnson's role in the gang was as a shooter. Johnson's moniker was Little Rifleman; he took the name from a big homie.

When Jackson was released from prison in the fall of 2006, he made contact with Johnson, who was living with his girlfriend, a Hispanic woman in her late 30's. When Jackson was released again in June, he became active in the gang again, hanging out, selling drugs, and smoking marijuana. During June, July, and August, he saw Johnson "[a]ll the time" "[i]n the hood." Johnson was hanging out, selling a bit of drugs, smoking marijuana, drinking, and "banging" — being wild, packing a

gun, and having an I-don't-care attitude. Johnson was still claiming Watts and Lotus clique, and was active during that time, riding for the Country. Jackson knew these things because he saw them, and heard them from Johnson and other people in the hood.

Jackson first met Dixon when Jackson was nine or 10. When Jackson was young, he was aware that Dixon went to prison for manslaughter for killing an Eastside Crip named "Freeway Joe." Jackson knew Dixon fairly well before Dixon went to prison and knew, from Dixon's tattoos, associates, and the colors he wore, that he was a Country Boy Crip in the Watts and Lotus clique. His moniker was Dodo.

When Jackson was released from prison in June 2007, Dixon was also out of custody. The two got together almost every day in the hood. Dixon was in the gang at that time. Jackson saw him selling drugs, hanging with the homies, smoking marijuana, and riding for the hood. He was kind of a leader in the gang. He had status based on going to prison for what he did, and he also had family status, because his mother's family had a lot of reputation in the hood. Dixon grew up in the Country Boy Crip neighborhood.

Jackson also knew Lee, having met him long ago at Lee's mother's house. Lee did not grow up in the neighborhood, but had relatives who lived there. Jackson knew Lee to be a member of the Country Boy Crips, because Lee was from Watts and Lotus. Lee's role was "kind of low key," basically hanging out with other people. Lee was "on the down low," almost like undercover. For instance, he did not dress like a gang member. Lee got his reputation from his older brothers, "Big Critter" and "Little Critter." Before Jackson went to prison the first time, however, he saw Lee selling drugs, hanging out on the corners, and riding.

When Jackson was out of custody during the summer of 2007, he would see Lee at various locations in the hood, including at functions at homies' houses, and at Lee's mother's house. [FN43] Lee claimed Country Boy Crip at that time. His role in the gang was being a driver. He would drive people around or rent cars for them, as he had money. Lee hung out with Johnson and Dixon, his brothers, and some of the other homies from the hood. During that summer, Jackson saw Lee in the neighborhood about every other day. Jackson did not know Lee to have a moniker, but he would see Lee sometimes wear the hood's colors. Jackson and Lee were not best of friends; Jackson learned, when he was released from prison, that the mother of his child had had a sexual relationship with Lee while Jackson was in custody. Jackson never discussed it with Lee, and it was his impression the relationship had ended.

[FN43] Lee's mother lived on Wingstone.

Jackson knew the roles of a number of people who were Country Boy Crips during the summer of 2007. For instance, Tonriko Shropshire's role was drug dealer and gangbanger, meaning an active member in a gang. The role of Big Gage (true name, Joseph Gage) was hustling (selling drugs) and banging, and he was an OG. The role of D-Keys (true name, Darius Keys) was selling drugs, hanging out, and being an active gang member. The role of Bus Loc (true name, Bradley Walker) was gangbanger and drug dealer. Walker and Dixon were fairly close friends. Jackson did not know anyone whose moniker was Big Boy. He did, however, know Big Jim, who had been a volunteer football coach when Jackson was growing up. Big Jim was an OG who sold marijuana, hung around, and "produce[d] a lot of stuff for the Country," meaning he distributed money to buy guns and "call[ed] some shots." Jackson also knew Two C's (true name, Marcus

34

Bolden or Bowen), whose role was a drug dealer; he would push "major weight" by selling ounces of rock cocaine. Jackson also knew Nip (true name, Trent Abraham); his role was a drug dealer, active gang member, gangbanging, and riding.

Jackson knew someone referred to as the light homie. The person's name was Chris Haynes; he was very light skinned, with hazel eyes, and was a member of the gang. He drove a Lexus with Nevada license plates. His role was being a pretty boy, gangbanging, and hustling. Fat-Fat's last name was Killebrew. He was from the Country, although he had family who were Eastside. Before Jackson went to prison, Fat-Fat's role was being a hustler and active gang member. Jackson did not remember if he saw him out on the streets in the summer of 2007. Jackson also knew Goo, although he could not remember his real name. Goo was a member of the Country Boy Crips; he was like a little homie, but always listened to what older homies said and "was down for whatever." Pookie (true name, Columbus Holford) drove people around and sold Ecstasy and marijuana. Maniac (true name, Sterling Endsley) had the role of being an older homie, gangbanger, selling drugs, and riding. During the summer of 2007, Jackson saw defendants associate with each other, Bus Loc, Goo, Maniac, Two C's, Big Jim, and a couple of others.

During the summer of 2007, a number of people sold marijuana from a house in the vicinity of Cheatham Street and Cottonwood Road. The house belonged to John B. It was called the dodie house, because Jackson and the others were selling chronic (high-grade marijuana). [FN44] Jackson heard of a robbery that took place at the dodie house in the summer of 2007, and learned that Johnson and Dixon were suspected. John B told Jackson that he believed his cousin, Big Jim, sent them over to rob him because he was making more money selling marijuana in the hood than Big Jim. John B also believed they robbed him because his cousin "Third," an Eastsider, was allowed to sell marijuana there. It angered Jackson to learn the perpetrators were members of the same gang as the victims, and he started to question the loyalty of the Country Boy Crips toward each other.

> [FN44] Jackson knew a female named Teresa who went by "Reese," but no male who went by that moniker.

Johnson also told Jackson about this robbery, and admitted defendants were the perpetrators. He said that Barry, Third (whose real name was Keathon), and Keshawn were the only people in the house. Lee acted as a decoy to go into the house, then Dixon entered and then Johnson. They pointed weapons toward everyone's heads and told them to get down. Johnson said they took an ounce of chronic, about $3,200 in cash, and things like video games, computers, and laptops.

That same summer, "Raybo," one of Jackson's older homies and someone with whom he was very close, was murdered. Jackson learned about it on August 9, when Two C's called him to say that Raybo had been found dead at the chronic spot. [FN45] Jackson learned that Keshawn Johnson, "Fumes" (David Taylor), and John B were suspected of involvement. Raybo, Keshawn, and John B were all Country Boy Crips. Fumes was not, but had grown up around a couple of the older homies and was the father of Jackson's sister's baby. There had been bad blood between Fumes and Raybo; Fumes had told Jackson that Raybo had broken into Fumes's house and robbed him of some guns. Fumes had told Jackson that he knew who did it and was going to get the person back. After Raybo was killed, Keshawn told Jackson that Keshawn set Raybo up and then Fumes gunned Raybo down in the house.

35

[FN45] The certified death certificate showed that Larry Raymond Bowen was killed on August 9 at an address in the 1300 block of Cheatham Street, Bakersfield, and that the cause of death was gunshot wounds of the head.

The fact one Country Boy had set up another Country Boy made Jackson feel depressed and angry. As a result, Jackson "hooked up" with defendants later the same day, and told them that he knew where Fumes's father lived. He also gave Johnson Fumes's cell phone number. Jackson did not know what street the father's house was on, but offered to take defendants there.

Everyone got in the Expedition. Johnson was driving, Dixon was the front passenger, and Jackson and Lee were in the back seat, with Jackson behind the driver. Jackson saw a Tec-9, a nine-millimeter semiautomatic, what appeared to be a Glock semiautomatic that was a bigger handgun than a nine-millimeter, a .32-caliber revolver, and a 12-gauge shotgun with the stock sawed off and duct tape wrapped around it, all in the cargo area of the vehicle. Lee started handing them out. He gave Jackson the .32-caliber revolver, Johnson the Tec-9, Dixon the Glock, and kept the nine-millimeter for himself. The shotgun remained in the cargo area in the back.

Jackson and defendants discussed their plan, which was for Jackson to show the others Fumes's father's house, where Jackson believed Fumes was hiding out. They were "[g]oing to go get revenge back for the hom[ie]," i.e., kill Fumes at his father's house. [FN46] To this end, they got on a freeway. Jackson was able to find the house after getting lost a couple of times. Fumes's father lived by Bakersfield College, off of Panorama Drive. [FN47]

[FN46] Jackson did not believe he was going up there to kill Fumes's father; his intention was simply to point out the location. He took the gun when they offered it to him because he did not want to look scared or like "a punk."

[FN47] Records for Lee's cell phone showed a call made at 8:58 p.m. on August 9, that registered on the cell phone antenna near Bakersfield College. Phone records also showed three calls on August 9, and two on August 10, from Lee's phone to what may have been Fumes's cell phone. Those were the only calls to that number between February and September. (Tam Hodgson, the district attorney's investigator who obtained and analyzed the various phone records, had information from some sources that Fumes had one cell phone number, and from other sources that he had a slightly different number. Hodgson could not say which number was correct.)

After Jackson located the house, the group circled around for a while to plan their escape route. They then parked across the street and "scop[ed] out" the house. Nothing got done that day, however. Defendants said they were going to come back and get Jackson later on that night, but they never did. Jackson did not know whether anybody went back to the house. He himself abandoned the plan to shoot Fumes.

Johnson drove them back down from the bluffs to the apartment complex on Eye Street, then defendants took the guns and headed toward the apartments. They did not say why they were taking guns into those apartments or what was going on; Jackson just knew it was "a spot," meaning a hangout. Defendants had always told

36

him they were going to Eye Street, that they had a spot over on the Westside. Jackson remained in the Expedition. During the five to eight minutes before defendants returned to the vehicle, he saw a newer-model, red, four-door compact car, possibly a Toyota or a Kia, without tinted windows. On August 23, the day Jackson was arrested for violating parole, he saw the car again, this time in the area of Casino Street and Cottonwood Road. Dixon and Bus Loc were in it.

During the time Jackson was out of custody in the summer of 2007, Johnson talked to him about his involvement in some shootings and robberies. Near the end of June or early July, the two were sitting in the Expedition on Cheatham Street, smoking marijuana, when Johnson talked about a shooting that had happened in the Stroller Boys area, off McNew Court. He also talked about a shooting off South Real Road and Planz. Johnson said he was stressing, and that if stuff hit the fan, it would link him back to the crimes. [FN48]

> [FN48] The record is somewhat confusing as to when Jackson claimed to have first been told about the Real Road and Planz shooting by Johnson. Jackson was specifically asked how long it was after he got out of custody on June 9 until he had the conversation with Johnson in the Expedition about the Stroller Boys (McNew Court) shooting. Jackson responded that the conversation occurred at the end of June or beginning of July. Jackson also testified, however, that Johnson told him about two shootings during this conversation. One was in the Stroller Boys area off of McNew Court, and the other was off of South Real Road and Planz. On cross-examination, Jackson testified that Johnson told him about the Real Road shooting while they were in the Expedition on Cheatham Street, and that this was more than three weeks before Raybo was killed. Jackson testified that he learned about Raybo's murder on August 9. The implication is that he learned about this shortly after it happened, since when he was on Cheatham Street talking to Keshawn Johnson about what had happened, the police were still at the scene. Yet the shooting at Real Road and Planz, in which Adrian Bonner was wounded, took place on August 11, after Raybo was killed, not before, as necessarily would have had to be the case in order for Johnson to discuss it with Jackson in late June or early July.

Jackson had a second conversation with Johnson on the subject at a gathering on Anderson Street about a week after Raybo's funeral. Johnson again said he was stressed out, and that if the stuff came back on him, it would link him to the McNew Court shooting, where a female was supposed to have gotten shot. Johnson said he was going over there to get at some Eastsider — Anthony Lyons — but then stuff went "all bad." Johnson related that he and Dixon were the shooters, while Lee was the driver and waited for them to come back. [FN49] Things went haywire. The police came or something, and Johnson accidentally dropped a hoodie and a cell phone and some stuff. Johnson was upset when he told this to Jackson. Johnson also said that while he was attending a funeral for his and Jackson's deceased homie, a police officer named Mario was following him around. Johnson was nervous about that. [FN50]

> [FN49] On cross-examination, Jackson testified that Johnson did not say anything about Lee being involved in this incident, but only that Johnson and Dixon did the shooting. Jackson told the police that Johnson did not tell him anything about a car or how they got away.

> [FN50] Raybo's funeral was held at the Church of Higher Ground on August 18. Because of information there was a disturbance brewing

between rival gang members at the church, the Bakersfield Police Department's gang unit had officers there, as was common with respect to gang members' funerals. Sergeant Jehle, whose nickname in the gang area was Mario, was present at the funeral and made eye contact with Johnson, whom he then observed for a couple of minutes. When people were dispersing, Jehle may have seen Johnson again. There were tensions at the funeral because factions from both the Eastside Crips and Country Boy Crips were there, as Bowen had friends and family on both sides. Although there were posturing and verbal exchanges, there was no physical altercation.

Johnson related that he had also been involved in another shooting. He said he, Dixon, and Lee were "rolling around" at night when they bumped into some Bloods at a mini market somewhere off of South Real Road and Planz. They saw the Bloods again at the stoplight, and Johnson came out of the window and started shooting at the Bloods. Johnson said he was pretty sure he hit one, and he heard later that the person was paralyzed. Johnson said the shooting was retaliation for Cutty Pete. Cutty Pete was a Country Boy Crip who was shot by the Bloods. Jackson knew about that shooting from his homies and from what Cutty Pete told him. [FN51] In addition to Johnson, Jackson received information about the Real Road and Planz shooting from his brother, who had a relationship with a Blood's sister.

> [FN51] According to Adrian Bonner, Cutty Pete appeared to be in "okay" physical condition at the time of their verbal altercation the morning Bonner was shot. As far as Bonner could tell, Cutty Pete had not been shot.

Jackson was arrested on August 23 as a parole absconder. He told the officer that he could not afford to get locked up because he had a family to take care of, and that he knew some information about some shootings. Jackson decided to talk about what he knew because he was fed up with the Country due to the death of Raybo and the robbery, and he wanted out. He wanted a normal lifestyle. Officer Beasley, who arrested Jackson, put Jackson in touch with Detectives Heredia and Darbee. Jackson spoke with them later that night and told them about the McNew Court and Real Road shootings, but he held back some details because he was not sure how much he could trust them. They were former gang officers who had harassed Jackson a couple of times. In later interviews, he told everything he knew about the shootings.

Following his arrest, Jackson was booked into jail. He was in a holding cell when he saw Dixon, who was in a different holding cell. Later, they were placed in the same cell. Dixon told Jackson he was accused of running from the police out of a car with Lee. Dixon said there was a Tec-9 in the car, and that Maniac was in the car with them but got away. Dixon said he never even got to use the gun. Dixon said he (Dixon) also got away and made it home, but then the police came to his house and arrested him and accused him of running from the car. Dixon was angry at Lee because he thought Lee told on him.

Dixon and Jackson were in the same cell for three or four days. [FN52] During that time, Dixon told Jackson that he was involved in the shootings on McNew Court. Dixon said he and Johnson both were shooting and did not know which one hit the victims. After the shootings, they started going back to the car. Police or someone came, and Johnson dropped a hoodie or cell phone. Lee was waiting in the car, and they went back and got in. Dixon said he got picked up later on and questioned about that case, but he was not arrested for it. [FN53] Dixon said that

38

when he got "out of this gun beef case," he was going to slow down. He just wanted to get out and take care of his son. Dixon also said he thought he killed his own cousin "over there." [FN54] Dixon said he had done things for the hood, but the homies were not showing him recognition and giving him money and things like that.

[FN52] Jail records showed Jackson and Dixon were assigned to the same cell from August 24 to August 29.

[FN53] On cross-examination, Jackson testified that when he first spoke to Dixon, Dixon said he and Johnson were involved in the McNew Court shooting. He said nothing about Lee. On redirect examination, however, Jackson testified that he remembered telling the grand jury that Dixon said Lee was the driver during the Stroller Boy (McNew Court) shooting, and reiterated that Dixon told him, in jail, that Lee was the driver of the car during the McNew Court incident.

[FN54] Dixon did not go into further detail, although Jackson knew Dixon was related to the Wallaces who lived on Watts Street. In one of his interviews with detectives, Jackson related that Dixon said his cousin's name was James Wallace.

Dixon also told Jackson about the shooting on South Real Road. He said he was in the car when Johnson came out of the window on the "red rags," meaning Bloods. Lee was driving, and Dixon was the one who pointed out the Bloods. [FN55]

[FN55] On cross-examination, Jackson testified that when he was hearing this story, he was not hearing that Lee was in the car and, in fact, he told detectives that Dixon was the driver. On redirect examination, however, Jackson testified that he had told the grand jury that Dixon said Johnson shot the person on the corner of Real Road and Planz, and Lee was the driver of the car. Jackson reiterated that that was indeed what Dixon told him while in custody on August 24.

On August 29, Darbee and another detective asked Jackson if he would agree to testify if this case went to court. Jackson stated he was willing to do so, despite the fact it would make him a marked man for the rest of his life. Jackson then did his time on his parole violation and was released in January 2008, without any intervention from the Bakersfield Police Department. Upon his release, he went into the Witness Relocation Program. He was in the program for about five months, during which time his rent was paid and he was given $400 to $500 per month for his other expenses. In June 2008, his parole was violated for being around a gang member. [FN56] It was his understanding that he would be placed back in the Witness Relocation Program after he finished testifying.

[FN56] This person had come to Jackson's location. Jackson did not go into the Country; he left the Country Boy Crips when he decided to testify.

Jackson was brought from prison to the county jail on October 31, in preparation for his testimony at trial. Early in November, he was placed in a holding cell next to Lee, who saw him and wanted to know what Lee did to Jackson, and whether this was about Lee having a relationship with the mother of Jackson's baby. When Jackson said it did not have anything to do with her, Lee wanted to know if Jackson was going to get on the stand and testify against them. Jackson said he did not know because he wanted Lee to leave him alone. When Lee kept on pressuring

him, Jackson said he would not testify. Lee then told Jackson to sabotage the case by saying it was something about the mother of Jackson's child that made Jackson mad and caused him to lie. Jackson agreed he would do that so Lee would leave him alone. At some point during the conversation, Lee said Rifleman wanted Jackson to say Jackson was having a relationship with Rifleman's girl who drove the Expedition. Jackson knew nothing about whether a girlfriend of Johnson was going to testify, but told Lee that if it would help them, to "lay it out" to him. The last time Jackson saw or talked to Johnson's girlfriend was in 2006, when he first got out of prison.

After this conversation with Lee, Jackson had a conversation with Johnson. Johnson told Jackson the same thing Lee had. Johnson asked if Jackson was being paid for his testimony, having heard Jackson received $10,000. Johnson also said that when he beat up his girl in Las Vegas, he got a ride back to Bakersfield with Chris Haynes. Johnson said he knew where Jackson was staying, and he mentioned a motel.

On another occasion in jail, Jackson was being placed in a holding tank when he saw Johnson in another holding tank. Johnson called Jackson a "bitch ass nigga." In November 2008, Jackson's custody situation was changed, and he was housed in his own isolated cell with his own television, and transported to court by a special team. He was testifying because he believed it was the right thing to do. If he were to serve his parole violation in prison, however, he would not get his own cell or television.

Testimony of Law Enforcement Gang Experts

As of April 19, Kern County Sheriff's Senior Deputy Little was in the gang unit, and responsible for all Black gang activity in Kern County. He was an expert on gangs, and particularly African-American gangs. The first time he learned of Lee was in April, after the McNew Court shootings. However, in April 2007, there were approximately 750 to 1,000 members and affiliates of African-American gangs, and he did not know them all. He had known Johnson since 1998 or 1999 when Johnson's name first came up in a gang context. Little had heard of Dixon in the context of Dixon's manslaughter conviction, but did not know much about him. Little was unaware of any instances in which Johnson was searched and a firearm was found, or in which his or his family's residence was searched and a gun or ammunition was found.

On July 7, Little conducted a search of a residence in the 2900 block of North Half Moon, where Dixon was residing. Little found one letter from Juaqkeib Oliver and another from Frankie Baker. Both contained gang references. The letter from Oliver was signed "Munchy Locsta" and talked about the author being on an "egg hunt" because of being sentenced to a lengthy prison term. "Egg" is a derogatory term for Eastside Crip gang members.[FN57] Little found no hoodies, black pants, guns, or ammunition.

[FN57] "Cornbread" is a derogatory term for Country Boy Crips.

During the course of his investigation, Little searched the Internet site MySpace.com, to see if any defendants had a MySpace page. [FN58] Little was unable to locate a MySpace page for Dixon or Johnson, but found one registered to a David Lee from Bakersfield that displayed photographs of the David Lee who was a defendant in this case. The screen name was "Gunner," and next to it was the acronym "P.E.N.U.T.E." A photograph of Lee and Johnson had been selected

as the "this-is-who-I-am" photograph.

[FN58] It was Little's experience that gang members are often proud of their membership. They may use a social network, such as MySpace, to advertise their membership, sometimes posting photographs of themselves displaying gang signs, writing about their gang ideology, and the like.

By means of a search warrant, Little obtained public and private information for the page from MySpace in August. [FN59] Public information included a photograph of Lee and Johnson and, under "Gunner's interests," a flashing message "Keepin' it Gangsta." There was also a photograph of Lee and a person known to Little to have Country Boy Crip connections. Private information included a subscriber's birth date, city of residence, and occupation that were consistent with Lee, as well as unread messages that were consistent with the dates Lee was in custody. Some comments contained gang references, such as "Cuz" (which Crip gang members call each other) and "South" (another name for Country Boy Crips, who also go by South Side Crips). A number of messages also contained gang references. Included in these was "900 block," which refers specifically to the Stroller Boy Crip subset of the Eastside Crips and which derives from an address on Feliz Drive that is a famous location for the Stroller Boy Crip subset. One of the messages, which was sent the morning of March 22 by someone accessing Lee's MySpace page, referred to the Tahoe being shot up the previous night on Pacheco Road and the writer "bounc[ing] bacc," and concluded, "it's still ESK till I die. P.E.N.U.T.E. Bitch." This message was consistent with the shooting of Lee's Tahoe on Deanna Way, a location one or two blocks north of Pacheco Road. In Little's opinion, based on his overall experience, the reference to bouncing back was indicative of someone bouncing back and taking retaliation. It was plausible that the retaliation was the McGowan shooting, which fit with the timeline. [FN60]

[FN59] If a MySpace account has been set to private, only those who request to be and are accepted by the account holder as MySpace friends can access the private portion.

[FN60] Little testified he could not cite a case in which gang members said something to the effect of, "I bounced back," to refer to a shooting of a rival. Little found no references to the McNew Court shooting or the shooting at Real Road and Planz on the MySpace page.

Ultimately, Little obtained search warrants for various other MySpace sites, including those of Lee's family members. As a result, he learned P.E.N.U.T.E. stood for "Putting Egg Niggas Under the Earth." From interviews with some who used the acronym, Little learned it was a clique of Westside Crips and Country Boy Crips, but did not last long and was not considered to be an active clique anymore.

Based on the Agustin interviews, the materials he reviewed, and particularly the MySpace investigation, Little opined that Lee was the owner of the MySpace account under his name. Little further opined that the Web site was indicative of gang activity on Lee's part.

Senior Officer Sherman of the Bakersfield Police Department testified as the People's primary expert on gangs. He was familiar with the Country Boy Crips, which existed in 2007, from personal contact with Country Boy Crip members, their rival gang members, and investigating gang crimes in which Country Boy

41

Crips were victims and suspects. In his opinion, the Country Boy Crips was a criminal street gang in 2007, as it had three or more people, its members had a common sign or symbol, and its members were involved in an ongoing pattern of criminal activity involving criminal offenses listed in the Penal Code.

Sherman recounted the history and growth of the Crip movement in Bakersfield; the development of the Eastside, Westside, and Country Boy Crip factions; the traditional territories of those factions; and the various subsets of the Country Boy and Eastside Crips. Sherman testified that powder blue is the color associated with the Country Boy Crips, and that the North Carolina college team uses the same color. Sherman also explained the role played by graffiti, to both mark territory and show disrespect to rivals. He also explained the role of tattoos, which, depending on the actual tattoo, show gang membership or allegiance. They may also be indicative of disrespect to rivals, or pay tribute to deceased fellow gang members. Sherman explained that, while there will be members in every gang who have tattoos related to that gang, not every member will have a tattoo. Sherman also explained that clothing can be used to show membership in a gang or to show disrespect to a rival gang. However, not all gang members wear their colors all the time, because they know the consequences of being documented by law enforcement in gang clothing and how it can affect a possible criminal trial. Just because someone does not wear colors does not mean he is not a gang member. In addition, gang members also use hand signs to communicate and show where they are from or that they are a rival.

Sherman explained that respect is a very large part of the gang lifestyle, and in fact a lot of gang members get into the gang because they want that respect. A gang member can get respect by having a lot of money, being a good narcotic dealer, or being willing to go around with a weapon and shoot rival gang members. If a person who belongs to a gang is disrespected, that person has to answer back. If he does not, he ruins not only his own respect, but shows the other gangs that his gang is not very strong. Often, the retaliation must go above and beyond the nature of the disrespect. For instance, disrespect with words will be answered with physical assault. A physical assault might be answered with a shooting. A shooting might be answered with murder. Although the retaliation does not have to be immediate, it has to occur.

In 2007, there were several Country Boy Crip hangouts — places where the gang members would congregate, usually either to conduct their criminal activity or to throw parties. The main ones were the D&A Market on Cottonwood Road, the Hollywood Market on East Planz, the Watts Market at Watts and Lotus, and residences in the 900 block of Bradshaw, the 1100 block of Altus, and the residence on Deanna Way at which Lee's vehicle was shot in March. The Eastside Crips also had particular hangouts, as did the Westside Crips. In 2007, a weak alliance existed between the Country Boy Crips and the Westside Crips. That year, one of the latter's common hangouts was a residence in the 400 block of Eye Street.

In 2007, the Country Boy Crips had over 200 members. Their main rivals were the Eastside Crips and the Bloods. The rivalries were long-standing and ranged from simple assaults and fights to drive-by shootings to homicides. One of the major incidents between Eastside and Country was the Casa Loma shooting in 1999. Several Country Boy Crip and Westside Crip gang members were at a wake at Casa Loma Park when several Eastside Crip gang members came by, fired into the large crowd of people there, and so shot several affiliates and family members of both gangs. Beginning in January 2007, the Eastside-Country rivalry showed itself

in a number of shootings going back and forth between the two, where members from each gang were victims of gang violence. Sherman opined that the McNew Court shootings in April were part of this pattern, which continued on into May.

The Eastside Crips' primary activities were narcotics possession for sale, weapons possession, assaults, and homicides. In Sherman's opinion, the Eastside Crips were an active criminal street gang in 2007. Based on his research, he opined that Anthony Lyons, Othelon Lyons, Curtis Miller, and Albert Darrett were all Eastside Crip gang members in 2007. Sherman found no information, however, to indicate James Wallace or Vanessa Alcala were gang members.

In 2007, the Bloods and Country Boy Crips were rivals. The Bloods' primary activities were narcotic possession for sale, weapons possession, assaults, and homicides. The Bloods in Bakersfield did not have a traditional territorial boundary; rather, because they were small in number, they were more migrant and controlled small apartment complexes or a few blocks in an area for a while until they usually were run out. In 2007, their hangouts included Monterey and Inyo Streets and the Grinnage residence on Deborah Street. A lot of rock cocaine sales were conducted at Inyo and Monterey Streets. In 2007, there were tensions between the Bloods and other rival gangs in Bakersfield.

Based on his investigations, Sherman opined that the Bloods were an active criminal street gang in 2007. From his research, he concluded that Adrian Bonner was at least affiliated with the Bloods, and Edwin McGowan was a Blood gang member, in 2007.

In Sherman's opinion, in 2007, the primary activities of the Country Boy Crips were sales and possession for sale of narcotics, including rock cocaine (the primary drug sold), methamphetamine, and heroin; possession of concealed and loaded firearms; threats and intimidation of witnesses and victims; burglaries; shootings; and murders. In Sherman's experience, the sale of narcotics is used to fund the gang, allowing it to buy more narcotics and firearms, and to rent cars and properties and facilitate gang activities. The possession of concealed and loaded firearms assists the gang in that firearms are used to fight against rival gang members, to protect gang members from rival gang members, to protect their narcotic trafficking endeavors, and as a form of respect. A gang member who carries a firearm will be "more macho" than one who does not. Burglaries are committed by gang members to steal items to sell to gain money to further the gang's narcotic activity, and also in an effort to locate firearms. Shootings and murders are used to fight against rival gang members, to show other gangs that they are not a gang to be "messed with," and to get respect.

Based on his investigations and the information he gathered from speaking with other officers and from working in the gang unit, Sherman opined that in 2007, the Country Boy Crip criminal street gang was engaged in a pattern of criminal activity. Based on his training and experience, he further opined that gang members discussed crimes and court cases among themselves (and sometimes with law enforcement officers), and that the pattern of criminal activity by the Country Boy Crips was a matter of common knowledge for gang members.

For purposes of showing predicate offenses and a pattern of criminal activity, Sherman described the following cases:

> • Case No. BF95016A, involving Dixon. In that matter, in March 2001, Dixon and another African-American male were walking in Eastside Crip

territory when they shot at several teenagers sitting on a porch. A month later, Dixon shot and killed an Eastside Crip member who was in Country Boy Crip territory. On September 11, 2001, Dixon pled to manslaughter and was sentenced to prison. In Sherman's opinion, Dixon was a member of the Country Boy Crip gang when the offense was committed.

• Case No. BF105692, involving Vertis Bayne. In that matter, in August 2003, Bayne shot an Eastside Crip while riding past on a bicycle. He was convicted of attempted murder, assault with a firearm, and ex-felon in possession of a firearm with gang enhancements, and sentenced to prison. In Sherman's opinion, Bayne was a member of the Country Boy Crips when the shooting was committed.

• Case No. BF106522, involving Joseph Ferguson. In that matter, in April 2004, officers investigating a shooting tried to stop a vehicle driven by Ferguson, but a pursuit ensued. During the pursuit, an Uzi-type firearm was thrown from the vehicle. Ferguson was convicted of weapons violations, including gang member in possession of a firearm, and evading police with a gang enhancement, and sentenced to prison. In Sherman's opinion, Ferguson was a member of the Country Boy Crips at the time of the offenses.

• Case No. BF115529, involving Eddie Peterson, Sr. In that matter, in March 2006, officers conducting a parole search of Peterson's motel room found narcotics and sales indicia. Peterson was convicted of possession of narcotics for sale and sentenced to prison. In Sherman's opinion, Peterson was a member of the Country Boy Crips at the time of the offense.

In connection with the present case, Sherman researched the criminal history of defendants in order to determine if they were active gang members at the time the crimes were committed. He determined that Johnson, whose birthday was April 12, 1986, had the monikers Lil C, Rifle, and Little Rifleman, and that he had gang-related tattoos in several places on his body. He also determined that Johnson had numerous police contacts, dating back to October 2000, in which Johnson variously associated with Country Boy Crip members, was in Country Boy Crip territory although he did not live there, admitted his own Country Boy Crip membership, or was involved in gang-related activity. Two of the contacts involved Johnson being the victim of gang-related shootings, and another resulted in Johnson being convicted of being an accessory to a gang-related murder that took place in Eastside Crip territory. In addition, what was written on the shirt Johnson wore at the picnic in January 2007, showed his Country Boy Crip membership and his disrespect toward Eastside Crips. Also, rap lyrics written by Johnson referred to the gang, gang lifestyle, and violence associated with that lifestyle. Sherman also reviewed Johnson's jail bookings. In the bookings between December 2004 and September 2007, he claimed Crip and requested keep-away from the Bloods. [FN61]

[FN61] The jail does not have enough housing to keep apart the various cliques of the gangs.

Based on everything Sherman reviewed and personal contact he had had with Johnson, Sherman opined that between March 1 and August 22, 2007, Johnson was an active member of the Country Boy Crips. Agustin's and Jackson's testimonies reinforced his opinion.

Sherman also researched Lee, whose date of birth was October 17, 1984. Lee had

44

what appeared to be a gang-related tattoo. His moniker was Gunner or Gunman. Lee had several prior contacts with law enforcement dating back to July 30, 2005, at which time he was with known Country Boy Crip gang members and associates. In February 2007, he was stopped in the company of Johnson and other Country Boy Crip members, in Country Boy Crip territory, although he did not live in that area. On March 21, 2007, Lee was the victim of a shooting at a Country Boy Crip hangout on Deanna Way, but did not stay at the crime scene because he did not want to have police contact at the time for "whatever personal reasons." On March 22, he was again the victim of a shooting, this time in the vicinity of a Blood hangout near the Country Boy Crip hangout on Deanna Way. Again, he initially did not want to tell police about being shot, but later provided a statement. [FN62] When contacted by Sherman and another officer the next day, Lee admitted that his friends and family were Country Boy Crips, although he did not admit that he himself was. In August, Lee was arrested with Dixon after a vehicle pursuit, and a Tec-9 handgun was found in the vehicle.

> [FN62] In Sherman's experience, people who are in gangs are often victims of gang violence because of the lifestyle they are in.

Sherman also reviewed Lee's MySpace page. There were gang references in some of the incoming and outgoing messages, with the writer (who gave Lee's telephone number) identifying himself as a Country Boy Crip, referencing other Country Boy Crip members, and trading threats with an Eastside Crip. [FN63] The page also contained a photograph of Lee making a "W" hand sign for Watts. In addition, letters seized during the search of Lee's residence on Myrtle Street contained gang references and indicia. One of the letters from Robert ("Critter") Lee expressed surprise that Lee was giving up his job "for the hood," and warned that if Lee was going to do that, he could only trust a few people. Another from Robert Lee warned Lee not to tell their parents about what Lee and his brother, a Country Boy Crip, were doing. By contrast, Robert Lee's letters to his father contained no gang references.

> [FN63] Sherman conceded he did not have personal knowledge of the identity of the author of any of the entries, and did not compare the dates and times with records of Lee's work history.

Sherman also reviewed Lee's jail bookings. Lee did not claim a gang or request to be kept away from anyone. Based on everything he reviewed, however, Sherman opined that Lee was an active member of the Country Boy Crips between March 1 and August 22, 2007. Agustin's and Jackson's testimonies reinforced this opinion.

Sherman also researched Dixon, whose date of birth was October 11, 1983. Dixon had the monikers Dodo and Baby Clacc, and he had gang-related tattoos on various parts of his body. Prior police contacts revealed that in May 1998, Dixon was arrested for possession for sale of rock cocaine while in the company of individuals who later became documented Country Boy Crip members. The next month, he was acting as a lookout for narcotics sellers in Country Boy Crip territory. In September 1998, Dixon was arrested for possession of rock cocaine and a firearm. In December 1999, Dixon was arrested in Country Boy Crip territory for possessing a loaded firearm. In November 2000, Dixon was the victim of a drive-by shooting while in Country Boy Crip territory. In March 2001, Dixon was contacted at Watts and Lotus, although he did not live in Country Boy Crip territory. In April 2001 was the gang-related shooting that resulted in Dixon's manslaughter conviction. During a July 2007 parole search of Dixon's residence, officers found letters containing gang references addressed to Dixon. In August

45

2007, Dixon was with Lee during the vehicle pursuit. Dixon fled, but was later arrested at his apartment. He was seen wearing light powder blue clothing, and a loaded Tec-9 was found in the vehicle.

Sherman also reviewed Dixon's jail bookings. In May and August 2007, Dixon claimed Crip, with Country Boy Crip as the subset, and requested a keep-away from Bloods. Based on everything he reviewed, Sherman opined that Dixon was an active member of the Country Boy Crips between March and August 2007.

Sherman did background checks on persons mentioned by Agustin and Jackson in their testimonies. In addition to determining their true names, he opined that Bus Loc, Fat-Fat, D-Keys, Goo, Big Jim, Raybo, Two C's, Nip, Cutty Pete, Riko, and Big Gage were all Country Boy Crip members, with Gage being an OG. Sherman also researched Agustin's background. He found no gang-related contact with police for her.

Sherman explained that all gang members are expected to "put[] in work" for the gang. "Putting in work" can mean selling narcotics, stealing items, getting guns, or even committing a shooting or assault. The type of work may vary according to the gang member's personality or strengths. A shot-caller is an old gangster who has been around for a while, has put in his work, and is well respected. He may be the one who directs the actions of others. There are shooters within the gang; these are the people who commit the assaults, drive-by shootings, and even homicides. They are the aggressors and enforcers. These persons are respected because they are feared, even by fellow gang members. The status of the victim has an effect on the status of the shooter; if he shoots a rival gang member, he gains status and respect. By contrast, if, in trying to shoot a rival member he misses and kills an innocent party, it will not necessarily create a backlash against him, but he will not get as much respect. It is common for shooters in a gang to brag to fellow gang members about whom they shot. They will not, however, take credit for something someone else did, as that would constitute disrespect toward the actual shooter. The bragging, which is done to get credit for the shooting, does not commonly involve a recitation of intricate details.

Sherman explained that a walk-up shooting involves walking up to the intended target and shooting. If it is done in rival gang territory, the perpetrators usually will have some sort of transportation. They will either drive through the territory to scope out the target or see if it is available, then park somewhere close, physically get out of their vehicle, walk up to the target, shoot, and then return to the vehicle and flee the rival gang territory. Communication with other gang members during walk-up shootings usually is by phone; there needs to be communication between the shooters and the person left in the car in case something goes wrong and plans change. Clothing also plays a part; the shooters commonly wear neutral colors that will not make them stand out to witnesses. On the other hand, it can also be used as a ruse to throw suspicion onto a rival gang. Layers of clothing may be worn so the shooters can change their physical appearance after committing the crime and thus will not fit the descriptions given to police. Sometimes, gang members will stash clothing before the shooting and then change into it later.

Sherman also explained that a drive-by shooting involves driving the car up to the target. Disadvantages are that the shooters' vehicle is seen and a vehicle leaving the scene at a high rate of speed draws the attention of arriving law enforcement officers. Shooters on foot can find somewhere to hide and even wait out the police.

According to Sherman, women play a supportive role in the Country Boy Crips

46

and other gangs. They provide the male gang member with financial support, a place to live, a car to use, or a cell phone or clothing. They also conceal or stash the male gang member's illegal activities, such as guns or narcotics. Whether gang members discuss gang activities with the women depends on the trust factor between them. If the two are in an ongoing, serious relationship, he may divulge some things to her, but is unlikely to go into depth regarding the inner workings of the gang. The male will instill in the female the idea that she is not to tell; if she does, she risks assault or death.

Gangs have rules about not cooperating with law enforcement. One who cooperates is considered a snitch. Even a gang member who is a victim of gang violence often will not cooperate, because he wants to get his respect back, and allowing the police to take care of it will not achieve that. Similarly, a gang member will not want to come to court and testify, even against a rival gang member for that is considered snitching. A gang member who testifies may face threats, intimidation, and assault, both to him and to his family.

In answer to hypothetical questions based on the prosecution's evidence, Sherman opined that the shooting at Monterey and Inyo, shootings at McNew Court, and shooting at Real Road and Planz were committed for the benefit of the Country Boy Crips, and were done with the intent to promote, further, or assist criminal conduct by the Country Boy Crips. Sherman further opined that if there was an agreement between the involved Country Boy Crips to do the shooting or the killing, plus an act of traveling to the location for that purpose, those acts also were committed for the benefit of the Country Boy Crips. A Country Boy Crip member promotes his gang by shooting at a rival gang.

Sherman further opined that if a Country Boy Crip who was a convicted felon was in possession of a loaded firearm in the vicinity of McNew Court, that act would promote or benefit the Country Boy Crips gang, because that gang member was willing to carry the firearm and commit an act for the benefit of the gang. In addition, Sherman opined that if four Country Boy Crips, each armed and in agreement to locate and kill the person (or a relative of the person) they believed had murdered their fellow gang member, drove to a location near Panorama Drive to carry out their intention, those acts were committed for the benefit of, and with the intent to promote, further, or assist conduct by, the Country Boy Crips. The Country Boy Crip who was killed was thereby disrespected, and the four Country Boy Crips were acting to get the respect back for their gang and their deceased friend. Even the act of getting together with guns and going to the location would earn them respect, as they were willing to take matters into their own hands. If the felon who possessed a firearm helped a second Country Boy Crip sell a firearm so the latter could leave Bakersfield after shooting a rival gang member, his acts would be done with the intent to promote or benefit the Country Boy Crips.

II.    Defense Evidence

Johnson's Case

Jim Dill lived in the Encina Street residence in mid-September 2007. Before he cleaned the fireplace, there was a quarter inch of ash in it, but no burnt clothes or metal zippers.

Theodore Richard was a cement mason at the time of trial, and had been doing that since June 2008. As of the time he testified, he was not doing anything else for money.

47

Richard was Jackson's cousin. Jackson was "like a brother" to Richard, who was testifying because of the various things Jackson had told him about this situation. Jackson had been frequently seeking Richard out ever since Richard came home.

Jackson told Richard that Jackson was not going to testify in this case. Jackson related that law enforcement had threatened to charge him with Raybo's murder, and he was afraid of being prosecuted for that offense. During their conversations, Jackson mentioned a girl named Sara that he was dating. Jackson said she was supposed to be the ex-girlfriend of one of the defendants in this case. Jackson told Richard that he was lying about defendants. Richard never told Jackson not to come to court or what to say if he took the witness stand, but he did tell Jackson not to testify to the lies Jackson was telling Richard.

Richard denied ever being told by Johnson (whom he had never met) or anyone else to intimidate Jackson or try to convince him not to come to court. He admitted, however, having been convicted in federal court in February 1999 of conspiracy to distribute and possession for sale of cocaine. While in federal custody in April 2000, he pled no contest in Kern County to felony assault with a firearm.

Kevin Griffith saw the car involved in the shooting of Adrian Bonner. It was like a red Nissan Sentra, and the paint on the back trunk hood was bleached or oxidized by the sun. Later that night or possibly early the next morning, he saw what he was "pretty sure" was the same car again. [FN64] It had been pulled over at Fastrip on Real Road and Ming. Shannon Fowler's car was not the car Griffith saw at the time of the shooting or later. Griffith was not able to clearly identify anyone in the car at the time of the shooting. When he saw the car later, it contained three African-American men. The driver appeared older than defendants. The others in the car were "[m]ostly older" than defendants, perhaps in their late 30's. [FN65]

> [FN64] In his 911 call, he said he was positive it was the car.

> [FN65] In the summer of 2007, Aaron Norwood drove a red 1991 or 1992 Ford Tempo. The paint on Norwood's car was pretty faded and dull.

On August 11, Norwood worked the 6:00 p.m. to 10:00 p.m. shift at PetsMart. He took no breaks, although the store's employees may have left around 9:30 that evening at the manager's behest. He drove his car to work that day and parked it in front of the store. He did not drive the car during his shift, no one borrowed it, and when he left to go home, it was in the same place that he had left it. After work, he went to a party, then, around 2:00 a.m., he was pulled over at the Fastrip at Ming and Real Road, which was about a mile from Real Road and Planz. At the time, he was with his cousin and a friend. The police searched the car, and the next day searched Norwood's house. They found a live .38-caliber round of ammunition. It had belonged to Norwood's late brother, and Norwood had kept it. Norwood was interviewed at the police station and, after it had been confirmed with his boss that he and his vehicle had both been present at PetsMart at the time of the Adrian Bonner shooting, released.

Dixon's Case

On August 11, 2007, Pamela Ginn's grandson had a birthday party at Camelot Park, an amusement park on Oak Street. The party began about 2:00 p.m. and lasted until it started to get dark. Ginn, who had known Dixon most of his life, saw

48

him at Camelot Park that day. He was there until the party ended, and helped put the gifts in the car. At no time did she see him leave the party.

Dixon testified that he was born in Bakersfield and raised in the Country. Growing up in that area, Dixon — who acquired the nickname Dodo during childhood — saw drug sales and shootings every day. He grew up with a bunch of kids who got into the gang. They hung out together because they were friends and grew up with each other.

Dixon admitted that in addition to being called Dodo, he was sometimes called Baby Clacc, a name he took for himself because he wanted to be like his cousin, Frankie Baker, who was known as Big Clacc. Dixon knew the Country Boy Crips were a criminal gang, but explained that those in the gang looked on each other as family, as there were several generations of people within the gang. In addition, because Bakersfield was so small, it was not unusual to have family members in the other gangs. For example, Dixon's father used to be an Eastside Crip.

Dixon was 14 years old when he became a Country Boy Crip. The only crimes he ever committed were possessing firearms and selling rock cocaine. He never shot a gun, but simply carried a firearm for protection. He sold drugs for himself. He did this in Country Boy Crip territory. The gang left him alone because his mother lived there and he was raised there.

Dixon denied committing the killing for which he pled no contest to voluntary manslaughter in 2001; he was charged with murder and wanted to go to trial, but his then-attorney told him juries did not like gangs. His attorney told him that he was facing a sentence of 56 years to life in prison versus six years. Dixon, who was only 17 at the time, did not want to do life. Dixon did not have any tattoos until he went to prison. He got almost all of his tattoos when he was 18 and in prison, where tattoos are "just fashion."

Dixon was paroled on March 4, 2007. He moved in with his cousin Keshiea, who lived off of Pacheco Road, but she got evicted. He then moved in with Myeshia Herring on Chandler, then moved to an apartment on North Half Moon with Keanna King. Each time he moved, he notified his parole officer. After he paroled, he did not do anything for the gang, but just socialized with Country Boy Crips because all his friends were from there. As for Johnson, Dixon knew he was a gang member, but did not know what his role was in the gang. The two merely socialized, and Dixon never saw Johnson do any criminal activities. Around March or April, Johnson was cutting hair in different neighborhoods. When he cut hair, he sometimes wore his brown barber's smock.

Dixon had known Lee since elementary school. Lee was only known as Dave. Dixon never saw him sell any drugs; Lee did not grow up like that. When Dixon was in prison, he would hear that Lee's brothers were "hanging out," but not Lee. Dixon had seen Lee smoke marijuana, but never with a mask. Dixon never saw him with any weapons of any kind. Lee never wore powder blue clothes. How he dressed in court was how he dressed on the street.

Dixon did not have a cell phone when he was first paroled, but Myeshia and the others could not get in contact with him so she said her sister had a phone for him. He let other people use the phone if they needed it. He last saw that phone on April 18, in Agustin's Expedition. Johnson dropped Dixon off, and Dixon forgot the phone. Dixon called Johnson from the house phone at Keanna King's residence and told Johnson he would get it from him the next day.

The next day or shortly after, however, Myeshia contacted him and said Deputy Little wanted to talk to him. Dixon called Little, who asked him to come in for an interview. Dixon went, but denied he was known as Dodo, because that name had been used against him back in 2001. He also denied that the cell phone found at the scene was his, because the officers were telling him they had an eyewitness who had seen him on McNew Court. They asked whether he was Rifleman. That was why Dixon subsequently called Johnson; Dixon asked him why Dixon's phone was at a crime scene. Dixon could not explain to the detectives about forgetting the cell phone in the Expedition, because if someone becomes a snitch, his family will disown him, and Dixon's whole family was from the gang.

After Dixon asked Johnson why Dixon's phone was at a crime scene, Johnson left and went to San Jose. Johnson never explained why the phone was there.

Dixon denied being present at the shootings on McNew Court. James Wallace was his cousin, although they did not grow up together. Dixon denied robbing any drug dealer on Cheatham Street or Reese Street. Robbing one's own homie would bring repercussions and would probably cause one's own gang to turn against the robber.

Dixon was acquainted with Shannon Fowler. Among the people who lived in the apartments in the 200 block of Eye Street during August 2007 were Fowler, who was having a sexual relationship with Lee, and Krystle, who was seeing Johnson. In addition, a girl Dixon was seeing often visited her friends in the complex. Fowler had a red car, but she never let Dixon and the others drive it. Dixon had never been in that car.

Dixon was familiar with the house in the 400 block of Eye Street. The man who lived there sold drugs. Dixon grew up with the daughters of the woman who lived there. Dixon never went to that location to help Johnson try to sell a gun so he could go to Las Vegas. Johnson never took Dixon to the intersection at Real Road and Planz to show him a camera.

Dixon grew up with Raybo. When he learned from his aunt that Raybo had been killed, he borrowed his sister's car and drove over to Reese and Cheatham Streets. He estimated there were about 200 people there when he arrived, including Johnson, Lee, and Raybo's brothers. Everybody was discussing what had happened; everyone knew it was an inside job, meaning it had to be a homie who did it. During this discussion, Jackson arrived. Johnson walked over to him, and Dixon, Lee, Raybo's brothers, and some other homies followed. They all told Jackson that they had heard he killed Raybo. Jackson denied it and blamed it on Fumes (David Taylor).

While everyone was talking to Jackson, Dixon left to pick up his sisters. He returned later to the area of Reese and Cheatham, but never got into a vehicle with Jackson, Johnson, and Lee to go to the Bakersfield College area to kill Fumes or his father. Jackson was telling everyone that he knew where Fumes or Fumes's father stayed, but to Dixon's knowledge, no one went up there.

Dixon denied knowing Adrian Bonner or being at South Real Road and Planz at the time Bonner was shot. He was at Camelot Park, off California and Oak, at the time of the shooting. Dixon learned of the Bonner shooting shortly after it happened. When he and Ginn's son left Camelot Park, they went to the residence of Columbus Holford. Bonner's sister and Holford were friends, and she had called Holford right after the shooting.

On August 23, the day he was arrested, Dixon was the driver of a car that also contained Lee and someone called "Set Trip," whose real name Dixon did not know. The three were just talking. Dixon did not know there was a Tec-9 in the car until Set Trip told him to drive off because he had the gun in the lunch pail. Set Trip tossed the gun in the back seat, and Dixon let him out. Dixon jumped out of the car and ran because he did not want to go back to prison. After his arrest, he was booked into the Kern County jail and was placed in the same cell as Jackson. He never discussed the shootings with Jackson, however. Although Dixon and Jackson talked while celled, the talk was about them both changing and leaving the gang. Jackson was particularly worried about his parole violation. [FN66]

> [FN66] According to Dixon, he himself gave up the gang lifestyle when he was arrested for possession of the Tec-9.

Dixon pled guilty to participating in a criminal street gang in the case arising out of the vehicle pursuit, and was sentenced to prison. While housed at Wasco State Prison, Dixon heard that Othelon Lyons was also imprisoned there. They were never on the same yard, however, and never had any contact or conversation.

Emmanuel Burts, Jr., married Agustin in September 2008. At the time he testified, he was in jail as the result of her bringing charges against him. [FN67] When he was arrested, he telephoned and wanted to let the defense attorneys in this case know Agustin had lied on the stand.

> [FN67] Burts was pending charges of spousal abuse and felony threats. He had suffered a number of prior felony and misdemeanor convictions for various offenses.

Before she had testified, Agustin and Burts lived in Fresno. Agustin had transcripts and went over them. She also went on the Internet and looked at maps. She told Burts she was refreshing her memory of the locations to which she went with her ex-boyfriend.

While Agustin was in Bakersfield testifying in this trial, she telephoned Burts every day to let him know when she was back in her room. She told Burts that she was testifying truthfully, but was leaving out parts. She said she was not being truthful about certain things because she did not want her son involved. Johnson sold a gun to Agustin's son, in Agustin's presence, right before they went to Las Vegas. Agustin said it was the gun used in the homicide. In addition, Agustin told Burts that either Lee or Dixon (Burts could not remember which) had nothing to do with the murder.

In the time he had known Agustin, Burts formed the opinion that she was very deceiving and conniving. Burts was aware Agustin received $750 for rent and $450 for her personal things each month as a witness for the prosecution in this case. In Fresno County, however, she applied for food stamps and welfare, and never reported she was receiving that money.

## Lee's Case

According to Marc Taylor, a forensic scientist/criminalist and laboratory director of Technical Associates, Incorporated, in Ventura, California, there are ways to preserve and process items, such as expended shell casings, so that they can be tested for fingerprints and potential DNA without interfering one with the other.

1  Latent fingerprints and DNA both can be recovered from expended shell casings.
2  In his opinion, placing individual shell casings in on cottony cushioning in small
   white boxes, as was done in this case, could result in ridge lines left by whoever
3  touched the casing being wiped off by the cotton. Similarly, packaging multiple
   expended shell casings together in an envelope could lead to a transfer taking place
4  or to the ability to detect a fingerprint being affected due to the rubbing together of
   various pieces of evidence. He could not, however, say whether that happened in
   this case.

6  In DNA testing, when there is a good quantity of DNA, the peaks on the
   electropherogram will be well within the normal analytical range. There are
7  specific procedures to test the analytical thresholds of the instrument to be sure
   that when there is a peak above a certain height, it represents a reliable result. If
8  low levels of DNA from an individual are present, things may show up in certain
   areas of the electropherograms but disappear in others. Whether to include or
9  exclude an individual as being in the profile can then become subjective. For
   example, when an allele is present but in a weaker range, there are limitations on
   what interpretations can be made of that allele being present. Sometimes, the
10 results are inconclusive. Taylor could not say whether there was a subjectivity to
   the analysis of the DNA results in this case or whether there were low quantities of
11 DNA.

12 Johnson, 2013 WL 5366390, at *2-45.

13 **III.    DISCUSSION**

14     A.    Jurisdiction

15     Relief by way of a petition for writ of habeas corpus extends to a person in custody

16 pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

17 treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor,

18 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as

19 guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern

20 County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. §

21 2254(a); 28 U.S.C.§ 2241(d).

22     On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

23 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

24 enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

25 filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

26 and is therefore governed by its provisions.

27     B.    Legal Standard of Review

28     A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

52

the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 U.S. 992, 999-

1    1001 (9th Cir. 2004), *cert.denied*, <u>Maddox v. Taylor</u>, 543 U.S. 1038 (2004).

2         To determine whether habeas relief is available under § 2254(d), the federal court looks to

3    the last reasoned state court decision as the basis of the state court's decision.  <u>See</u> <u>Ylst v.</u>

4    <u>Nunnemaker</u>, 501 U.S. 979, 803 (1991); <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir.

5    2004).  "[A]lthough we independently review the record, we still defer to the state court's

6    ultimate decisions."  <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002).

7         The prejudicial impact of any constitutional error is assessed by asking whether the error

8    had "a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v.</u>

9    <u>Abrahamson</u>, 507 U.S. 619, 623 (1993); <u>see also</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 119-120 (2007)

10   (holding that the <u>Brecht</u> standard applies whether or not the state court recognized the error and

11   reviewed it for harmlessness).

12        C.      Review of Claims

13        The instant petition presents the following grounds for relief[2]: 1) The trial court erred by

14   denying Petitioner's motion for severance; 2) The trial court erred by allowing the prosecution

15   gang expert to testify concerning Petitioner's tattoo; 3) The state court unreasonably determined

16   that the violation of Petitioner's <u>Miranda</u> rights was harmless beyond a reasonable doubt; 4) The

17   state court unreasonably ruled that the gang expert's testimony that "gang members enjoy killing"

18   was harmless beyond a reasonable doubt; 5) The state court unreasonably ruled that conspiracy to

19   participate in a gang is a crime; 6) The trial court erred by admitting evidence of a red car owned

20   by a friend of Petitioner; 7) The state court unreasonably determined that the trial court's denial

21   of Petitioner's motion for new trial based on ineffective assistance of counsel was reasonable; 8)

22   The state court unreasonably denied Petitioner's <u>Brady</u>/prosecutorial misconduct claim; 9) The

23   state court unreasonably rejected Petitioner's omnibus claim of ineffective assistance of trial

24   counsel; 10) The state court unreasonably rejected Petitioner's claim of ineffective assistance of

25   appellate counsel; and 11) The state court unreasonably denied the claim that the cumulative

26   prejudice of the afore-mentioned errors denied Petitioner a fair trial.

27   _____

28   [2] The Court will address Petitioner's direct appeal claims first, as they provide background for the claims he
     presented on state habeas review.

                                                    54

1.    Trial Court Error – Motion for Severance

Petitioner claims that the state court unreasonably denied his claim that the trial court's denial of his pre-trial motion for severance violated his constitutional right to a fair trial. He argues that much of the evidence introduced against his co-defendants prejudiced him because the evidence was highly inflammatory.

a.    State Court Decision

Lee and Dixon contend the trial court abused its discretion by denying their pretrial motions for severance. They say the trial court's ruling resulted in gross unfairness and denied them their constitutional right to a fair trial. The People say a joint trial was proper.

*1. Background*

Prior to trial, Lee moved to sever his trial from that of the other defendants, should the trial court deny his in limine motions to (1) exclude testimony related to Lee being arrested, charged, and convicted in the case involving the Tec–9 found in the backseat of the car driven by Dixon; (2) exclude any testimony by Agustin that Johnson told her Lee performed certain acts; (3) preclude the People from questioning any of its witnesses about Lee's criminal history, allegations, or character evidence; (4) preclude any testimony concerning Agustin's, Jackson's, and Bonner's fear of defendants; and/or (5) exclude any testimony concerning the domestic violence incident between Johnson and Agustin that occurred in Las Vegas in August 2007. [FN72] The People opposed the motion, arguing in pertinent part that (1) a joint trial was preferred; (2) there existed no *Aranda–Bruton* [FN73] issues that required severance; (3) incriminating statements made by defendants were declarations against interest; (4) no severance was required where inconsistent defenses were to be presented; and (5) no severance was required since the evidence against all defendants was strong.

> [FN72] Although Lee specified that particular incident, his argument appears to have encompassed any incidents of domestic violence between Johnson and Agustin.

> [FN73] *Bruton v. United States* (1968) 391 U.S. 123; *People v. Aranda* (1965) 63 Cal.2d 518.

During argument on various evidentiary in limine motions, all defendants joined in the motion for severance. After a lengthy discussion, the trial court found no basis upon which to grant severance due to the introduction of expert testimony on BWS or evidence of domestic violence as it related to Johnson and Agustin. Accordingly, it denied the motion for severance as to that issue, but reserved its ruling insofar as the motion was based on other issues. Defendants subsequently requested an Evidence Code section 402 hearing to determine whether Senior Officer Sherman was qualified to testify as a gang expert. In part, his testimony concerned Dixon's prior voluntary manslaughter conviction and involvement in an earlier shooting. The People sought admission of evidence concerning the prior incidents both in terms of the information upon which Sherman relied in forming his opinions, and also pursuant to Evidence Code section 1101, subdivision (b). After arguing admissibility of the evidence under that statute, Lee asserted that

55

admission of prior gang-related shootings by another defendant was unduly prejudicial to him, especially in light of the disparity in gang-related evidence vis-à-vis Lee as opposed to the other defendants, and that the court could not mitigate the prejudice through an admonishment. Johnson joined.

After extensive argument, the trial court ruled that Dixon's prior acts were admissible under Evidence Code section 1101, subdivision (b), and not subject to exclusion under Evidence Code section 352. [FN74] Lee then renewed his motion for severance, citing the "vast[ly]" disproportionate evidence. Johnson joined the motion, requesting severance from Dixon. The People responded that severance would serve no purpose because Lee and Johnson were charged with identical crimes, the evidence was strong against all defendants, and the evidence would be admissible against each in separate trials. After further argument concerning, in large part, the admissibility against nondeclarant defendants of statements made by another defendant to Agustin or Jackson, the trial court denied the motion to sever without prejudice.

[FN74] We will discuss the propriety of these rulings, *post*.

Just before the start of jury selection, Lee again moved for severance of his trial from that of the other defendants. Lee cited the domestic violence incidents that were going to be admitted against Johnson; the testimony of the BWS expert that was going to be admitted with respect to Agustin; the lengthy amount of gang evidence that was going to be produced against Johnson; the statements made between Johnson and Agustin, some of which would not be cross-admissible; the statements between Johnson and Jackson, some of which would not be cross-admissible; Dixon's prior manslaughter conviction, service of time in prison, and subsequent parole status; the tattoos and photographs of Johnson and Dixon, that would not be cross-admissible against Lee; statements between Dixon and Agustin that would not be cross-admissible; statements between Dixon and Jackson that would not be cross-admissible; and the gang evidence as to Johnson and Dixon that would not be cross-admissible against Lee. Lee expressed particular concern about spillover prejudice, and the disparate amounts and strength of the evidence against each defendant. The People opposed the motion on the grounds that the evidence was strong as to each defendant, as well as cross-admissible. Finding Lee could receive a fair trial, the court denied the motion.

### 2. *Analysis*

Section 1098 provides in part: "When two or more defendants are jointly charged with any public offense, ... they must be tried jointly, unless the court order separate trials." Under this section, "a trial court must order a joint trial as the 'rule' and may order separate trials only as an 'exception.' [Citation.]" (*People v. Alvarez* (1996) 14 Cal.4th 155, 190.)

"'A "classic" case for joint trial is presented when defendants are charged with common crimes involving common events and victims.' [Citation.] Though severance is in the sound discretion of the trial court, severance should generally be granted "'in the face of an incriminating confession [by a codefendant], prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony.'" [Citations.]" (*People v. Pinholster* (1992) 1 Cal.4th 865, 932, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459; *People v. Massie* (1967) 66 Cal.2d 899, 916–917; cf. *Zafiro v. United States* (1993) 506 U.S. 534, 539.)

The foregoing factors are not exclusive and are most often applied in cases involving defendants who are charged with crimes arising out of the same episode(s), as opposed to separate occasions. (*Calderon v. Superior Court* (2001) 87 Cal.App.4th 933, 938.) In the present case, defendants were jointly charged with crimes arising out of the same episodes for the most part, but Dixon was not charged in count one, and Lee was not charged in counts six and ten. Under such circumstances, it has been held that the criteria guiding trial court discretion with respect to joinder of counts (§ 954) are also instructive. (*Calderon, supra*, at pp. 938–939.) They are: "(1) whether evidence of the crimes would be cross-admissible; (2) whether some charges are likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a strong one, or with another weak case; and (4) whether any of the charges is a potentially capital offense." (*Id*. at p. 939.)

"We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared at the time the court ruled on the motion. [Citation.]" (*People v. Avila* (2006) 38 Cal.4th 491, 575; accord, *People v. Mendoza* (2000) 24 Cal.4th 130, 160–161 [discussing review under § 954].) A trial court abuses its discretion when its ruling "falls outside the bounds of reason." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1226.) "If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable that the defendant would have obtained a more favorable result at a separate trial. [Citations.] If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder "'resulted in 'gross unfairness' amounting to a denial of due process.'" [Citation.]" (*People v. Lewis, supra*, 43 Cal.4th at p. 452.)

At the time of its rulings, the trial court reasonably could have concluded the potentially prejudicial evidence either would have been admissible in separate trials or, to the extent it would not have been, could be adequately compartmentalized among defendants by means of limiting instructions. "The fact that evidence of other incidents was admissible against some defendants and not others does not require separate trials. [Citation.]" (*People v. Goodall* (1982) 131 Cal.App.3d 129, 141.) The court also reasonably could have concluded severance was not warranted by potentially antagonistic defenses (see *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150 [trial court abuses its discretion in denying severance only where conflict between defendants alone will demonstrate to jury that defendants are guilty]), by the relative dissimilarity of the quantity and quality of the evidence implicating one defendant as compared to the others (see *id*. at p. 151; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 43), or by prejudicial association (see *Letner and Tobin, supra*, at p. 152 [prejudicial association justifying severance occurs where evidence regarding one defendant might make it likely jury would convict that defendant, and more likely find codefendant guilty based on relationship between the defendants rather than upon evidence separately implicating codefendant] ).

One asserting prejudice in this situation must prove it; a bald assertion is not enough. (*People v. Kemp* (1961) 55 Cal.2d 458, 477.) "[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials. [Citations.]" (*Zafiro v. United States, supra*, 506 U.S. at p. 540.) We conclude the trial court did not abuse its discretion by denying the severance motions.

However, we cannot reject, out of hand, Lee and Dixon's claims that joinder resulted in such unfairness as to violate due process. We recognize that jurors are

presumed to follow instructions limiting the purpose(s) for which evidence can be considered or the defendant(s) against whom it can be considered. (*People v. Coffman and Marlow, supra*, 34 Cal.4th at pp. 43–44.) Nevertheless, there can be no doubt in the present case that these matters sometimes were complex.

"Prejudice cannot be understood in a vacuum. The touchstone of the court's analysis is the effect of joinder on the ability of the jury to render a fair and honest verdict. Prejudice will exist if the jury is unable to assess the guilt or innocence of each defendant on an individual and independent basis. 'Rather, the ultimate question is whether under all of the circumstances, it is within the capacity of the jurors to follow the court's admonitory instructions and, correspondingly whether they can collate and appraise the independent evidence against each defendant solely upon the defendant's own acts, statements, and conduct.' [Citation.]" (*United States v. Tootick* (9th Cir.1991) 952 F.2d 1078, 1082 [discussing joinder and severance under Fed. Rules Crim.Proc.].) As we cannot assess the fairness of trial without reviewing the trial record and analyzing many of the other claims of error made by defendants on this appeal (see *People v. Cleveland* (2004) 32 Cal.4th 704, 726), we will revisit the issue of severance in our discussion of cumulative prejudice, post.

*Johnson*, 2013 WL 5366390, at *48–51.

> b. Legal Standard and Analysis

There is no clearly established Federal law which holds that joinder or consolidation of charges may violate the Constitution.  In United States v. Lane, 474 U.S. 438, 446 n. 8 (1986), the Supreme Court stated in a footnote that "[i]mproper joinder does not, in itself, violate the Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."

However, in Young v. Pliler, the Ninth Circuit stated:

> *Lane* considered only the effect of misjoinder under Federal Rule of Criminal Procedure 8, and expressly stated that no constitutional claim had been presented. See Lane, 474 U.S. 438, 446 & n. 9, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Thus, Lane's broad statement-found in a footnote without citation to any legal authority-that misjoinder could only rise to the level of a constitutional violation if it was so prejudicial as to violate due process, was probably dictum. Only Supreme Court holdings are controlling when reviewing state court holdings under 28 U.S.C. § 2254; Court dicta and circuit court authority may not provide the basis for granting habeas relief. Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

Young, 273 Fed.Appx. 670, n. 1, 2008 WL 1757564 (9th Cir.2008) (unpublished); see also Collins v. Runnels, 603 F.3d 1127, 1132–33 (9th Cir.2010).  Moreover, the Supreme Court recently stated that "[j]oint proceedings are not only permissible but are often preferable when the joined defendants' criminal conduct arises out of a single chain of events."  Kansas v. Carr, 136

S.Ct. 633, 645 (2016).

In ascertaining the "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. Given that there is no clearly established Federal law in this instance, the Court cannot grant relief, since habeas relief is triggered only when the state court adjudication runs afoul of clearly established federal law. See Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (absent a Supreme Court decision that squarely addresses the issue it "cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent…and so we must defer to the state court's decision").

Even assuming that the Supreme Court's footnote could be considered clearly established Federal law, no constitutional violation occurred in this case because the prejudice was not so great as to deny Petitioner his right to a fair trial. Lane, 474 U.S. at 446, fn. 8. The defendants' conduct arose from the same chain of events, and much of the evidence was cross-admissible for the gang offenses and enhancements. Accordingly, the state court adjudication was not objectively unreasonable. For the foregoing reasons, the claim should be rejected.

### 2. Trial Court Error – Tattoo Evidence

Petitioner contends that the state court unreasonably determined that the trial court did not err in permitting the gang expert to testify regarding his tattoo. He argues that his tattoos of a gun and bullet strikes were irrelevant to the issue of whether he was a gang member or to any other issue in the case. He claims, the evidence was highly prejudicial and deprived him of a fair trial.

### a. State Court Decision

Defendants make numerous claims of error concerning the trial court's evidentiary rulings and related matters. Because many of the issues involve determinations of relevance and/or probative value versus prejudicial effect, we first state the general legal principles concerning those subjects before turning to defendants' specific contentions. [ . . . . ]

"'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of

59

the action." (Evid.Code, § 210.) "'While there is no universal test of relevancy, the general rule in criminal cases might be stated as whether or not the evidence tends logically, naturally, and by reasonable inference to establish any fact material for the prosecution or to overcome any material matter sought to be proved by the defense. [Citation.] Evidence is relevant when no matter how weak it may be, it tends to prove the issue before the jury.' [Citation.]" (*People v. Freeman* (1994) 8 Cal.4th 450, 491.)

While all relevant evidence is admissible except as otherwise provided by statute (Evid.Code, § 351), "[n]o evidence is admissible except relevant evidence" (*id.*, § 350). We review for abuse of discretion a trial court's rulings on relevance. (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.) That court is vested with wide discretion in determining relevance, but has no discretion to admit irrelevant evidence. (*People v. Alexander* (2010) 49 Cal.4th 846, 904.) "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered. [Citations.]" (*People v. Giminez* (1975) 14 Cal.3d 68, 72.)

"Under Evidence Code section 352, the probative value of the proffered evidence must not be substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. [Citations.]" (*People v. Cole, supra,* 33 Cal.4th at p. 1195.) "'The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.'" (*People v. Zapien* (1993) 4 Cal.4th 929, 958.) "Evidence is substantially more prejudicial than probative [citation] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome' [citation]." (*People v. Waidla* (2000) 22 Cal.4th 690, 724.)

"[T]he trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.] Where, as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125 (*Rodrigues*).)

[¶] . . . [¶]

### a. Lee's Tattoo

Lee challenges the admission of evidence concerning his tattoo. He says the prosecution's gang experts should not have been permitted to testify he had a tattoo, or that it was a gang tattoo and indicated Lee's involvement in shootings or criminal activity. Lee further contends introduction of his purported admissions regarding the tattoo violated *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*) and his constitutional right against self-incrimination. Dixon joins both arguments. The People say the trial court did not err in admitting the evidence, and, assuming Miranda was implicated, any error was harmless beyond a reasonable doubt.

### 1. Background

Lee moved, in limine, to preclude any mention of his tattoo without an Evidence

60

Code section 402 hearing to determine its relevance and admissibility. At the hearing, Senior Deputy Sherman testified, in pertinent part, to his qualifications as an expert on gangs in general and the Country Boy Crips in particular. He testified that tattoos show a gang member's allegiance to the person's gang and specific set within the gang. Common tattoos for Country Boy Crips are "CBC" for "Country Boy Crips," "NC" for "Notorious Country," "W" and "L" for "Watts and Lotus," and "Madd Blocc." Country Boy Crip members may also have tattoos such as "ESK" for "East Side Killer," "WSK" for "West Side Killer," or "BK" for "Blood Killer." Johnson and Dixon both had multiple tattoos along those lines.

Lee had one tattoo on his forearm. It depicted a firearm with four apparent bullet holes and some cartridges. The tattoo was significant to Sherman in a gang context because Lee's moniker was Gunner. Although Sherman often saw tattoos of guns on gang members, such a tattoo was not common among Country Boy Crips. Sherman had never seen a semiautomatic handgun tattooed on another Country Boy Crip. As for the number of cartridges (four or five, in Lee's case), Sherman had noticed on other people with such tattoos that they could be significant in regard to how many shootings the person had done and how many times the person had been shot. [FN114] Sherman had read reports concerning Lee's activities and was unable to find such a nexus here. He agreed that Lee had none of the common Country Boy Crip tattoos such as were seen on Johnson and Dixon.

> [FN114] Sherman could not recall who told him about the possible significance of the number of bullets, or when or where he had talked to that person.

Counsel for Lee asked that Sherman's opinion with respect to Lee's tattoo be precluded on foundation and relevance grounds, and as prejudicial under Evidence Code section 352. The prosecutor then elicited testimony from Sherman concerning Lee's MySpace page. Sherman opined that the fact Lee had a MySpace page with "Gunner" written on it showed a correlation between Lee's moniker and the tattoo. Having a gun tattooed on an arm was consistent with being a gang member, especially when the person's moniker was Gunner. The court overruled the objections.

Later, Bakersfield Police Officer Williamson testified about his contact with Lee after Lee's car was shot. Outside the jury's presence, the prosecutor informed the court that Williamson had arrested Lee on outstanding warrants, and had seen Lee's tattoo during booking and had spoken to him about it. The prosecutor represented that the incident was something Sherman was going to use as part of his evaluation of Lee from a gang standpoint, and that Williamson could establish Lee had the tattoo in March 2007. When counsel for Lee asked if Lee had been read his rights first, the trial court decided to hold an additional Evidence Code section 402 hearing.

Williamson testified at the hearing that on March 21, 2007, his first contact with Lee was at the Myrtle Street residence, where he was responding to a call of Lee's vehicle being shot. He did not see Lee's tattoo at that time. Lee had an active misdemeanor warrant or warrants, and Williamson participated in transporting him to jail and booking him. Williamson saw the tattoo while Lee was being booked. Williamson told Lee he liked it. Lee looked kind of perplexed, as if he did not know exactly what Williamson meant. Williamson asked if Lee fancied himself as a shooter. Lee looked over at Williamson and smiled a bit. Williamson said it was all right; Williamson was, too. Williamson then counted the bullet strikes, said that was a lot, and asked if it was shootings or kills. At that point, Lee looked straight

61

ahead and did not say anything.

Williamson explained that, in order to identify the person, identification of tattoos typically is part of the general booking process. He did not advise Lee of his rights at any point. He did not feel it was necessary in order to talk to Lee about his tattoo. Williamson was not investigating anything concerning the warrant pursuant to which Lee was being booked, and did not ask questions about that matter. At the time, Williamson was in the gang unit. Although he was not aware then of the address on Deanna Way and its significance, he had received training that tattoos of firearms were significant and that, while common on Hispanic gang members and seen on Caucasian gang members, they were not often seen on African–American gang members. While a firearm alone may not have drawn his interest, there is a significance when bullet strikes, hash marks, or rounds of ammunition stacked up on each other are considered in relation to the firearm.

Williamson did not have any knowledge of Lee at the time. By observing and asking about the tattoo, however, he was "absolutely" gathering intelligence for the gang unit, and he felt it might be pertinent in the future. Accordingly, Williamson immediately told his partner, who was writing a report, what he had seen so it could be documented. Williamson acknowledged he did not have to ask Lee questions about the tattoo in order to have Lee booked into the jail.

The prosecutor argued Williamson was just gathering basic information, and that, since the warrant was for charges of reckless driving, resisting arrest, and not having insurance, Lee was not in custody for purposes of *Miranda* because the questions asked of him were not related to the charges on which he was in custody. Moreover, the questions were not designed to elicit any information concerning those charges.

The court ruled *Miranda* had not attached because Lee was not questioned regarding the matters for which he was being booked. Accordingly, and in light of the gang-related charge and enhancements and the fact Williamson had some gang expertise, it permitted the prosecution to question Williamson on the subject in front of the jury.

In the jury's presence, Williamson testified that on March 21, 2007, after Lee's car was shot, Williamson took Lee into custody on a misdemeanor warrant and transported him to the downtown jail. While Lee was being booked, Williamson observed a tattoo of a pistol with four bullet strikes on Lee's forearm. There was also a tattoo of a stack of five bullets on the outside of the forearm. Williamson said to Lee, "that's bitchin'." Lee looked over at Williamson and gave him a perplexed, confused look. Williamson clarified he meant the pistol, asked if Lee fancied himself as a shooter, and said he did, too. Lee kind of smiled at him. Williamson then counted the bullet strikes, said "Wow," and asked if they stood for shootings or kills. At that point, Lee turned and faced straight ahead with a solemn, unemotional look on his face, and nothing further was said. [FN115]

    [FN115] Lee's objections on hearsay and Miranda grounds were overruled.

Williamson testified that through his training and experience, he had learned that tattoos of firearms on individuals indicated they fancied themselves as shooters. Seeing the firearm with the bullet strikes piqued his interest. Firearm tattoos are common on Caucasian and Hispanic gang members, but are uncommon on African–American gang members. A firearm by itself is not as significant as a firearm with marks or bullets or bullet strikes next to it, as the additional marks

usually signify events. Williamson was unable to name any other individual he had seen with a firearm tattoo. Williamson personally had no evidence that evening that Lee was an African–American gang member. He did not read Lee his rights before talking to him because Lee was not under arrest for a related offense. Engaging in conversation about tattoos is not required in order to book someone at the jail, although the observation of tattoos during the booking process is important for identification purposes. Before Williamson saw the tattoo, he had been told someone thought Lee was a gang member, which made the tattoo very interesting.

Williamson explained that a gang officer's primary method for gathering intelligence is to contact people on the street and talk to them. Williamson personally always tried to look at tattoos while doing this, because they typically represent affiliations, significant events in the person's life, and the like. Seeing how the tattoos change or are improved over time can be an indication that the person continues to participate in the gang lifestyle. Often, Williamson asks the person what the tattoos mean. This is a standard operational technique used by all officers for gathering intelligence that might be used later, even years down the road.

The subject of tattoos arose again when Sherman testified. In discussing photographs of various gang tattoos, Sherman talked about one depicting someone's hand holding a revolver. Sherman explained that it was unusual to see tattoos of firearms on Black males, although many Hispanics had them. Nevertheless, the photograph was of an African–American male who was not one of the defendants.

With respect specifically to Lee's tattoo, Sherman testified it was the only tattoo Lee had that was of interest as far as gang indicia were concerned. The gun itself might or might not be significant. Correlated with the bullet strikes around it, however, it appeared to Sherman to be a gang-related tattoo, with the bullet strikes referencing something. Sherman had seen them before on other individuals, who had told him they signified being shot at or being shot, and were a mark of honor, in essence, for doing something criminal. Lee's moniker of Gunner was significant in terms of its correlation with the firearm and bullet strikes. In addition, in Sherman's experience, a lot of monikers have something to do with a trait of the person. For instance, if a gang member does crazy things all the time, his moniker might be "Psycho." As a result, the moniker Gunner tended to suggest to Sherman that the person was an active gunman or that that was the trait he had been given.

Sherman took Lee's tattoo into consideration in opining Lee was an active member of the Country Boy Crips between March 1 and August 22, 2007. Sherman also based his opinion on Lee's police contacts, MySpace page, and letters and rap lyrics in Lee's possession.

In argument to the jury, the prosecutor discussed the incident in which Lee's car was shot. She mentioned that this was when the exchange took place about Lee's tattoo, and that Williamson and Sherman both said it was one thing to have a gun tattoo, but the bullet strikes made this tattoo more significant in a gang context. In arguing defendants were all gang members, the prosecutor noted Lee had the moniker Gunner, a gang tattoo, gang contacts and arrests by law enforcement, photographs of him flashing gang signs and with other documented Country Boy Crips, telephone contacts with documented Country Boy Crips, letters from his brother acknowledging the gang lifestyle, rap lyrics with gang references, the gang references on his MySpace page, his admission to Agustin that he was a Country Boy Crip, and Jackson's testimony that he was a Country Boy Crip.

## 2. Analysis

### a. Significance and Meaning of the Tattoo

Lee and Dixon say Lee's tattoo was irrelevant, because it could not be tied to the assertion bullet strikes were related to criminal activity, or to anything having to do with Country Boy Crips or Lee's activities. They also say there was insufficient foundation for testimony the tattoo supported expert opinion Lee was a Country Boy Crip and the bullet strikes correlated with involvement in shootings or criminal activity. Finally, they argue that even if relevant, evidence concerning the tattoo was more prejudicial than probative under Evidence Code section 352.

"Evidence possessing *any tendency* in reason to prove or disprove any disputed material fact is relevant. [Citations.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 711, italics added.) Evidence leading only to speculative inferences is, however, irrelevant. (*Ibid.*) That Lee's tattoo was of a type commonly seen on gang members, albeit Hispanic and Caucasian ones, had at least some tendency in reason to prove the tattoo was gang related, which in turn had some tendency in reason to prove Lee was a gang member. It did not have to be dispositive of the disputed fact in order to be admissible. (*People v. Richardson* (2008) 43 Cal.4th 959, 1002.) As demonstrated by the photograph Sherman displayed to the jury, firearm tattoos were not unknown in African–American gangs; moreover, even if not in itself indicative of Lee's membership in the Country Boy Crips, the tattoo corresponded to Lee's moniker Gunner. Considered in light of the other evidence of Lee's membership in the Country Boy Crips, including his police contacts, references on his MySpace page, and references in the letters from his brother and rap lyrics, evidence of the tattoo was not rendered irrelevant simply because it did not link him directly with, or was not a tattoo commonly seen on members of, the Country Boy Crips.

Nor was there insufficient foundation for the expert testimony related to the tattoo. "'"We are required to uphold the trial judge's ruling on the question of an expert's qualifications absent an abuse of discretion. [Citation.] Such abuse of discretion will be found only where "'"the evidence shows that a witness clearly lacks qualification as an expert...."'" [Citation.]' [Citation.]" (*People v. Wallace, supra*, 44 Cal.4th at pp. 1062–1063.) Here, the trial court did not abuse its discretion by finding that Sherman and, to a lesser degree, Williamson, had expertise in gangs.

"'A properly qualified expert may offer an opinion relating to a subject that is beyond common experience, if that expert's opinion will assist the trier of fact. [Citation.] Even so, the expert opinion may not be based on assumptions of fact that are without evidentiary support or based on factors that are speculative or conjectural, for then the opinion has no evidentiary value and does not assist the trier of fact. [Citation.]' [Citation.] [¶] "'"[A]n expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based. [Citations.]" [Citation.]' [Citation.]" (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 529–530; accord, *People v. Richardson, supra*, 43 Cal.4th at p. 1008.)

In forming an opinion, "a gang expert may rely upon conversations with gang members, on his or her personal investigations of gang-related crimes, and on information obtained from colleagues and other law enforcement agencies. [Citations.]" (*People v. Hill* (2011) 191 Cal.App.4th 1104, 1121–1122.) Sherman testified at length to his qualifications and the sources of his information. The

testimony provided a basis from which the jury reasonably could conclude the tattoo at least was related to Lee's moniker, which in turn was indicative of his gang membership. (See *Gardeley, supra*, 14 Cal.4th at p. 620.) Lack of specificity in terms of the source(s) of the information affected the testimony's weight rather than its admissibility, and was amply probed during cross-examination. (See *People ex rel. Dept. of Transportation v. Clauser/Wells Partnership* (2002) 95 Cal.App.4th 1066, 1085–1086.)

*In re Alexander L.* (2007) 149 Cal.App.4th 605, 611–612, on which Lee and Dixon rely, is distinguishable. There, when asked about the primary activities of the gang, the witness responded that he knew the gang had been involved in certain crimes. His testimony was found to lack an adequate foundation, because information concerning the basis of his knowledge, and thus the reliability of his testimony, was never elicited from him at trial. In the present case, Sherman testified that he had talked about the significance of tattoos of firearms with bullet strikes to individuals who themselves had such tattoos. In light of his other testimony concerning his training and experience with gangs, he did not need to name the sources of his information in order for the trier of fact to assess the weight and persuasiveness of his testimony. (See *People v. Lawley, supra*, 27 Cal.4th at p. 132.)

Here, the expert witnesses explained to the jury why they found the tattoo of particular interest and its potential significance. It was also made clear to the jury that such a tattoo was an unusual one for African–American gang members, so there was little danger the jury would automatically conclude the bullet strikes or cartridges in Lee's tattoo corresponded to criminal activity. This is especially true since Lee had the tattoo in March 2007, and there was no evidence he was involved in any shootings before that time. Finally, because of the correlation between the tattoo and Lee's moniker, and the ample other information that formed the basis of Sherman's opinion Lee was a Country Boy Crip, evidence of the tattoo was not "so uniquely inflammatory that its potential for unfair prejudice clearly outweighed its probative value" such that it should have been excluded under Evidence Code section 352. (*People v. Zambrano, supra*, 41 Cal.4th at p. 1142; see also *People v. Medina* (1995) 11 Cal.4th 694, 749.) Sherman and Williamson were properly allowed to testify concerning the tattoo and its significance. (See *People v. Ochoa* (2001) 26 Cal.4th 398, 437–438, disapproved on another ground in *People v. Prieto, supra*, 30 Cal.4th at p. 263, fn. 14.)

Johnson, 2013 WL 5366390, at *65-66, 102–06.

b.    Legal Standard and Analysis

A federal court in a habeas proceeding does not review questions of state evidence law. Our inquiry is limited to whether the evidence ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Therefore, habeas relief is unavailable for Petitioner's claim that the admission of the expert's testimony concerning his tattoo violated state evidentiary law.

With respect to the admission of evidence, there is no Supreme Court precedent governing

a court's discretionary decision to admit evidence as a violation of due process.  In Holley v.

Yarborough, the Ninth Circuit stated:

> The Supreme Court has made very few rulings regarding the admission of
> evidence as a violation of due process. Although the Court has been clear that a
> writ should be issued when constitutional errors have rendered the trial
> fundamentally unfair, [Citation omitted.], it has not yet made a clear ruling that
> admission of irrelevant or overtly prejudicial evidence constitutes a due process
> violation sufficient to warrant issuance of the writ. Absent such "clearly
> established Federal law," we cannot conclude that the state court's ruling was an
> "unreasonable application."  [Citation omitted.] Under the strict standards of
> AEDPA, we are therefore without power to issue the writ . . . .

Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); see Moses v. Payne, 555 F.3d 742,

760 (9th Cir. 2008) (holding that trial court did not abuse its discretion in excluding expert

testimony "[b]ecause the Supreme Court's precedents do not establish a principle for evaluating

discretionary decisions to exclude the kind of evidence at issue here").  Since there is no clearly

established Supreme Court precedent governing a trial court's discretionary decision to admit

evidence as a violation of due process, habeas relief is foreclosed.   Id.  Therefore, Petitioner

cannot demonstrate that the state court decision was contrary to, or involved an unreasonable

application of, clearly established federal law.  See 28 U.S.C. § 2254(d).

        Nevertheless, there can be habeas relief for the admission of evidence when the evidence

"is so extremely unfair that its admission violates fundamental conceptions of justice."  Perry v.

New Hampshire, 565 U.S. 228, 237 (2012).  Only if there are no permissible inferences that the

jury may draw from the evidence can its admission rise to the level of a due process violation.  Id.

at 920.  In this case, a fair-minded jurist could find that the gang expert's testimony was not so

extremely unfair as to violate due process.  The gang expert testified that tattoos like Petitioner's

are common among gang members, although more common among Caucasians and Hispanics

rather than African-Americas; therefore, the evidence had a tendency to show Petitioner was a

gang member.  In addition, the expert testified that the tattoo was consistent with Petitioner's

gang moniker of "Gunner."  Petitioner thus fails to show that no permissible inferences existed

that the jury might draw from the challenged evidence; accordingly, the claim does not rise to the

level of a federal constitutional claim and is, therefore, merely an issue of state law that is not

cognizable in these proceedings.  Therefore, the claim should be denied.

1

3.     <u>Miranda error</u>

2

    During booking, Petitioner was subjected to questions by the officer without having been

3

given <u>Miranda</u>[3] warnings. Petitioner argues that the statements he made should not have been

4

admitted. He claims that the state court unreasonably determined that the <u>Miranda</u> violation was

5

harmless beyond a reasonable doubt.

6

    a.   <u>State Court Decision</u>

7

8

9

Lee and Dixon contend that, in questioning Lee about the tattoo during booking, Williamson subjected Lee to custodial interrogation without the benefit of *Miranda* warnings. As a result, they say, Lee's responses to the questions should have been excluded, and their admission was federal constitutional error. The People say *Miranda* was not triggered by mere booking questions.

10

11

12

13

14

In *Miranda, supra*, 384 U.S. at page 444, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.... Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."

15

16

17

18

19

20

21

22

"'Absent "custodial interrogation," *Miranda* simply does not come into play.' [Citation.]" (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) "[C]ustodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (*Miranda, supra*, 384 U.S. at p. 444, fn. omitted.) "Whether a person is in custody is an objective test; the pertinent inquiry is whether there was "'a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" [Citation.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.) Interrogation, for purposes of invoking the *Miranda* protections, "refers not only to express questioning, but also to any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301, fn. omitted, italics added.)

23

24

25

26

In reviewing a trial court's ruling on a *Miranda* issue, we accept its determination of disputed facts if supported by substantial evidence. However, we independently review uncontradicted evidence, and also independently decide whether the challenged statements were obtained in violation of *Miranda*. (*People v. Davis, supra*, 46 Cal.4th at p. 586; *People v. Sims* (1993) 5 Cal.4th 405, 440, disapproved on another ground in *People v. Storm* (2002) 28 Cal.4th 1007, 1031–1032; *People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161–1162.)

27

28

---

[3] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

Here, there is no question that Lee was in custody when Williamson asked about his tattoo. Contrary to the prosecutor and trial court's apparent belief, the United States Supreme Court has squarely rejected the notion *Miranda* attaches only with respect to the matter for which the person is in custody. In *Mathis v. United States* (1968) 391 U.S. 1, 4–5, that court stated: "The Government ... seeks to narrow the scope of the *Miranda* holding by making it applicable only to questioning one who is 'in custody' in connection with the very case under investigation. There is no substance to such a distinction, and in effect it goes against the whole purpose of the *Miranda* decision which was designed to give meaningful protection to Fifth Amendment rights. We find nothing in the *Miranda* opinion which calls for a curtailment of the warnings to be given persons under interrogation by officers based on the reason why the person is in custody. In speaking of 'custody' the language of the *Miranda* opinion is clear and unequivocal: [¶] 'To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized.' [Citation.]" California courts have long recognized this principle. (See, e.g., *People v. Underwood* (1986) 181 Cal.App.3d 1223, 1231; *In re James M.* (1977) 72 Cal.App.3d 133, 136–137.) [FN116]

> [FN116] The issue is somewhat more complicated where the individual being interrogated is already in jail or prison when the questioning takes place. In such instances, something beyond the mere fact of incarceration is required in order for an interrogation to be custodial for *Miranda* purposes. (*Howes v. Fields* (2012) 565 U.S. ___ [132 S.Ct. 1181, 1189–1191, 1192–1193]; *People v. Macklem* (2007) 149 Cal.App.4th 674, 686–696 & cases discussed therein; see also *Maryland v. Shatzer* (2010) 559 U.S. 98, 112–113 & fn. 8.) We know of no authority extending such a requirement to the booking stage.

We also find it beyond reasonable dispute that Lee was subjected to interrogation within the meaning of *Miranda*. Williamson candidly admitted he was attempting to elicit gang intelligence that might prove useful down the line. He knew tattoos of firearms were significant in the gang context, especially when coupled with bullet strikes, hash marks, or rounds of ammunition. Although he did not know anything about Lee, he specifically asked if the bullet strikes in the tattoo represented shootings or kills—in short, Lee's involvement in criminal activity, whether by active participation in a criminal street gang or by participation in shootings or homicides. (See *People v. Roquemore* (2005) 131 Cal.App.4th 11, 25–26.) Not only were Williamson's questions reasonably likely to elicit an incriminating response, that type of response was precisely what Williamson was hoping to get.

It is true that small talk between police and a suspect in custody is permitted. (*People v. Gamache* (2010) 48 Cal.4th 347, 388.) This was not mere small talk, however; Williamson's inquiries were neither innocuous nor neutral. (See *ibid.*) It is also true that the asking of routine booking questions does not trigger the need for *Miranda* warnings. (*Pennsylvania v. Muniz* (1990) 496 U.S. 582, 601–602 (plur. opn. of Brennan, J.); *People v. Gomez* (2011) 192 Cal.App.4th 609, 628–629.) This type of routine gathering of background biographical information has been held to include questions about gang affiliation where such questions are asked for a legitimate administrative purpose, such as to ensure members of rival gangs are not placed together in jail cells. (*Gomez, supra*, at pp. 630–635; *U.S. v. Washington* (9th Cir.2006) 462 F.3d 1124, 1132–1133.) The questions here were neither routine nor asked for administrative or safety purposes. Rather, they were

designed to elicit incriminating admissions. (*Pennsylvania v. Muniz, supra*, 496 U.S. at p. 602, fn. 14 (plur. opn. of Brennan, J.); *Gomez, supra*, at p. 629.)

The People point to *People v. Morris* (1987) 192 Cal.App.3d 380 (*Morris*), in which we stated: "A police officer's concerns for jail security, encompassing the safety of the suspect, can be triggered by a variety of factors, some of which would have nothing to do with the offense underlying the suspect's incarceration and, as importantly, could only be explored by inquiring of the defendant himself. Thus a suspect who is booked into jail wearing tattoos or other indicia of gang affiliation might alert the booking officer to the possibility of gang-related violence; the quickest way for the officer to resolve such concern is to ask the suspect whether jail personnel should anticipate any trouble in this regard once the suspect becomes housed in the jail. So long as the offense for which the suspect is in custody is not itself gang-related, there is no reason the officer should foresee the question will elicit an incriminating response. In such a circumstance, an incriminating response is not the product of affirmative police conduct and would be admissible in the absence of *Miranda* warnings." (*Id*. at p. 390.)

*Morris* has been disapproved on this issue to some extent by *People v. Williams* (2013) 56 Cal.4th 165, 186–188 and footnote 15. Neither *Morris* nor *Williams* assists the People here. Williamson's testimony makes clear that he was not asking about Lee's tattoo in an attempt to resolve any sort of security concern, and that his questions were not ones that were required for the booking process. (Compare *People v. Williams, supra*, at pp. 187–188 & fn. 14.)

There is language in *People v. Wader* (1993) 5 Cal.4th 610 that offers some support for the People's position. There, the defendant was arrested on an outstanding warrant that was unrelated to the murder with which he ultimately was charged. Frank Hillhouse, who was known to police to be acquainted with the defendant, also was wanted on an outstanding warrant. (*Id*. at pp. 632–633, 634.) Following the defendant's arrest, Sheriff's Sergeant Hoops asked him where Hillhouse was. The defendant replied that he had heard Hillhouse was in a certain area and had been involved in shooting someone. The next day, Hoops again questioned the defendant, who provided additional information about Hillhouse and the shooting. It was only after this time that Hoops learned details of the murder with which the defendant ultimately was charged. Hoops further determined, without asking additional questions, that the defendant was wearing boots matching the description of a pair bought with the victim's credit card. (Id. at pp. 634–635.)

The California Supreme Court held that Hoops's inquiries about Hillhouse were not interrogation within the meaning of *Miranda*. The court stated: "Not every question directed by an officer to a person in custody amounts to an 'interrogation' requiring *Miranda* warnings. The standard is whether 'under all the circumstances involved in a given case, the questions are "reasonably likely to elicit an incriminating response from the suspect."' [Citation.] This is an objective standard. 'The subjective intent of the [officer] is relevant but not conclusive. [Citation.] The relationship of the question asked to the crime suspected is highly relevant. [Citation.]' [Citations.] As Sergeant Hoops's testimony indicates, his inquiry regarding the whereabouts of Hillhouse was designed to elicit information about Hillhouse, not defendant. There is no indication in the record before us that the inquiry was at all relevant to any charge for which defendant was then in custody or any crime of which he was then suspected. Accordingly, Sergeant Hoops was not required to advise defendant of his rights under *Miranda* ...." (*People v. Wader, supra*, 5 Cal.4th at p. 637.)

In the present case, in contrast, Williamson's questions—while not relevant to any charge for which Lee was then in custody—were both designed and reasonably likely to elicit information about Lee and, potentially, his involvement in criminal activity. Accordingly, they constituted interrogation within the meaning of *Miranda*. Lee's responses, although not verbal, constituted "statements" obtained in violation of *Miranda* (see Evid.Code, § 225; *People v. Whitfield* (1996) 46 Cal.App.4th 947, 958, fn. 6) and should have been suppressed. The trial court erred by admitting the evidence. [FN117]

> [FN117] At trial, the prosecutor warned that if the court found a *Miranda* issue here, it would potentially affect all future contacts between law enforcement and suspected gang members, and all field identification contacts. Aside from the fact that application of the Constitution's requirements should not turn on how far-reaching the effects may be, such contacts usually involve either consensual encounters or temporary detentions. Generally speaking, they do not constitute "custody" for *Miranda* purposes. (*Maryland v. Shatzer, supra*, 130 S.Ct. at p. 1224; *People v. Clair, supra*, 2 Cal.4th at p. 679.)

> *Miranda* error is assessed under *Chapman's* "'harmless beyond a reasonable doubt'" standard. (*People v. Aguilera, supra*, 51 Cal.App.4th at p. 1166; see *People v. Davis, supra*, 46 Cal.4th at p. 588.) We find the error nonprejudicial under this standard. Lee's responses were ambiguous. Even assuming jurors interpreted his smile to mean he did indeed fancy himself as a shooter, because he had the tattoo before any of the charged offenses occurred, jurors would not have concluded it was a tacit admission of complicity in the charged offenses. Since Sherman testified concerning other shootings in which Johnson and Dixon were involved, jurors likely would have further concluded Sherman would also have done so with respect to Lee, had any other such shootings existed. Thus, jurors would not have speculated the tattoo referred to shootings in which Lee was involved and about which jurors were not told.

Johnson, 2013 WL 5366390, at *107–09.

> b. Legal Standard

The Fifth Amendment provides that "no person shall be compelled in any criminal case to be a witness against himself." A suspect subject to custodial interrogation has a Fifth Amendment right to consult with an attorney, and the police must explain this right prior to questioning. Miranda v. Arizona, 384 U.S. 436, 469–73 (1966). In Miranda, the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. To this end, custodial interrogation must be preceded by advice to the potential defendant that he or she has the right to consult with a lawyer, the right to remain silent and that anything stated can be used in evidence against him or her. Id. at 473–74. These procedural

1  requirements are designed "to protect people against the coercive nature of custodial

2  interrogations." DeWeaver v. Runnels, 556 F.3d 995, 1000 (9th Cir. 2009).

3        Error in admitting statements obtained in violation of Miranda is deemed harmless for

4  purposes of federal habeas review unless the error "had substantial and injurious effect or

5  influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993);

6  Ghent v. Woodford, 279 F.3d 1121, 1126 (9th Cir. 2002).

7              c.   Analysis

8        Petitioner fails to demonstrate that no rational jurist could have found that Petitioner's

9  vague, non-verbal responses did not have a substantial and injurious effect on the verdict.  The

10 state court reasonably determined that Petitioner's responses were completely ambiguous, and

11 even if Petitioner's smile in response could have been taken to mean he thought himself a shooter,

12 it could not have been taken as an admission to the crime, since the tattoo was acquired before the

13 crimes were committed.  Moreover, as pointed out by Respondent, Petitioner's non-verbal and

14 ambiguous responses paled in comparison to the evidence of his participation in the crime, such

15 as his cell phone calls with the co-defendants during the crimes and in the vicinity of the crimes,

16 the presence of his DNA on clothing left in the area, the evidence that he pressured Jackson to

17 provide false testimony, and his statements that he could have helped Johnson violently suppress

18 Agustin's testimony.  As to the ambiguous responses showing a tendency to participate in

19 criminal gang activities, they pale in comparison to his online claims of endorsing the criminal

20 activities of the Country Boy Crip gang.  The claim should be denied.

21             4.   Evidence that "Gang Members Enjoy Killing"

22       Petitioner claims that the state court unreasonably determined that the gang expert's

23 testimony that "gang members enjoy killing" was harmless beyond a reasonable doubt.

24             a.   State Court Decision

25      Lee says the trial court erred by allowing Sherman to testify that sometimes gang
     members enjoy killing, that enjoying killing is part of being a gang member, and
26      that sometimes gang members participate in gang activities because they find it
     exciting. Lee says the evidence was irrelevant, based on speculation and without
27      reasonable foundation, and more prejudicial than probative under Evidence Code
     section 352. Johnson and Dixon join. The People suggest defendants have misread
28      the testimony in question, and say it was properly admitted in any event.

*1. Background*

Prior to being shot, Lee worked as a respiratory therapist in Los Angeles. During direct examination, the prosecutor asked Sherman, without reference to any particular individual and without objection, what motivated a person to join a gang. Sherman replied that there could be several different reasons: "[I]t could be somebody that's being picked on and they want to feel a part of something. It could be that they grew up out in the neighborhood and they feel that their family's from there and that's where they need to go. It could be motivated by greed. They see fellow gang members having nice cars, lots of money, and so they want to participate and gain that. It could be that they see these guys, gang members, going around with guns and everybody looks up to them and they're scared and intimidated by them and that's something they may want to be a part of."

Later, on direct examination, and again during questioning about gang members in general, the prosecutor asked whether all gang members dressed a certain way. Sherman answered no, and explained that years before, most showed their colors and dressed like gang members. Upon becoming aware of the Penal Code sections and how dressing like a gang member could be used against them in court, however, many steered away from that and dressed more normally. The same was true with respect to tattoos. The prosecutor noted that Sherman had testified about selling drugs to finance the gang. She then asked if some gang members had legitimate jobs. Sherman replied affirmatively, and explained that some gang members had a regular job and wanted to work, because they had a family to support and were not making enough money with the gang. In addition, some wanted to try to distance themselves from the gang and "pull themselves away" by doing something legitimate. Again, there was no objection.

During cross-examination, counsel for Lee asked Sherman if, in preparing to form his opinion about Lee, Sherman had included Lee's educational background, work history, or professional licensing. Sherman answered no to each. Sherman agreed that if a Black male in a Country Boy Crip neighborhood wore powder blue clothing, got caught selling drugs, threw gang signs, and had gang tattoos, Sherman likely would classify him as a gang member. Asked if, conversely, a Black male who was from or frequented the Country Boy Crip neighborhood, did not have tattoos or wear blue, but had a lot of friends in the gang and hung out with gang members, might be considered undercover, Sherman responded that it would depend on more information than counsel provided. Sherman agreed that some Black gang members lived within the gang boundaries while others did not, some wore gang colors while others did not, some sold drugs while others did not, and some rented cars for each other while some rented cars for themselves. Sherman further agreed that some African–Americans went to college while others did not, some were respiratory therapists while others were not, and some were certified in Advanced Cardiac Life Support while others were not. Counsel for Lee ended his examination, "Doesn't it kind of sound like if you're young and Black and happen to be in the Country you really can't win either way?" The trial court sustained the prosecutor's objection that the question was argumentative.

The prosecutor immediately elicited Sherman's testimony that he was not basing his opinion that Lee was a Country Boy Crip on the fact Lee was African–American and had been seen within the territorial boundaries of the Country Boy Crips. Rather, he was basing his opinion on the investigation as a whole, including a particular photograph, letters from Lee's brother, the MySpace page, Lee's contacts with other Country Boy Crip members, his arrest for primary criminal activities of the gang, and Sherman's experience. The prosecutor asked some

questions about the letters from Lee's brother, then this took place:

"Q. Do people with educations belong to gangs?

"A. They do.

"Q. Why would someone with an education and a job belong in a gang?

"A. Again, the stigma of the gang. They want to be a part of the gang, whether they enjoy what the gang does, what the benefits are, or whether their family's deeply enthralled in the gang. There's nothing the gang says that prevents you from getting an education or a job.

"Q. *Officer Sherman, sometimes do people just enjoy killing other people*?

"[COUNSEL FOR JOHNSON]: Objection.

"[COUNSEL FOR LEE]: Join.

"[COUNSEL FOR JOHNSON]: 'Sometimes' is vague and it's conclusory and it's prejudicial.

"THE COURT: Can you be a little more specific?

"[COUNSEL FOR JOHNSON]: Irrelevant.

"[PROSECUTOR]: "Q. *Sometimes do gang members enjoy killing other people*?

"A. Again, I can't speculate to what a gang member specifically is thinking, whether he enjoys it or not. I just know it's an aspect of what comes with a gang member.

"Q. Sometimes do gang members get involved in activities of the gang because it's exciting to them?

"A. Yes.

"Q. How do you know that? [¶] ... [¶]

"[COUNSEL FOR JOHNSON]: It's vague; calls for speculation.

"THE COURT: The vague objection is overruled. [¶] You may answer in the context of your qualifications, sir, and experience.

"A. I've spoken with gang members that they do it for the excitement, whether it be the narcotics selling, the money, having all the property, having the cool things, being able to go fight other rival gang members whenever you want, so they find that exciting." (Italics added.)

### 2. Analysis

Defendants' relevancy objection should have been sustained. [FN118] The prosecutor was entitled to rebut the defense's suggestion that, because Lee had an education and a legitimate job, he was not a gang member. She achieved that

purpose by asking an expert in gangs why someone with a job and an education would belong to a gang. The question and answer about whether it was exciting arguably fell within the trial court's discretion to admit: Sherman had spoken to gang members on the subject, giving his answer a reliable, nonspeculative foundation; because he did not suggest gang members found killing people exciting, his answer was not unduly prejudicial under Evidence Code section 352. Whether people in general or gang members in particular sometimes enjoy killing other people, however, had no tendency in reason to prove or disprove any disputed fact at trial. [FN119]

> [FN118] Dixon did not join the objections, but in light of the trial court's rulings, it would have been futile for him to do so.

> [FN119] Although no objection was raised on this ground, we also find the subject not a proper one for expert testimony. "Opinion testimony may be admitted in circumstances where it will assist the jury to understand the evidence or a concept beyond common experience. Thus, expert opinion is admissible if it is '[r]elated to a subject that is sufficiently beyond common experience [and] would assist the trier of fact.' [Citation.] Expert opinion is not admissible if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness. [Citation.]" (*People v. Torres* (1995) 33 Cal.App.4th 37, 45.) Jurors do not need an expert to tell them that some people like to kill. (Cf. *People v. Johnson* (1993) 19 Cal.App.4th 778, 785 [proposition that prison inmates sometimes lie not outside common understanding of jurors].) Moreover, Sherman's testimony that he knew it was an aspect of what came with being a gang member was without adequate foundation. (*In re Alexander L., supra*, 149 Cal.App.4th at pp. 611–612; see *People v. McWhorter* (2009) 47 Cal.4th 318, 362.)

> The erroneous admission of expert testimony is reviewed under the *Watson* standard. (*People v. Prieto, supra*, 30 Cal.4th at p. 247; see also *People v. Avitia* (2005) 127 Cal.App.4th 185, 194.) There is no reasonable probability any defendant would have obtained a more favorable result had the challenged evidence been excluded. Nor was defendants' trial rendered fundamentally unfair by its admission.

Johnson, 2013 WL 5366390, at *109–11.

       b.  Legal Standard and Analysis

As previously noted, it is not for the federal court to review questions of state evidence law, and the Court's inquiry is limited to whether the evidence ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). There is no Supreme Court precedent governing a court's discretionary decision to admit evidence as a violation of due process; therefore, habeas relief is foreclosed. See Holley, 568 F.3d at 1101. However, there can be habeas relief for the admission of evidence when the evidence "is so

1    extremely unfair that its admission violates fundamental conceptions of justice." Perry, 565 U.S.

2    at 237. Only if there are no permissible inferences that the jury may draw from the evidence can

3    its admission rise to the level of a due process violation. Id. at 920.

4         In this case, a fair-minded jurist could agree with the state court's determination that the

5    gang expert's testimony was not so extremely unfair as to violate due process. Although the court

6    found this evidence to be irrelevant, the court determined that any error was harmless. Given that

7    the expert declined to provide an opinion on the question, it is clear that the trial was not

8    fundamentally rendered unfair. The claim should be denied.

9         5.    Crime of Conspiracy to Participate in a Gang

10        Petitioner contends that he was erroneously charged with conspiracy to participate in a

11   gang. On appeal, however, the California Supreme Court determined that state law criminalizes

12   conspiracy to participate in a gang. People v. Johnson, 57 Cal.4th 250 (2013). The federal court

13   is bound by the state court determination of state law. The claim is meritless.

14        6.    Evidence of Friend's Red Car

15        Petitioner next claims that the state court unreasonably determined that the admission of

16   evidence concerning Shannon Fowler's burgundy 2006 Toyota Corolla was proper. He argues

17   that admission of the evidence violated his rights to due process and a fair trial.

18             a.   State Court Decision

19   Lee contends the trial court erred by admitting evidence that Shannon Fowler
     owned a burgundy 2006 Toyota Corolla around the time of the Real Road and
20   Planz shooting. Lee says the evidence was irrelevant because, aside from its color,
     this car did not match the descriptions given by eyewitnesses to the shooting of the
21   car used therein. Lee says admission of the evidence violated his right to a fair
     trial, because the evidence served to confuse the jury and create the illusion
22   Fowler's car was used in the shooting, which in turn explained away the absence of
     evidence linking defendants to the suspect car. Johnson and Dixon join. The
23   People say Lee's claim is based on a "selective view of the prosecution's case,"
     and that the evidence was properly admitted.
24
                              *a. Background*
25
     On March 21, 2007, Officer Shaff went to Lee's house to investigate the shooting
26   of Lee's vehicle. Shaff did not recall seeing a burgundy or red car in the garage or
     immediate area. During the course of his investigation in this case, Senior Deputy
27   Little did not come across any red or burgundy vehicles that were registered to
     Lee.
28

                                            75

Adrian Bonner testified that on the afternoon he was shot, he saw Lee in a burgundy car as he was leaving the parking lot of the Taco Bell where he had eaten. The car Lee was driving was a small, four-door burgundy Suzuki or Hyundai Elantra. Bonner clarified that he was not saying for sure it was that kind of car; he was just trying to give an example of what the car looked like. It had rounded edges and a boxy roof. It was reddish burgundy. It was not brand new, but was a newer model, which to Bonner meant 2001 and more recent. It possibly could have been a 2005 automobile. It had newer license plates. Bonner was able to see into the car; only Lee was inside.

Approximately 15 to 20 minutes later, when Bonner was stopped for a red light at Real Road and Planz, he was shot. Out of the corner of his eye, he saw a burgundy vehicle passing on the passenger side of his vehicle. He could not see anyone inside, because the vehicle was driving away. He did not know if it was the same car he had seen Lee driving earlier, although he got a good look at the color and believed it was the same as the car Lee had been driving.

Bonner recalled telling the grand jury that it was a burgundy car and he could not see how many people were inside because the windows were tinted. At trial, however, he testified that he may have thought the windows were tinted because of how dark it was getting, how far away the car was, and the direction it was going. He thought there may have been a shadow making the window look tinted. [FN110]

> [FN110] Bonner admitted that the first time he said the window's darkness may have been caused by a change of light and not tinting was at trial.

Christopher Calloway witnessed the Bonner shooting. He described the car from which the shots were fired as a burgundy color, maybe a newer model Ford Taurus. To him, newer model meant the later 1990's or early 2000's. He believed the car was "[s]omething of [the] nature" of a Ford Taurus. The car looked more rounded, not more boxy and edgy. The paint was not new or old, but instead was in "[w]ell-kept shape."

Ruben Gonzaga also witnessed the shooting. He considered the car "mostly a cherry red," possibly a Chevrolet.

Talia Zarate was another witness to the shooting. She testified the car from which the shots were fired was a small four-door vehicle, and like a maroon or cranberry color. She did not remember the type, and did not recall telling officers that it looked to be a late 1990's Ford Taurus.

Bryan Kunzmann also saw the shooting. He described the car at trial as either a dark red or burgundy color, late model, and like a Ford Taurus or with that kind of rounded body style. It had four doors.

During the time Agustin was with Johnson, she saw Lee in various automobiles. His own vehicle was black. He told her that he rented vehicles. The one she saw him in the most was a powder blue Magnum. She never saw Lee drive a red vehicle.

On August 23, 2007, Senior Officer Findley responded to an apartment complex in the 200 block of Eye Street upon learning that the Nissan involved in a pursuit had been reported stolen from that address. Parked in the lot at the back of the apartment complex about 8:30 that night was a red car. Findley took photographs

of the area that included the car. He was not aware of a photograph of the car ever being shown to Bonner or any of the witnesses to Bonner's shooting.

Jackson testified that he had only seen Lee in two different cars. One was a brownish or goldish Lexus with tinted windows. The other was a red car. Jackson saw Lee in the red car around June, in the three-month period Jackson was out of custody. It was a newer—possibly 2003 to 2005—red compact car, like a Toyota or something similar. He did not know the model. It was a shiny red, although not a bright red. Lee told Jackson he had rented the car. On August 23, 2007, Jackson saw Dixon and Bus Loc in a red car that looked like a Toyota. He thought it was the same car he had previously seen parked behind some apartments on Eye Street. It looked like the same car he had seen Lee driving two or three times.

Shannon Fowler testified that in August 2007, she lived in an apartment on Eye Street. She had a burgundy Toyota Corolla. Over defense objection that the car was irrelevant because it had never been identified by anyone as being involved in any shootings, Fowler testified that the car was a four-door 2006 model, and that she believed it was the only red car that belonged to the occupants of the apartments at the time. She had control of the only set of keys, but let her brothers drive the car whenever they wanted. Fowler got the car at the end of 2006, and had it for almost a year. It did not have tinted windows. At some point after August 2007, it was repossessed.

Over defense objection, Fowler identified photographs as being of her car, which she co-owned with her boyfriend, who was incarcerated at the time. [FN111] The photographs depicted the vehicle as it looked in August 2007. The photographs were admitted over defense objection. Fowler identified them as having been taken at the Orange County Police Department in connection with her prior boyfriend's case.

> [FN111] Counsel for Johnson asked for an offer of proof as to what witness would identify the car as being one involved in any shooting. Asked to respond, the prosecutor stated: "Your Honor, Dupree Jackson—I don't really want to go into this in front of this witness. I think this is unfair and I think the evidence is obvious." The court then overruled the defense objections. We cannot help but note that the prosecutor tended to respond to relevance objections by stating her belief that the evidence in question was relevant. Since it was the court's duty to make the necessary rulings, it would have been preferable for it to do so on a basis other than the prosecutor's determination of relevance.

Fowler acknowledged being acquainted with Lee, but denied ever having a romantic relationship with him. He never telephoned her from jail, and she never gave him a ride in her red car. His clothes were never in her car. To impeach Fowler, the prosecutor played a recorded telephone call made from Lee, who was in jail, to a person whose voice Sherman recognized as being that of Fowler. In the course of the conversation (which made it apparent Fowler and Lee had an intimate relationship), Fowler mentioned Lee's brother getting Lee's clothes from her car.

Detective Heredia was involved in attempting to locate the red car that was used in the shooting of Adrian Bonner. On January 14, 2009, he received information regarding Fowler, and then interviewed her. As a result, he contacted the Orange County Sheriff's Department, got the license number of a vehicle that belonged to her, and eventually obtained photographs of the vehicle that were taken in 2007.

Heredia ran a DMV registration check on the license number, and learned Fowler was one of the registered owners of the car from February 8, 2007, to February 8, 2008. Heredia learned the car had been assigned a new license plate on April 24, 2008, and he learned the name of the new owner. Heredia located the car on January 16, 2009, at an address in Bakersfield. The car had tinted windows and a fin in the back, which it did not have in the Orange County photographs. Over relevancy objections, photographs of the car as it appeared when Heredia found it were admitted into evidence. Heredia was unable to say how the car appeared on April 11, 2007. He neither showed photographs of the car to the witnesses to the Bonner shooting nor directed anyone to do so.

Adrian Bonner was recalled to the stand, and testified that he was fairly familiar with makes and models of cars, and thought Lee was in a burgundy Suzuki Forenza when Bonner saw him about 20 minutes before the shooting. At the prosecutor's request, Bonner had looked on the Internet for photographs of Suzuki Forenzas. He found some, and confirmed they were consistent with the car he saw. On cross-examination, Bonner testified that he could "pretty much" tell the difference between a Suzuki Forenza and a Toyota.

Shown photographs of the car that Heredia had taken on January 16, 2009, defense witness Kevin Griffith testified it was not the car he saw involved in the shooting on August 11, 2007, nor was it the one he saw later that night. Griffith's best recollection of the car involved in the shooting was that it was like a red Nissan Sentra. The paint on the hood of the trunk was kind of bleached out or oxidized by the sun. The car looked "fairly newer" to him, but he could not tell the age by looking at it.

In her argument to the jury, the prosecutor showed side-by-side photographs of Fowler's car before it was sold and a Suzuki Forenza. The prosecutor argued that at a glance, the two cars were almost identical, and she pointed out that Kunzmann said the car involved was a Toyota Corolla. [FN112] She further told jurors that Heredia found the car during the course of trial, which was why photographs of it were not shown to the various witnesses. Without objection, she asserted: "[A]nd Martin Heredia tracked down that car and found out that *that is the red car that they used to shoot Adrian Bonner in.*" (Italics added.) Defense counsel countered by arguing it was not the same car and there was no evidence linking Fowler's car to the one used in the shooting.

> [FN112] This was a reference to the description Kunzmann gave in his 911 call.

### b. Analysis

As previously stated, "'Evidence is relevant when no matter how weak it may be, it tends to prove the issue before the jury.' [Citation.]" (*People v. Freeman, supra,* 8 Cal.4th at p. 491.) Defendants cite *People v. Cox* (2003) 30 Cal.4th 916 (*Cox*), disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at page 421, footnote 22, as support for their claim evidence that Fowler's car was irrelevant. We find *Cox* dispositive and supportive of the trial court's ruling.

In *Cox*, a witness testified that she and the defendant often went camping, and that the defendant had handcuffs, guns, and a knife in his car. When the prosecutor sought to ask her how many guns, the defense objected on relevance grounds arguing that, because the witness would testify that the defendant stabbed the victims, there was no evidence guns were used. The trial court sustained the

objection on Evidence Code section 352 grounds. It later reversed its ruling, however, reasoning that because the cause of death was not known, the prosecution should be allowed to show the defendant had instruments that would allow him to overpower and kill his victims. (*Cox, supra*, 30 Cal.4th at p. 955.)

On appeal, the defendant contended the introduction of the three guns found during the search of his car was prejudicial error, because the guns were never shown to have any connection with the commission of the charged offenses. (*Cox, supra*, 30 Cal.4th at p. 955.) The California Supreme Court rejected the argument, stating:

> "In *People v. Riser* (1956) 47 Cal.2d 566 [ (Riser ), disapproved on other grounds in *People v. Morse* (1964) 60 Cal.2d 631, 639, fn. 5, 652 & fn. 17 & *People v. Chapman* (1959) 52 Cal.2d 95, 98], the defendant murdered two people during a robbery. The killing was committed with a Smith and Wesson .38–caliber Special revolver. The gun was never recovered. [*Riser*, at p. 573.] Riser was found with three holsters, one of which could hold a .38–caliber Smith and Wesson Special revolver. Riser also possessed a Colt .38–caliber revolver, which could not have been the murder weapon. (*Id*. at p. 577.) We stated the rule of admissibility as follows: 'When the specific type of weapon used to commit a homicide is not known, it may be permissible to admit into evidence weapons found in the defendant's possession some time after the crime that could have been the weapons employed. There need be no conclusive demonstration that the weapon in defendant's possession was the murder weapon. [Citations.] *When the prosecution relies, however, on a specific type of weapon, it is error to admit evidence that other weapons were found in his possession, for such evidence tends to show, not that he committed the crime, but only that he is the sort of person who carries deadly weapons*. [Citations.]' [Citation.] Because the murder weapon was known, we ruled that the admission of the Colt .38–caliber revolver was error, but such error was not prejudicial. [Citation.]

> "Here, it is not known how the three victims were killed. Although the prosecutor argued that the evidence pointed to a stabbing, such argument did not preclude the reasonable possibility that one or all three of the victims had been shot. [Citation.]

> "Moreover, given [other evidence], it is also reasonable to infer that defendant, who had unfettered access to three weapons, may have used the same to get [victims] into his car and keep them in his car during the drive to the location of their murder. [¶] ... [¶]

> "Here, the guns were relevant either as possible murder weapons, or as weapons that could have been used to coerce the victims into defendant's car or otherwise subdue them, 'in furtherance of the criminal plan' to kill them. There was no error in admitting the guns in evidence." (*Cox, supra*, 30 Cal.4th at pp. 955–957, italics added.)

Defendants highlight the italicized portion of *Riser*. In *Riser*, however, the prosecution's own witness *established* that the bullets found at the scene of the crime were fired from a Smith and Wesson .38 Special revolver, and not from either the Colt .38 or the P38 that the trial court admitted into evidence. (*Riser, supra*, 47 Cal.2d at p. 577.) The high court's statement about the prosecution relying on a specific type of weapon must be read in light of those facts. Where the

evidence is not conclusive, as in *Cox*, the prosecutor's argument of a specific theory does not fall within the *Riser* holding, because "[t]he trier of fact is not limited by any hierarchy of theories selected by the prosecution." (*People v. Manson* (1976) 61 Cal.App.3d 102, 207, cited with approval in *Cox, supra*, 30 Cal.4th at p. 956.)

*People v. Farnam, supra*, 28 Cal.4th 107, illustrates our reasoning in this regard. In that case, the defendant was arrested, and a knife found in his possession, about two months after the homicide. When the prosecution sought admission of the knife to show it could have been the tool used to cut telephone cords at and gain entry into the victim's house, the defendant objected on relevance, due process, and Evidence Code section 352 grounds, arguing no connection between the knife and the crimes could be established. The trial court overruled the objection, and a criminalist then testified that, although the knife could not be conclusively identified as having been used, it could have been used. (*People v. Farnam, supra*, 28 Cal.4th at p. 156.)

On appeal, the defendant claimed the trial court abused its discretion and denied him due process by admitting the knife and related testimony, since the knife was irrelevant and its improper introduction led jurors to infer he was the murderer simply because he possessed a similar knife two months after the homicide. (*People v. Farnam, supra*, 28 Cal.4th at p. 156.) The California Supreme Court rejected the claim, finding that evidence the defendant possessed a knife two months after the crimes, coupled with evidence the perpetrator used a sharp instrument consistent with the knife, tended to establish the defendant was the perpetrator. The court observed that the fact many people may also have possessed such a knife might diminish the strength of the evidence, but did not make it irrelevant. (*Id*. at pp. 156–157; see also *People v. Freeman, supra*, 8 Cal.4th at p. 491 [FN113].) That the prosecution could not conclusively connect the knife to the crime scene did not matter, because the knife *could have been* the one used. (*Farnam*, at p. 157.) Furthermore, admission of the knife was not error under Evidence Code section 352, because, in light of the criminalist's testimony, the trial court reasonably could have concluded the jury would not be confused or misled. (*Farnam*, at p. 157.) Thus, the court concluded, "although the probative value of the knife was not that strong, the danger of confusion, speculation, or prejudice was minimal. We find no abuse of discretion and no deprivation of defendant's due process rights." (*Ibid*.) This was so even though the criminalist testified that, in his opinion, any other sharp, single-bladed object, including a scalpel, kitchen knife, or scissors blade, could have cut the objects at the crime scene. (*Id*. at p. 157, fn. 26.)

    [FN113] In *People v. Freeman, supra*, 8 Cal.4th at pages 490–492, the state high court rejected the argument that evidence of a garbage bag found in the defendant's car shortly after a robbery was irrelevant because no one identified it as having been used in the robbery, and numerous people must possess such common items in their cars.

In the present case, Bonner and the eyewitnesses to his shooting gave a variety of descriptions of the car involved. Although none of the descriptions or other evidence established that Fowler's car was used, neither did they eliminate that possibility. Because the evidence did not establish the specific type of car used, *Riser* is not controlling.

The evidence showed more than that Lee merely was acquainted with someone who had a burgundy car. Rather, a reasonable inference could be drawn that he

had an intimate relationship, during the relevant timeframe, with the owner of such a car, and that she let other people use her vehicle. Under the circumstances, evidence concerning Fowler's car was relevant, as it had some tendency in reason to show Lee had access to a car that may have been the one used in the shooting, and thus that he was involved in the crime. Although the probative value of the evidence was not great since no one could identify Fowler's car as the car used in the shooting, there was no danger the evidence would be used as improper character or disposition evidence, as is a possibility where possession of weapons is involved. (See *People v. Barnwell* (2007) 41 Cal.4th 1038, 1055–1056; *People v. Archer* (2000) 82 Cal.App.4th 1380, 1392–1393.) Moreover, in light of the various descriptions of the car involved and the fact Griffith said Fowler's car was *not* the one used, there was, contrary to defendants' argument, little danger of confusion, speculation, or prejudice.

It is true the prosecutor went too far in arguing Heredia found out Fowler's car was the one used in the shooting. Heredia's testimony suggested nothing of the sort. This did not affect the evidence's admissibility, however. (*People v. Harrison, supra,* 35 Cal.4th at p. 230.) Defendants did not object to the prosecutor's assertion, but reasonably countered her argument with argument emphasizing the lack of evidence linking Fowler's car to the shooting. Admission of the evidence neither constituted error under state law nor a deprivation of defendants' rights to due process and a fair trial.

Johnson, 2013 WL 5366390, at *97–102.

b. Legal Standard and Analysis

As noted, there is no Supreme Court precedent governing a court's discretionary decision to admit evidence as a violation of due process; therefore, habeas relief is foreclosed. See Holley, 568 F.3d at 1101. Habeas relief is only available if admission of the evidence "is so extremely unfair that its admission violates fundamental conceptions of justice." Perry, 565 U.S. at 237. Only if there are no permissible inferences that the jury may draw from the evidence can its admission rise to the level of a due process violation. Id. at 920.

Here, it is clear that the state court decision was not unreasonable. Although it was not established that Fowler's vehicle was the one used in the crime, the evidence showed it was a possibility. The vehicle resembled the one used in the crime and matched one eyewitness's description as to the make, model and color. The jury could have drawn the inference that Petitioner had an intimate relationship with Fowler, that she let Petitioner borrow her vehicle, and that the vehicle was the one used in the crime. In addition, there was no danger that the evidence could be used as evidence of bad character or a particular disposition to commit the crime. A fair-minded jurist could agree with the state court's determination that the evidence was relevant

1 and did not render the trial fundamentally unfair. The claim should be denied.

2        7.    Motion for New Counsel

3       Petitioner next complains that the state court violated his constitutional rights when it

4 failed to grant him new counsel in order to prepare and present a motion for new trial based on

5 ineffective assistance of trial counsel. He further faults the trial court for failing to inquire further

6 into Petitioner's complaints concerning trial counsel.

7        a.   State Court Decision

8       Lee contends the trial court erred by denying his postverdict request to substitute
appointed counsel. (*People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).) The
9 People say the court acted within its discretion.

10 *A. Background*

11       On the date originally set for sentencing, Lee asked for a *Marsden* hearing with
respect to his trial attorney. [FN159] Lee asserted he was denied a fair trial and the
12 effective assistance of counsel, and he requested new counsel to bring a new trial
motion based on ineffective assistance of counsel.
13

14          [FN159] Lee twice sought unsuccessfully to have new counsel appointed
prior to trial. He does not now challenge the rulings on those motions.

15 Lee claimed:

16 ● His case should have been severed from that of his codefendants.

17 ● Counsel should have filed a motion in limine to exclude gang expert testimony.

18 ● Counsel should have filed a motion in limine to impeach prosecution witnesses
who were biased and had motive and opportunity to lie.
19

20 ● Counsel failed to object to or file motions to exclude the prison letters authored
by Lee's brother, Lee's tattoo, and the Internet postings.

21 ● Witnesses existed who could have testified concerning the events of March 21,
2007, and the condition of Lee's hand after he was shot, and who could have
22 testified he was not at the tattoo parlor when Bonner was there. No investigator
talked to these witnesses and they were not called at trial.
23

24 ● Counsel failed to obtain Lee's cell phone records for the entire time period to
show a pattern of calls, to call an expert on cell phone records, and to call an
25 expert disputing the prosecution's cell phone tower evidence.

26 ● Counsel failed to present evidence that Saleta Roseburr's house, the Crip house
at Monitor and Pacheco Road, and where Bonner was shot were on the same cell
phone tower, so Lee could have been at Roseburr's house when the shooting took
27 place.

28 ● Counsel failed to call a witness to testify concerning how long Lee had had his

firearm tattoo and what it meant.

● Counsel failed to call the person who actually created the MySpace page and put "Keepin' it Gangsta" on it, or Lee's cousin, who wrote the messages the prosecutor found significant.

● Lee wanted to testify about the messages he wrote and what they meant, but counsel told him it probably was not a good idea to testify.

● Counsel failed to subpoena a witness who was subpoenaed by counsel for Johnson, or to request a bench warrant when the witness, who could have testified Bonner was lying about some of Bonner's activities before the shooting, failed to appear.

● Counsel failed to elicit the distance between McNew Court and the Country, to show Johnson would not have had to leave his clothes at a crime scene if he had a getaway driver, since he could have run to Country Boy Crip territory in under a minute.

● Counsel failed to present evidence that when gang members rent cars, they do not use credit cards and their own driver's licenses. Counsel also failed to call witnesses who would have testified that when Lee rented cars, he was out of town with them.

● Counsel failed to present jail housing records to show that Bonner could not have been threatened in jail.

● Counsel failed to present a letter Jackson wrote to Dixon apologizing and stating Jackson was lying.

● Counsel failed to introduce Lee's medical records to show he could not have fired a gun because, after he was shot, his fingers would not bend.

● Although counsel sought to exclude Lee's statement to Johnson in the back hallway, counsel used it in his closing argument against Lee's wishes and even though Lee told him it was not what he said.

● Counsel used an argument tying Lee to the McNew Court shootings against Lee's wishes.

● Counsel failed to provide evidence and paperwork to Lee or to go over things with him. Although, as the court noted, the two spoke in the courtroom, there was only so much they could discuss there, and by then it was too late because trial had started.

● Counsel refused to call any of Lee's witnesses, and did not have an investigator talk to Lee about which witnesses should be contacted. Counsel himself saw Lee at the jail only about four times.

The court questioned defense counsel about some of Lee's claims. Counsel related that he had an investigator if he was meeting with a client and the client indicated there would be a reason to have alibi witnesses investigated. Early on, however, Lee indicated he did not remember where he was on the dates of the various incidents, and so there was not really a list of people to have an investigator talk to.

83

With respect to Lee's claim no witnesses were called, counsel explained there was indeed an expert appointed to review the cell tower information, a DNA expert was appointed early on, and a witness with a criminalistics background was called at trial. As for other potential witnesses, it was never the People's theory that Lee was a shooter at any of the crime scenes, but rather that he was the driver. Because there were photographs of vehicles owned and driven by Lee that were outside the Bakersfield area during the time of the incidents, a reasonable inference could be drawn that he was capable of driving. Counsel did not call Lee's doctor because (1) the doctor was not an expert in trajectory, and (2) would have had to speculate about what Lee's condition might have been at a certain time or date had he taken a certain medication. Moreover, Lee's injuries were not suffered during a criminal act Lee was alleged to have committed. The crimes Lee was convicted of committing were incidents in which the People's theory was that he was capable of driving a car. There was no indication he fired a weapon during those incidents.

With respect to whether Lee was given the opportunity to testify, counsel pointed out that Lee was admonished of his rights in that regard on the record. Counsel explained he understood it was a client's constitutional right to testify or not, and that counsel did not make that decision for his clients.

Counsel chose to address Lee's other claims by category, rather than individually. With respect to motions and objections, counsel observed, and the court confirmed, that counsel filed a number of in limine motions. Counsel also objected, during the trial process, on both state and federal constitutional grounds. Experts were appointed and utilized. Counsel interviewed but chose not to call Burts to impeach Agustin, believing his testimony would be harmful; counsel for Dixon ultimately called him as a witness. As far as character witnesses, counsel pointed out that the nature of character evidence is not someone who is called to testify to what they believe a tattoo to mean. Counsel believed such testimony would be objectionable on a number of grounds. Finally, as to the issue of alibi witnesses, Lee was unable to say where he was or when, making it difficult to acquire alibi witnesses.

Counsel acknowledged that he and Lee had disagreements concerning what counsel would say during closing argument. After Dixon and Burts testified, and Burts corroborated some of Agustin's testimony, counsel felt he had to shift positions to mitigate the damage done by that testimony and the testimony concerning the cell phone towers. Counsel felt it was in Lee's best interests to ask for instructions on lesser included offenses with respect to the Bonner shooting. He also chose to give the jury an option they could accept, which was that Lee was contacted after the McNew Court shootings and used as a means of escape, which was why his cell phone was in the area.

Counsel also acknowledged that he and Lee disagreed about whether to call certain witnesses such as Lee's father. Counsel explained that as a defense lawyer assessing credibility, he had to consider motivation and bias, the amount of time that had passed, and any criminal records that might be present on certain witnesses. Ultimately, counsel had to make those decisions.

Counsel conceded that his visits with Lee were minimal. He explained, however, that Lee had always maintained he was not involved, but did not remember where he was at the various times. Accordingly, counsel found it more fruitful to use his time doing other things such as trying to use Lee's work records as a platform to determine whether he might have been working some of the days in question, going through rental car receipts, and the like.

The court invited Lee to respond. Lee questioned why, if there was no indication he was the actual shooter, counsel asked for the lesser offenses, which gave the jury the option of finding him guilty as the shooter in the Bonner incident. Lee also noted his attorney asked no questions of Burts, even though Burts testified Agustin said either Lee or Dixon did not do anything. Lee conceded he told counsel that he did not know where he was at on all of the occasions, but there were witnesses who could have said where he was within certain time periods. Lee also opined that the expert witness called by counsel was not an effective witness. Lee also complained that counsel did not call the officers who were present on at least two occasions when Lee's house was searched, to testify they did not find any gas masks or gang attire; moreover, counsel did nothing to show that the Robert Lee for whom an obituary was found committed suicide and was not related to Lee.

Counsel admitted having a copy of Jackson's jail kite. However, when he asked Jackson on the stand whether he had ever communicated with Dixon about the incident or written anything to him, Jackson denied it. This left counsel unable to authenticate the writing. Counsel pointed out that Dixon could not do it, because it was made through a third person and was not a direct communication. Counsel also pointed out that he gave Lee a search warrant application containing the best description of evidence available at the time.

In ruling on Lee's motion for new counsel, the trial court observed that the standard was the same regardless of when the motion was made, to wit, whether defense counsel was not providing adequate representation or whether counsel and the defendant had such an irreconcilable conflict in their relationship that ineffective representation was likely to result. The court stated:

> "... I find from a review of all of the matters you've set forth here this morning and your written papers and your attachments in this matter, and from the totality of the evidence that [counsel] at all stages of this case, ... has provided very adequate representation and that you and [counsel] have not engaged in an irreconcilable conflict in your relationship that would prevent ineffective [sic ] representation in the future, and arguments that counsel would not make certain motions, disagreement on trial tactics, refusal to make certain arguments, those, as they stand alone, or in this case as you mentioned them, are insufficient to require discharge of appointed counsel. [¶] ... [¶]

> "If you're telling your attorney that he needs to call witnesses, needs to do certain things, and you don't know where you are on a given day, it puts the attorney in a very difficult position.

> "And I watched with great admiration on your attorney's presentation of the final argument, and ... he used a PowerPoint display, and I have never seen, in 26 years on the bench, a more effective use of electronic media and his presentation and the way in which he linked all of the evidence. I've just never seen an argument presented quite so well.

> "And I think when an attorney has ... limited material to present, he did the best he could under those circumstances.

> "So I think that what you're trying to do certainly can't be criticized, but you're trying to say that—or misrepresent—and I say this most respectfully to you—motives on his part or lack of determination. I mean, he's been in our court many, many times and he goes to the mat for everyone,

85

regardless of their position, and I certainly don't think that he gave up on you or failed to call any appropriate witness."

The court further found no irreconcilable conflict. As a result, it denied the *Marsden* motion.

*B. Analysis*

"[C]riminal defendants are entitled under the Constitution to the assistance of court-appointed counsel if they are unable to employ private counsel. However, the decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court, and a defendant has no absolute right to more than one appointed attorney.... [¶] '''The right of a defendant in a criminal case to have the assistance of counsel for his defense ... may include the right to have counsel appointed by the court ... discharged or other counsel substituted, if it is shown ... that failure to do so would substantially impair or deny the right ..., but the right to such discharged or substitution is not absolute, in the sense that the court is bound to accede to its assertion without a sufficient showing ... that the right to the assistance of counsel would be substantially impaired ... in case the request is not granted, and within these limits there is a field of discretion for the court.''' [Citations.]" (*Marsden, supra*, 2 Cal.3d at p. 123.)

*Marsden* established "that the trial court must give the defendant the opportunity to explain the reasons for desiring a new attorney. [Citation.] '[T]he trial court cannot thoughtfully exercise its discretion in this matter without listening to [the defendant's] reasons for requesting a change of attorneys.' [Citation.] Accordingly, 'When a defendant moves for substitution of appointed counsel, the court must consider any specific examples of counsel's inadequate representation that the defendant wishes to enumerate. Thereafter, substitution is a matter of judicial discretion. Denial of the motion is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel. [Citations.]' [Citation.]" (*People v. Smith* (1993) 6 Cal.4th 684, 690–691.)

*Marsden* applies posttrial as well as preconviction, and the standard, although sometimes worded differently, is the same. "'When, after trial, a defendant asks the trial court to appoint new counsel to prepare and present a motion for new trial on the ground of ineffective assistance of counsel, the court must conduct a hearing to explore the reasons underlying the request. [Citations.] If the claim of inadequacy relates to courtroom events that the trial court observed, the court will generally be able to resolve the new trial motion without appointing new counsel for the defendant. [Citation.] If, on the other hand, the defendant's claim of inadequacy relates to matters that occurred outside the courtroom, and the defendant makes a "colorable claim" of inadequacy of counsel, then the trial court may, in its discretion, appoint new counsel to assist the defendant in moving for a new trial. [Citations.]' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 346.)

The "colorable claim" language originated in *People v. Stewart* (1985) 171 Cal.App.3d 388, 396–397, which was the first case to apply *Marsden* posttrial (see *People v. Smith, supra*, 6 Cal.4th at p. 691). The California Supreme Court has made it clear that this does not state a lesser standard than that established in *Marsden* (*Smith*, at p. 693); instead, "the standard expressed in *Marsden* and its progeny applies equally preconviction and postconviction.... A defendant has no greater right to substitute counsel at the later stage than the earlier." (*Id*. at p. 694.)

Stewart has been disapproved to the extent its language implies a different rule than that of Marsden. (*People v. Smith, supra*, 6 Cal.4th at pp. 694, 696.)

In the present case, Lee moved to discharge defense counsel and have new counsel appointed to bring a motion for new trial based on ineffective assistance of counsel. (See *People v. Lucky* (1988) 45 Cal.3d 259, 281.) Thereafter, the trial court afforded him ample opportunity to explain the reasons for his request. (See *People v. Vera* (2004) 122 Cal.App.4th 970, 979.) Accordingly, we review the denial of Lee's motion for abuse of discretion. (*People v. Memro* (1995) 11 Cal.4th 786, 857; *Vera*, at p. 979.) "[D]iscretion is abused whenever the court exceeds the bounds of reason, all of the circumstances being considered. [Citations.]" (*People v. Giminez, supra*, 14 Cal.3d at p. 72.)

We conclude the trial court's ruling was reasonable, both with respect to counsel's purported inadequacies and any irreconcilable conflict between client and counsel. (See *People v. Memro, supra*, 11 Cal.4th at p. 857.) The court patiently permitted Lee to fully state his claims, seeking clarification where necessary for the court to ensure it understood Lee's true complaints. It inquired of defense counsel with respect to particular assertions by Lee, and solicited Lee's response after defense counsel addressed the various categories of Lee's claims. Many of Lee's complaints of counsel's purported inadequacy amounted to tactical disagreements. *Marsden* error will not be found under such circumstances. (*People v. Dickey* (2005) 35 Cal.4th 884, 922; see also *People v. Lazenby* (1992) 6 Cal.App.4th 1842, 1846.) To the extent there was a credibility question between Lee and defense counsel, the trial court was entitled to accept counsel's explanations. (*People v. Smith, supra*, 6 Cal.4th at p. 696.) In light of those explanations, it was not required to accept Lee's assertions of inadequate investigation (*People v. Vera, supra*, 122 Cal.App.4th at p. 979) nor, in our view, was it required to elicit from defense counsel a response to every single point raised by Lee (see *People v. Turner* (1992) 7 Cal.App.4th 1214, 1218–1219).

Lee says the trial court erroneously believed the scope of the *Marsden* inquiry was limited to in-court matters. We disagree. Although the court quoted at length from Justice Baxter's concurring opinion in *People v. Smith, supra*, 6 Cal.4th at pages 697–706, the record clearly shows it denied the motion only after obtaining and considering defense counsel's explanations of his conduct. The court was not required to ignore its own knowledge and observations of what went on at trial. (See *People v. Abilez* (2007) 41 Cal.4th 472, 488–489; *People v. Bolin, supra*, 18 Cal.4th at p. 347.)

Under the circumstances presented here, "'we find no basis for concluding that the trial court either failed to conduct a proper *Marsden* inquiry or abused its discretion in declining to substitute counsel.' [Citation.]" (*People v. Smith, supra*, 6 Cal.4th at p. 697, fn. omitted.) Lee is entitled neither to reversal nor to remand for a new *Marsden* hearing.

Johnson, 2013 WL 5366390, at *161–66.

### b. Legal Standard

The denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to counsel and therefore is properly considered in a habeas proceeding. Bland v. California Dep't of Corrections, 20 F.3d 1469, 1475 (9th Cir. 2000). It is well established that when a

criminal defendant voices a seemingly substantial complaint about counsel, the trial judge should make a thorough inquiry into the reasons for the defendant's dissatisfaction.  Id. at 1475–76; United States v. Robinson, 913 F.2d 712, 716 (9th Cir. 1990).  While a defendant has the right to make a motion for new counsel based on the defendant's perception of ineffective assistance of counsel, he does not have an automatic right to the substitution of counsel simply because he is dissatisfied with appointed counsel's performance.  Jackson v. Ylst, 921 F.2d 882, 888 (9th Cir. 1990).  The Sixth Amendment guarantees effective assistance of counsel; it does not guarantee a "meaningful relationship" between an accused and his attorney.  See Morris v. Slappy, 461 U.S. 1, 14 (1983).

The ultimate inquiry in a federal habeas proceeding is whether the petitioner's Sixth Amendment right to counsel was violated.  Schell v. Witek, 218 F.3d 1017, 1024–25 (9th Cir. 2000) (en banc). The habeas court considers whether the trial court's denial of or failure to rule on the motion "actually violated [petitioner's] constitutional rights in that the conflict between [petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment."  Id. at 1026.

c. Analysis

Petitioner fails to demonstrate that the state court rejection of his claim was objectively unreasonable.  As noted by the appellate court, the trial court held a hearing concerning Petitioner's motion for new counsel.  The court heard Petitioner's arguments, and his attorney's responses.  The trial court was satisfied with counsel's answers concerning all of Petitioner's concerns.  There is no basis in the record for requiring the removal of defense counsel under Marsden.[4]  Petitioner fails to demonstrate how a fair-minded jurist could not agree with the appellate court's reasoning.  The claim should be rejected.

8.    Brady/Prosecutorial Misconduct

Petitioner alleges that the prosecution withheld material cell phone records that could have

_____

[4] People v. Marsden, 2 Cal.3d 118 (1970).

been used to impeach critical witnesses, undermine the prosecution's case, and demonstrate Petitioner's innocence. Petitioner sought the evidence but it was discovered that the records in original form were no longer available. Therefore, the cell phone company compiled the data in substitute form. This was provided to defense counsel. Petitioner argues that the original records were in fact available, but the prosecution suppressed them.

a. <u>State Court Decision</u>

[] P.C. Section 1054.1 subd. (a), (b), (c) requires the prosecution to disclose all inculpatory and exculpatory material in its possession including the names of witnesses, their anticipated testimony, and things seized pursuant to search warrants. Failure to do so constituted a discovery violation and reversal of convictions. *Brady v. Maryland* (1963) 373 U.S. 83.

Petitioner contends that he didn't receive all the material regarding cellphone conversations allegedly occurring between Dixon, Johnson and himself.

Both Dean Marshall and Thomas Little successfully obtained search warrants from both T. Mobile and Sprint. Dep. McKinley Mosely, a District Attorney investigator, received numerous records including times of calls, parties, and a synopsis of text messages.

Petitioner contends that because of the closing of the west coast offices of Nextel, and the destruction of records, that office had to rely on switching systems. Petitioner sought post-conviction discovery under P.C. Section 1054.9 which applies to petitioner since he is serving three sentences of life without possibility of parole.

This discovery statute requires the prosecution to turn over material in its possession which is material to a claim of post-conviction relief. *In re Steele* (2004) 32 Cal.App.4th 682, 695-696. Petitioner received sufficient discovery not only from the prosecution but also from his counsel. The prosecution turned over records from the cellphone companies which explained the call patterns, when petitioner made those calls, and what antenna systems relayed them. The cell phone calls were not only from petitioner but to and from other codefendants including their girlfriends.

There were also no discovery failings from petitioner's counsel who sent over his file on CD-ROM. Counsel also subsequently sent a copy of the CD-ROM file to petitioner's father, who refused to accept them.

Hon. Michael Delostrito denied the motion for post-conviction discovery relief under the criminal case number on January 17, 2013. The order found that both the prosecution and trial counsel complied with post-conviction discovery, and it was up to petitioner to pursue and exhaust administrative remedies with the prison regarding examination of the proffered disks.

The prosecution turned over further discovery on March 6, 2014 in compliance with Hon. Michael Bush's order granting in part and denying in part petitioner's second motion for post-conviction discovery.

The court thus finds no *Brady* error by the prosecution.

Resp't's Ans., Ex. C.

While the state court only examined Petitioner's claims concerning post-conviction discovery, not pretrial, it is presumed that the Court rejected the pretrial claim on the merits. Johnson v. Williams, 133 S.Ct. 1088, 1091 (2013).

      b.  Legal Standard

Due process requires that the prosecution disclose exculpatory evidence within its possession. Brady v. Maryland, 373 U.S. 83, 87 (1963); Cooper v. Brown, 510 F.3d 870, 924 (9th Cir. 2007). This obligation encompasses the duty to discover and produce favorable evidence known to others acting on the government's behalf in the case, such as other agencies involved in the investigation or prosecution of the defendant. Kyles v. Whitley, 514 U.S. 419, 437 (1995); United States v. Zuno–Arce, 44 F.3d 1420, 1427 (9th Cir. 1995).

There are three components of a Brady violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281–82 (1999); see also Banks v. Dretke, 540 U.S. 668, 691 (2004); Silva v. Brown, 416 F.3d 980, 985 (9th Cir. 2005). The third element, prejudice, is also described as materiality. See Benn v. Lambert, 283 F.3d 1040, 1053 n. 9 (9th Cir. 2002) (explaining that, "for Brady purposes, the two terms have come to have the same meaning"). Evidence is material under Brady if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles, 514 U.S. at 433–34 (internal quotation marks and citation omitted).

      c.  Analysis

Petitioner claims that the prosecution possessed a number of cell phone records that were not provided to the defense. He alleges the evidence was suppressed and the prosecution relied instead on "switch maintenance records." Petitioner, however, fails to identify which records were specifically suppressed. The Court has reviewed the record, and in particular, Petitioner's exhibits which he claims clearly show that certain records were available to the prosecution that

were not made available to defense. Based on the exhibits, there is no indication that the prosecution had access to more evidence than was provided to the defense or that the defense possessed by means of subpoena. The exhibits show that the defense was in possession of a substantial amount of cell phone evidence, including cell phone records for Petitioner, cell tower locations and strength, and cell tower coverage areas, and this evidence was provided to the defense expert in advance of trial. See Pet., Ex. 5 at pp. 3, 5. Petitioner does not identify any other evidence which was withheld and his argument that other evidence existed which the prosecution withheld is pure speculation. Moreover, there is no indication that any of the purportedly suppressed evidence would have been helpful to the defense. Petitioner hypothesizes that the missing records could have shown that his cell phone was not in the area of the shootings when they occurred, but again, this is just speculation. Therefore, he cannot show prejudice. The claim should be denied.

         9.      Ineffective Assistance of Counsel

        Petitioner next claims he received ineffective assistance of trial counsel due to a multitude of errors and omissions, as follows: 1) Trial counsel failed to investigate the reliability and chain of custody of cell phone records, and he failed to properly object to the admission of cell phone records and to the qualifications of the chief investigator who testified as a cell phone expert; 2) Counsel failed to investigate and present evidence of third party culpability; 3) Counsel failed to subpoena and call lay witnesses; 4) Counsel failed to call Petitioner's doctor to explain his hand injury and defeat the prosecution's theory that he was firing a weapon; 5) Counsel failed to call witnesses concerning his MySpace page; 6) Counsel failed to impeach Dupree Jackson concerning a letter purportedly written by Jackson; 7) Counsel failed to object to the rental car evidence; 8) Counsel failed to object to funeral evidence or to introduce a death certificate; 9) Counsel failed to repeat an overruled objection regarding a defense failure to call as a witness a woman who had a prior romantic relationship with both Petitioner and Adrian Bonner; 10) Counsel failed to object to the prosecutor's characterization of eyewitness Ardalla West's 9-1-1 recorded phonecall, and failed to call Ardalla West as a witness; 11) Defense counsel failed to impeach Bonner concerning a threat made by Petitioner's brother; 12) Counsel failed to question

witness Emmanuel Burts; 13) Counsel erred by implying Petitioner's guilt as to lesser included offenses during closing argument; and 14) Counsel erred by advising Petitioner not to testify.

Some of these claims were addressed by the appellate court on appeal, while others were addressed by the superior court in habeas proceedings. The Court will address each allegation of ineffectiveness in turn.

a. Legal Standard

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75 (1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123. In effect, the AEDPA standard

1  is "doubly deferential" because it requires that it be shown not only that the state court

2  determination was erroneous, but also that it was objectively unreasonable. Yarborough v.

3  Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a

4  state court has even more latitude to reasonably determine that a defendant has not satisfied that

5  standard. See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

6  application was unreasonable requires considering the rule's specificity. The more general the

7  rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

8              b.  Cell Phone Records and Qualifications of Expert

9         Petitioner claims defense counsel: (1) failed to investigate and object to the qualifications

10  of the prosecution's expert witness concerning cell phones; (2) failed to investigate the reliability

11  and chain of custody of the cell phone records; (3) failed to object to the admission of the cell

12  phone records; and (4) failed to investigate and properly object to the switch maintenance record.

13         The superior court rejected this claim as follows:

14         Petitioner contends that his defense counsel failed to call an expert witness to
       counter the testimony of Tam Hodgsen. Petitioner concentrates his ire on the
15     failure to rebut the testimony of Hodgsen and other law enforcement officers
       concerning cellphone conversations.
16
       Cal. Ev. Code Section 801 permits the testimony of expert witnesses if their
17     testimony is helpful to the jury in where the knowledge of an expert is beyond the
       understanding of lay jurors.
18
       On September 2, 2008, petitioner's counsel moved to appoint Jeffrey Fischbach as
19     an expert to show that cell phone transmissions can be unreliable when their signal
       is lost while a user is traveling from one antenna site to another. This was to
20     counter the prosecution's expert who stated that the signal loss was minimal and
       the transmissions were discernible to enable the computers to maintain an accurate
21     record of the calls and their content.

22     The only guidance we receive is from the appellate court opinion wherein counsel
       stated to the trial court that the defense expert proved unreliable. Thus the
23     decision to call an expert to counter a prosecution expert is one of tactics. The
       appellate court found no fault by counsel and determined that counsel's decision
24     was correct given the circumstances of the case. Though the cell phone records
       are critical evidence, the prosecution could have obtained a conviction absent these
25     records given the numerous witnesses presented by the prosecution. . . .

26     The court thus finds no ineffective assistance of counsel on this ground.

27  Resp't's Ans., Ex. C.

28         The claim is without merit. First, as noted by the state court, defense counsel did in fact

                                           93

consult with a defense expert on cell phone tower information in advance of trial. However,
defense counsel determined that the expert proved unreliable. Petitioner fails to demonstrate how
this was erroneous. As to the remaining allegations, Petitioner fails to demonstrate that the
prosecution's expert was not qualified, that the cell phone records were unreliable, or that the
switch maintenance records were improper. His allegations are purely speculative and therefore
he cannot show any prejudice resulting from counsel's alleged omissions. Thus, the claim fails.

### c. Evidence of Third Party Culpability

Petitioner claims that counsel failed to present evidence that a third party was responsible
for the shooting of Adrian Bonner. This claim was rejected by the superior court as follows:

> Petitioner contends that his counsel failed to present evidence of third party
> culpability. This has relevance during the drive-by shooting of Adrian Bonner on
> August 21, 2007.
>
> Petitioner points to a stop of a vehicle occupied by Norwood. While Norwood was
> arrested after a traffic stop, nothing further developed. Norwood was not charged
> with complicity in this case. Given the witnesses who witnessed petitioner driving
> the car, and Johnson shooting Bonner out the back passenger window, there
> simply is no thirty-party liability to argue.

Resp't's Ans., Ex. C.

Petitioner claims that defense counsel should have investigated whether Paul Evans, who
was with the victim right before he was shot, was responsible for the shooting. However, this is
pure conjecture and therefore Petitioner cannot demonstrate prejudice. Moreover, defense
counsel sought to attack the prosecution's lack of evidence rather than prove third party
culpability. As Respondent points out, "[o]nce counsel reasonably selects a defense, it is not
deficient performance to fail to pursue alternative defenses." Rios v. Rocha, 299 F.3d 796, 807
(9th Cir. 2002).

### d. Lay Witnesses

Petitioner also faults counsel for failing to investigate and call several witnesses. The
superior court addressed the claim as follows:

> Petitioner blames his counsel for failing to call defense witnesses which could
> exonerate him such as Ardella West, and Paul Aranda as examples.
>
> The decision to call witnesses is a tactical one best left to counsel. The courts are
> reluctant to second-guess trial counsel. *People v. Beagle* (1972) 6 Cal.3d 441,

458.   Generally failure to call exculpatory witnesses which could lead to a meritorious defense is ineffective assistance of counsel.  *In re Alcox* (2006) 137 Cal.App.4th 655, 657, 666.

Aranda and West witnessed the shooting of McGowan, who was referred by the moniker of T Baby.  They identified Johnson, but were uncertain as to the role Lee played in the shooting because he was elsewhere waiting for further instructions. The issue of calling favorable witnesses is addressed in the second appellate opinion when the trial court queried on May 1, 2009.  Counsel testified that he queried petitioner about witnesses and he stated that he could not remember where he was during the three shootings.   If petitioner could not remember his whereabouts, then it is difficult for counsel to come up with favorable witnesses, a fact not lost on the appellate court who impliedly found no grounds for ineffective assistance of counsel on this ground in upholding the denial of the Marsden motion.  Petitioner presents no declarations from the witnesses he claims should have been called and their anticipated testimony.   This further discredits petitioner's claim.

Furthermore, the numerous prosecution witnesses that showed a pattern of criminal conduct based upon circumstantial evidence as well as the testimony of the victims such as Anthony Lyons, Othelon Lyons and the witnesses to Wallace and Alcala's murders would serve to rebut any favorable witnesses the defense could call.  The only tactic left to counsel was to call Mark Taylor to discredit the prosecution's investigation of these crimes.   The court finds no ineffective assistance of counsel on this ground.

Resp't's Ans., Ex. C.

The state court rejection of this claim was not unreasonable.  First, as pointed out by the state court, Petitioner could not recall where he was during the events in question.  If counsel did not know where Petitioner purported to be, counsel cannot be faulted for failing to investigate the identity of any favorable witnesses at those locations.  In addition, while Petitioner identifies several witnesses, he fails to show what they would have testified to and whether they would have so testified.  He provides no affidavits to support his claims.

In the appellate court, Petitioner also complained in his motion to substitute counsel that counsel failed to call witnesses.  The appellate court noted that counsel had explained that he and Petitioner disagreed on calling certain witnesses.  Counsel stated he considered the witnesses, their credibility, motivation, bias, amount of time that had passed, and their criminal records. Ultimately, counsel determined which witnesses to call.  Petitioner fails to demonstrate that counsel's decision was unreasonable.  The claim should be rejected.

e.   Petitioner's Doctor

Petitioner was also tried for conspiracy to commit an assault with a deadly weapon on

1   March 22, 2007. (Resp't's Ans., Ex. B at 2, 4.) Petitioner's hand had been shot that day, and the

2   prosecutor argued that the injury tended to show that he had been holding a gun when he was

3   shot. Petitioner claims that defense counsel should have called Petitioner's doctor to explain his

4   hand injury and defeat the prosecution's theory that he was firing a weapon. However, counsel

5   had no duty to prepare for each and every contingency. Moreover, there was nothing

6   objectionable in defense counsel relying on argument as to the lack of evidence. Petitioner

7   further fails to demonstrate prejudice, since there is no evidence as to what the doctor would have

8   testified and whether he would have testified.

9           f.   MySpace Page

10          Petitioner complains that evidence of his MySpace page was admitted over counsel's

11  objections. Further, he argues defense counsel was ineffective in failing to call witnesses in

12  response to the evidence.

13          As to the admission of evidence, Respondent correctly argues that habeas relief is

14  unavailable. Sarausad, 555 U.S. at 192 n.5. In addition, Petitioner admits that counsel objected

15  to the admission of some of the MySpace page evidence. (Doc. No. 1-2 at p. 68.) Counsel was

16  granted a continuing objection as to the pictures and words on the page. (Doc. No. 1-2 at p. 68.)

17  Counsel further objected repeatedly to the opinion of the gang expert. (Doc. No. 1-2 at p. 68, 70,

18  73.) Counsel cross-examined the expert to reveal that the expert had no information other than

19  his own opinion to show that Petitioner was responsible for sending the messages, and the expert

20  did not compare any of the dates and times of the messages to Petitioner's work schedule. (Doc.

21  No. 1-2 at 72.)

22          Although counsel repeatedly objected and argued the state of the evidence, Petitioner

23  faults counsel for failing to investigate and call witnesses who could have testified that the

24  MySpace postings were not his. He further faults counsel for failing to object to the

25  qualifications of the expert. Petitioner's claim fails because his arguments are conclusory. Like

26  his previous claims, he provides no evidentiary support. He provides no affidavits from these

27  other witnesses, he does not state what they would have testified to, and he fails to show they

28  would have testified. As to his failure to object to the qualifications of the expert, Petitioner does

not establish that the expert was not qualified. Therefore, it cannot be said that counsel erred. The claim should be rejected.

### g. Impeachment of Dupree Jackson

Petitioner complains that counsel failed to impeach Dupree Jackson with a letter purportedly written by Jackson which contradicted his testimony. As Respondent points out, trial counsel explained that the letter could not be authenticated once Jackson denied authoring it. (RT 11683-84, 11703-04.) Petitioner argues that the letter could have been authenticated if defense counsel had tried; however, Petitioner is speculating and cannot show prejudice. In addition, the matter of whether the evidence could be admitted is a question of state law unreviewable on federal habeas.

Petitioner also claims that counsel failed to investigate and call witnesses concerning the murder of Larry "Raybo" Bowen. Petitioner alleges that Jackson was involved in the murder and was testifying so as to avoid prosecution for that murder. Petitioner claims witnesses could have been called to testify as to Jackson's involvement. This claim is also purely speculative. Petitioner does not identify these witnesses, what they would have testified to, and whether they would have testified. Further, defense counsel did impeach Jackson by calling Theodore Richard, who testified that Jackson admitted to him that he was testifying to avoid prosecution for the murder of Bowen. Petitioner fails to show counsel erred or that he suffered prejudice.

### h. Car Rental Evidence

Jackson testified that Petitioner's role in the gang was to rent cars for the gang. Petitioner contends that the evidence proved no material fact and defense counsel should have objected. However, a fair-minded jurist could have found that Jackson's testimony concerning the car rentals had a tendency to show Jackson knew gang practices, thus tending to show him credible.

### i. Funeral Evidence

A funeral program for Robert Earl Lee, "Itty," included names of gang members and gang references. (RT 8250, 10031.) The prosecutor argued that Petitioner was related to Itty, and asked the jury if it was coincidence that the April 19, 2006, crimes occurred a year to the day after Itty died. (RT 11083-84.) Petitioner claims trial counsel should have objected to the introduction

of the funeral program and to the prosecutor's argument, because the program was irrelevant and Petitioner was not related to Itty. He further argues defense counsel should have introduced a death certificate for Itty showing he died of a gunshot wound to the head.

Defense counsel argued that the prosecutor's arguments were purely speculative, and that the evidence did not show that Itty died as a result of homicide. He further argued that the program refuted the prosecutor's claims that Petitioner was related to Itty because the program did not list Petitioner among Itty's relatives. (RT 11270-71.) However, Petitioner submits no evidence that he is not a step-brother to Itty, and he fails to establish that the program was not gang-related. He speculates that further investigation might have enabled him to further refute the prosecutor's claims, but he never provided the state court with evidence in support. In addition, he does not show how a death certificate revealing that Itty died by a gunshot wound to the head would prove he committed suicide. In sum, Petitioner fails to demonstrate that counsel erred, and that the error was prejudicial. The claim should be denied.

j. Encounter

At trial, the prosecutor used evidence of an encounter between Petitioner's girlfriend, Saleta Roseburr, and Adrian Bonner at a Denny's restaurant to argue motive and connect Petitioner to the attempted murder of Bonner. (RT 8797-98, 8803.) During closing arguments, the prosecution questioned why Petitioner did not call Roseburr as a witness and suggested that the reason Bonner was shot was because of the animosity that existed between them as a result of Bonner previously dating Petitioner's girlfriend. Petitioner faults counsel for failing to object. However, an objection was made as to the encounter evidence. Respondent is correct that a fair-minded jurist could conclude that defense counsel acted reasonably by not repeating the objection. Petitioner also fails to show prejudice. A fair-minded jurist could conclude that the encounter evidence was relevant because of Roseburr's connection to what occurred to Bonner. The claim is without merit.

k. 9-1-1 Call

During trial, the prosecution proffered the 9-1-1 call of Ardala West, in which she identified the car involved at the McGowan shooting as a black Pontiac. The 9-1-1 call was

admitted under the "excited utterance" hearsay exception. The prosecutor conceded West had said the vehicle was a Pontiac, even though Petitioner's vehicle was a black Jetta, but the prosecutor argued the mistake was understandable given the stress of the situation. Petitioner argues that defense counsel should have investigated and discovered that in West's grand jury testimony, she was certain it was a Pontiac.

The claim is without merit since the 9-1-1 recording reveals that West was uncertain of the make of the vehicle. When she was asked what kind of car was involved, she stated, "I couldn't tell." (CT 668.) When pressed again, she stated, "I don't know." (CT 668.) Only thereafter did she apparently guess it was a Pontiac. (CT 668.) In light of the 9-1-1 call, a fair-minded jurist could conclude that West would not have offered any favorable testimony had she been called, and that further investigation would not have benefitted the defense. Moreover, Petitioner fails to support his allegations with any evidence such as affidavits. The claim should be rejected.

l. Threat to Bonner by Petitioner's Brother

Adrian Bonner testified that he was threatened by Petitioner's brother, also known as "Critter," when Critter stopped next to Petitioner in a car and pointed a hand at him in depiction of a firearm. Petitioner contends this was false because Bonner estimated this occurred in November or December, but Bonner entered custody on September 27, 2007, and was not released. (RT 4876, 4882-83.) However, Detective Darbee testified that Bonner reported the threat approximately the second week of September of 2007. (RT 5286.) Petitioner argues counsel should have pursued this inconsistency further in order to impeach Bonner.

The claim is without merit. At sidebar, after Bonner estimated the threat occurred in November or December, defense counsel stated his intention to impeach Bonner with evidence that Critter entered custody on September 27, 2007. The date was ultimately clarified by Detective Darbee. A reasonable jurist could conclude that defense counsel had nothing to gain by pursuing additional questioning and investigation.

m. Evidence concerning Agustin

Petitioner claims counsel rendered ineffective assistance by failing to question Emmanuel

Burts concerning Petitioner's connection to the murders.

The Fifth DCA explained Emmanuel Burts' relationship to the case:

> Emmanuel Burts, Jr., married Agustin in September 2008. At the time he testified, he was in jail as the result of her bringing charges against him. [FN67] When he was arrested, he telephoned and wanted to let the defense attorneys in this case know Agustin had lied on the stand.
>
> > [FN67] Burts was pending charges of spousal abuse and felony threats. He had suffered a number of prior felony and misdemeanor convictions for various offenses.
>
> Before she had testified, Agustin and Burts lived in Fresno. Agustin had transcripts and went over them. She also went on the Internet and looked at maps. She told Burts she was refreshing her memory of the locations to which she went with her ex-boyfriend.
>
> While Agustin was in Bakersfield testifying in this trial, she telephoned Burts every day to let him know when she was back in her room. She told Burts that she was testifying truthfully, but was leaving out parts. She said she was not being truthful about certain things because she did not want her son involved. Johnson sold a gun to Agustin's son, in Agustin's presence, right before they went to Las Vegas. Agustin said it was the gun used in the homicide. In addition, Agustin told Burts that either Lee or Dixon (Burts could not remember which) had nothing to do with the murder.
>
> In the time he had known Agustin, Burts formed the opinion that she was very deceiving and conniving. Burts was aware Agustin received $750 for rent and $450 for her personal things each month as a witness for the prosecution in this case. In Fresno County, however, she applied for food stamps and welfare, and never reported she was receiving that money.

Johnson, 2013 WL 5366390, at *44.

The Fifth DCA noted that Petitioner's "[c]ounsel interviewed but chose not to call Burts to impeach Agustin, believing his testimony would be harmful; counsel for Dixon ultimately called him as a witness." Id. at *163. Petitioner noted that "his attorney asked no questions of Burts, even though Burts testified Agustin said either Lee or Dixon did not do anything." Id. When asked at the Marsden hearing about his decision not to question Burts, Petitioner's counsel stated that "[a]fter Dixon and Burts testified, and Burts corroborated some of Agustin's testimony, [he] felt he had to shift positions to mitigate the damage done by that testimony and the testimony concerning the cell phone towers. Id.

Counsel's decision on how to approach Burts was therefore a strategic decision made with full knowledge of the facts. Petitioner disagrees with counsel's approach, but "strategic choices

1  made after thorough investigation of law and facts relevant to plausible options are virtually

2  unchallengeable." Strickland, 466 U.S. at 690.  Here, it is plausible counsel did not question

3  Burts and examine him further concerning his statement that either Lee or Dixon did not have

4  anything to do with the murder, because doing so could have further corroborated Agustin's

5  testimony, and Burts could have clarified that it was not Petitioner but Dixon who had nothing to

6  do with the murder.  Counsel could have opted to let the statement rest and argue the state of the

7  evidence.  A fair-minded jurist could conclude that counsel's decision was reasonable.

8              n.  Lesser Included Offenses and Closing Argument

9       Petitioner claims counsel erred by requesting instruction on lesser included offenses to

10  attempted murder.  He states there was neither the prosecution nor the defense had suggested he

11  was liable for shooting rather than aiding and abetting a shooter; therefore, by requesting the

12  instruction, defense counsel implied that Petitioner was guilty of direct perpetration.  Respondent

13  correctly argues that requesting instruction on lesser offenses did not necessarily imply direct

14  perpetration.  Under Cal. Penal Code § 31, a principal is defined as "[a]ll person concerning in the

15  commission of the crime . . . whether they directly commit the act constituting the offense, or aid

16  and abet in its commission . . . are principals in any crime so committed."  Thus, although it was

17  not argued that Petitioner was the shooter, he was still found guilty as an aider and abettor.

18  Furthermore, under California law an aider and abettor can be convicted of a crime lesser than the

19  offense for which the actual perpetrator is liable.  People v. Lopez, 198 Cal. App.4th 1106, 1118

20  (2011).  Counsel could have believed that by giving the jury lesser included offense options, it

21  therefore would not necessarily find Petitioner guilty of attempted murder as an aider and abettor,

22  but possibly a lesser offense.  A fair-minded jurist could conclude that counsel's decision was not

23  unreasonable.

24       Petitioner next claims counsel was ineffective in handling his comment about hurting

25  Agustin.  He alleges that counsel failed to investigate witnesses to the comment and argue that the

26  comment never occurred.  Instead, counsel argued that Petitioner's comment showed only

27  frustration from hearing false testimony.  (RT 11267-68.)  Review of the record reveals that

28  defense counsel did challenge the evidence.  As noted by the Fifth DCA, defense counsel

"brought a <u>Pitchess</u> motion with respect to the two deputies involved, and requested personnel records in the form of complaints, investigations, or reports related to falsehoods and truthfulness of the deputies." <u>Johnson</u>, 2013 WL 5366390, * 89. Counsel also objected to admission of the evidence and cross-examined Agustin concerning her relationship with Johnson and whether she ever told Petitioner how Johnson was treating her. <u>Id</u>. Petitioner complains that other witnesses should have been called, however, he fails to state which witnesses should have been called, to what they would have testified, and whether they would have testified if called. The claim is meritless.

Petitioner also claims that defense counsel erred by admitting Petitioner's guilt in closing arguments when he argued that Petitioner may have only responded to cell phone calls at the time of the McNew Court shootings because he was reluctantly responding to calls for help, and at most was guilty as an accessory after the fact. However, there is no Supreme Court authority which forbids defense counsel from conceding evidentiary points or even some degree of criminality. Petitioner's citation to <u>Florida v. Nixon</u>, 543 U.S. 175 (2004) is unavailing. In <u>Nixon</u>, the Supreme Court held that in a capital case, there is no blanket rule demanding a defendant's explicit consent to a concession of defendant's guilt. Rather, the <u>Strickland</u> standard applies, and "if counsel's strategy, given the evidence bearing on the defendant's guilt, satisfies the <u>Strickland</u> standard, that is the end of the matter; no tenable claim of ineffective assistance would remain." <u>Nixon</u>, 543 U.S. at 193. Here, the evidence that Petitioner's cell phone was in the area of the McNew Court shootings was overwhelming. In light of the evidence, a fair-minded jurist could conclude that it was reasonable for counsel to offer a plausible explanation for Petitioner's presence in the area, even if it was conceding some degree of liability.

o. <u>Advice Not to Testify</u>

It is uncontested that defense counsel advised Petitioner not to take the stand; however, it is also apparent that Petitioner understood it was his choice to make. <u>Johnson</u>, 2013 WL 5366390, *162-63. "When a defendant is silent in the face of his attorney's decision not to call him as a witness, he has waived his right to testify." <u>United States v. Edwards</u>, 897 F.2d 445, 447 (9th Cir.), <i>cert. denied</i>, 498 U.S. 1000 (1990). A defendant's waiver of his right to testify

1   precludes his claim of ineffective assistance.  <u>United States v. Nohara</u>, 3 F.3d 1239, 1243-44 (9th

2   Cir. 1993); <u>Stephens v. State of California</u>, 28 F.3d 108, (9th Cir.1994).  In this case, since

3   Petitioner waived his right to testify, his claim of ineffective assistance is foreclosed.

4         In addition, as Respondent correctly points out, counsel's advice not to testify is virtually

5   unchallengeable.  <u>Strickland</u>, 466 U.S. at 690.  Counsel's advice was a tactical decision.  Putting

6   Petitioner on the stand could open him up to cross-examination concerning his criminal past.

7   Inasmuch as his testimony could help his case, it could also be potentially devastating to his case.

8   A fair-minded jurist could easily conclude that counsel's advice was reasonable and appropriate.

9         10.    <u>Ineffective Assistance of Appellate Counsel</u>

10        Petitioner contends that his appellate counsel was ineffective in failing to raise the claims

11  of ineffective assistance of trial counsel he later raised on state habeas.

12              a.  <u>Legal Standard</u>

13        In challenges to the effective assistance of appellate counsel, the same standards apply as

14  with claims of ineffective assistance of trial counsel.  <u>Smith v. Robbins</u>, 528 U.S. 259, 285

15  (2000); <u>Smith v. Murray</u>, 477 U.S. 527 (1986).  In <u>Robbins</u>, the United States Supreme Court

16  indicated that an appellate attorney filing a merits brief need not and should not raise every non-

17  frivolous claim.  <u>Robbins</u>, 528 U.S. at 288.  Rather, an attorney may select from among them in

18  order to maximize the likelihood of success on appeal.  <u>Id</u>.  As a result, there is no requirement

19  that an appellate attorney raise issues that are clearly untenable.  <u>Gustave v. United States</u>, 627

20  F.2d 901, 906 (9th Cir. 1980); <u>see also</u> <u>Gillhan v. Rodriguez</u>, 551 F.2d 1182 (10th Cir. 1977).

21  Here, the Court has already concluded that trial counsel was not ineffective under the Sixth

22  Amendment.  Therefore, it necessarily follows that appellate counsel could not have been

23  ineffective for failing to raise issues related to trial counsel's incompetence.

24        Moreover, in California, issues of ineffective assistance of counsel are preferably brought

25  on habeas review in order to enable trial counsel the opportunity to explain the reasons for his or

26  her conduct.  <u>People v. Mendoza Tello</u>, 15 Cal.4th 264, 266-67 (1997).  Therefore, Petitioner fails

27  to show that the state court rejection of this claim was unreasonable.  The claim should be denied.

28  ///

11.   Cumulative Prejudice

Petitioner claims that the cumulative effect of the errors arose to the level of a constitutional violation. "Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if their cumulative effect prejudiced the defendant." Ceja v. Stewart, 97 F. 3d 1246, 1254 (9th Cir. 1996) (citing Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992)); see also Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir. 2002). However, the Ninth Circuit has also recognized that where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation. See Rup v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996). In this case, no errors occurred, and hence, there can be no cumulative error.

## IV.   RECOMMENDATION

Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus be **DENIED** with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **May 9, 2017**                **/s/ Jennifer L. Thurston**
                                         UNITED STATES MAGISTRATE JUDGE